**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DM CONSTRUTORA DE OBRAS
LIMITADA, VENTURA LOCAÇÃO DE
EQUIPAMENTOS LIMITADA, and
CONSÓRCIO MGT,

            Petitioners,

    v.

TUPI B.V.,

            Respondent.

Civil Action No.: _____

## PETITION TO VACATE ARBITRAL AWARD

Pursuant to the Federal Arbitration Act ("**FAA**"), 9 U.S.C. §§ 1-16, including 9 U.S.C. §§ 10, 12, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, June 10, 1958 (the "**New York Convention**"), as implemented by Chapter 2 of the Federal Arbitration Act ("**FAA**"), 9 U.S.C. §§ 201-208, Petitioners DM Construtora de Obras Limitada ("**DM Construtora**"), Ventura Locação de Equipamentos Limitada ("**Ventura**"), and Consórcio MGT (collectively, "**Petitioners**" or "**CMGT**") petition this Court for an order vacating the Final Arbitration Award dated June 16, 2025 (the "**Award**") and issued by a panel of three arbitrators (the "Tribunal") in favor of Respondent Tupi B.V. ("**Respondent**" or "**Tupi**") in the arbitration proceeding titled *(1) DM Construtora de Obras Limitada, (2) Ventura Locação de Equipamentos Limitada, and (3) Consórcio MGT v. Tupi B.V.* (the "**Arbitration**"). The Arbitration was conducted in English, pursuant to arbitration provisions in two contracts between

the parties, and under the International Chamber of Commerce Arbitration Rules (the "**ICC Rules**"), and was seated in New York, New York, and thus in this District.[1]

## NATURE OF THE ACTION

1.     CMGT commences this proceeding to vacate the Award issued by the Tribunal in the Arbitration because: (i) the Arbitrators exceeded their powers by applying certain contract provisions to amounts paid by Tupi to CMGT on a time and materials basis (meaning a reimbursement of costs only to CMGT), and in many instances to amounts paid directly by Tupi to CMGT's suppliers, when those contract provisions were only meant to be applied when the contract was operating on a "lump sum" basis where CMGT was receiving an agreed lump sum amount from Tupi, allowing it to cover its costs and overheard and to make some profit.  When payment was being provided as lump sum—and when all other conditions for application were met—applying these provisions made sense and complied with the contract.  But the Tribunal's application of these provisions to tens of millions of dollars that either CMGT never received (because they were paid directly to suppliers) or that CMGT received to cover only its minimum costs, resulted in an Award that shockingly requires CMGT to absorb the cost of supplies/materials it purchased for Tupi, the owner of the project, and which the contract required be paid exclusively by Tupi, and to render millions of dollars in services ***for free without any remuneration***.  That result cannot be allowed to stand.

2.     CMGT also seeks vacatur because: (ii) the Award violates public policy by ***awarding a gross windfall*** to Tupi of approximately USD 70 million; (iii) the Award violates public policy by granting Tupi the equivalent of punitive damages; and (iv) the Tribunal engaged

---

[1] Consistent with the local practice in this District, Petitioners will submit additional supporting documents, including a memorandum of law, in support of this Petition in accordance with any briefing schedule set by the Court.

in misconduct and unfair treatment violating CMGT's fundamental right to be heard.  A true and accurate copy of the Award is attached hereto as Exhibit 1.

3.      As a result of the above, the Award should be vacated.

## PARTIES

4.      Petitioner DM Construtora de Obras Limitada is a company incorporated under the laws of Brazil, with its registered office at Rua Wiegando Olsen 2020, Curitiba, State of Paraná, Brazil.

5.      Petitioner Ventura Locação de Equipamentos Limitada is a company incorporated under the laws of Brazil, with its registered office at Rua José Valdemar Baron, Quatro Barras, State of Paraná, Brazil.

6.      Petitioner Consórcio MGT is a consortium formed by DM Construtora de Obras Limitada and Ventura Locação de Equipamentos Limitada, organized and existing under the laws of Brazil, with its principal place of business at Rua Wiegando Olsen 2020, Curitiba, State of Paraná, Brazil.

7.      Respondent Tupi B.V. is a company organized and existing under the laws of the Netherlands, with its principal place of business at Weena 762, 9th floor, Room A, 3014 DA, Rotterdam, The Netherlands.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this proceeding pursuant to Chapter 2 of the FAA.  Specifically, under 9 U.S.C. § 203, this Court has "original jurisdiction" over "[a]n action or proceeding falling under the [New York] Convention" "regardless of the amount in controversy."  The Award arose out of a legal relationship that is commercial in nature.  *See* 9 U.S.C. § 202; *see also F. Hoffmann-La Roche Ltd. v. Qiagen Gaitherburg, Inc.*, 730 F. Supp. 2d

318, 325 (S.D.N.Y. 2010); *Republic of Kazakhstan v. Chapman*, 585 F. Supp. 3d 597, 606 (S.D.N.Y. 2022).  Further, the dispute is not entirely between citizens of the United States, as it is between two foreign corporations.  *F. Hoffmann-La Roche*, 730 F. Supp. 2d at 325; *see also Chapman*, 585 F. Supp. 3d at 606.  The Award therefore falls under the New York Convention. *See* 9 U.S.C. § 202.

9.      This proceeding falls under the New York Convention because it is an "arbitral award arising out of a legal relationship" that is considered as "commercial" and is between parties domiciled in Brazil and the Netherlands, and thus not "entirely between citizens of the United States."  9 U.S.C. § 202.

10.     This Court has personal jurisdiction over Respondent, and venue is proper here, under 9 U.S.C. § 204 because the Award was "made" in New York, New York, where the arbitration hearings are considered to have been held—even though they were held remotely due to the COVID pandemic—and where Respondent consented to arbitrate.  Additionally, the Arbitration was governed by New York law.  Accordingly, Respondent consented to this Court exercising personal jurisdiction over it in a proceeding to vacate the Award.  *See* 9 U.S.C § 204; *Doctor's Assocs. v. Stuart,* 85 F.3d 975, 983 (2d Cir. 1996) ("A party who agrees to arbitrate in a particular jurisdiction consents not only to personal jurisdiction but also to venue of the courts within that jurisdiction."); *Alstom Brasil Energia e Transporte Ltda. v. Mitsui Sumitomo Seguros S.A.*, 2016 WL 3476430, at *5 (S.D.N.Y. June 20, 2016) ("It is well-settled that federal courts applying New York law have personal jurisdiction over parties that agree to arbitrate their disputes in New York.  Such a designation functions as the party's consent to jurisdiction, because to hold otherwise would be to render the arbitration clause a nullity." (cleaned up)); *Vidaplan, S.A., Inc. v. Cipriani Int'l, S.A.*, 2006 WL 8461283, at *5 (S.D.N.Y. Aug. 7, 2006) ("An agreement to

arbitrate in New York creates an inference of consent to the New York court's enforcement of the award. Here, Tupi and CMGT (the "**Parties**") signed an Agreement which provided for arbitration in New York and that New York law would govern. Therefore, the Parties consented to personal jurisdiction in New York." (cleaned up)); *NGC Network Asia, LLC v. PAC. Grp. Int'l, Inc.*, 2010 WL 3701351, at *3 (S.D.N.Y. Sept. 20, 2010) (similar).

11.    Independently, Respondent purposefully availed itself of this forum by arbitrating a dispute seated in New York and thereby submitted itself to this Court's personal jurisdiction.

12.    Venue is proper in this District under 9 U.S.C. § 204, which provides that an action to confirm an arbitration award may be brought in any court where the action could have been brought but for the arbitration agreement, or in the district "which embraces the place designated in the agreement as the place of arbitration if such place is within the United States." Here, the place of arbitration is New York, New York—the designated seat of the arbitration.

## FACTUAL ALLEGATIONS

### A.    The Parties and Their Contractual Relationship

13.    On July 26, 2012, DM Construtora and TKK Engenharia Limitada ("**TKK**") (which was subsequently replaced by Ventura) entered into two contracts—one with Tupi (the "**Tupi Contract**") and the other with Guará B.V. (the "**Guará Contract**", together with the Tupi Contract the "**2012 Contracts**")—for the supply of components, known as modules, used in the construction of offshore oil platforms to extract and process oil found in the Atlantic Ocean Santos Basin off the Brazilian shore. The two contracts provided that CMGT would design, procure, and construct 18 modules (the "**Modules**") to be used in the oil platforms. The aggregate contract price for the 2012 Contracts was USD 361,556,425 ("**2012 Contract Price**"). *See* 2012 Contracts Art. 9.2. True and accurate copies of the Tupi Contract and the Guará Contract are attached hereto as Exhibit 2 and Exhibit 3.

14.     On November 8, 2013, the DM Construtora, TKK and Tupi signed escrow agreements with Banco Citibank S.A. (the "**Escrow Agreements**").  The Escrow Agreements created an escrow account (the "**Escrow Account**") holding amounts linked to the supply of the Modules.  Tupi had exclusive control of the Escrow Account, including the power to approve the release of funds as work on the Modules progressed.

15.     On December 18, 2013, DM Construtora and TKK entered into a contract with Tupi that superseded and consolidated the 2012 Contracts into a single agreement (the "**Contract**").[2] Petrobras S.A.—which holds the largest share in both Tupi and Gaurá B.V.—managed the 2012 Contracts, the Contract, and subsequent amendments on behalf of Tupi.  A true and accurate copy of the Contract is attached hereto as Exhibit 4.

16.     Under Article 9.1 of the Contract, CMGT was to be paid a lump sum of USD 416,684,525 for the completion of the Modules (the "**Contract Price**").  *See* Contract Art. 9.2.  A significant portion of the USD 55,128,00 difference between the Contract Price and the 2012 Contract Price, in the amount of USD 53,200,000.00, was negotiated between CMGT and Tupi to compensate for a difference in the purchase price paid for the gas dehydration units ("**GDUs**"), that were significantly larger and heavier than what CMGT would have expected from the design documents of the project, or Front-End Engineering Design ("**FEED**").  *See* Award ¶¶ 158(c), 163(f); *see also,* Giovano C. Fantin's Witness Statement ("**Fantin Witness Statement**") ¶¶ 96-100.  A true and accurate copy of the Fantin Witness Statement is attached hereto as Exhibit 5.

17.     These GDUs—as with all materials used in the project—had to be procured from providers set forth in a vendors' list stipulated by Tupi.  *See* Award ¶ 163(e).  All of the suppliers

---

[2]  The Contract was amended seven times.

from the vendor list that could provide the GDUs—the most expensive pieces of equipment in the project—were based outside of Brazil. CMGT, with Tupi's knowledge and approval, ultimately purchased what it understood was the most appropriate GDUs from EBSE/Frames, a Dutch company. *See* Tupi's internal technical report (the "**PATEC**") at p. 11. A true and accurate copy of the PATEC is attached hereto as <u>Exhibit 6</u>.

18.  Around USD 31,300,000 out of the USD 53,200,000.00 were assigned back to Tupi by CMGT, per Tupi's instructions, and paid directly by Tupi to EBSE/Frames for the GDUs. *See* Exhibit 5 ¶ 100. The remaining USD 21,900,000 was paid by Tupi from the Escrow Account either directly to suppliers, or to CMGT to reimburse for the cost of suppliers, but was in all circumstances a reimbursement of actual costs only. *See id.* ¶¶ 92, 132-142.

19.  The Contract Price was subject to potential adjustments, including under Article 4.4, Article 10.13, and Article 12. At this point, the Contract was a "lump sum" contract, meaning that it was a fixed-price agreement where CMGT agreed to complete the project for a single, predetermined total cost that allowed it to recover its costs, plus overhead, and to make a profit; it did not have to reveal its actual costs to Tupi when the contract operated in this modality. Rather, CMGT would manage its costs to ensure that it was receiving an adequate return on its investment.

20.  Article 4 of the Contract required that CMGT utilize set percentages of goods, materials, and services of Brazilian origin ("**Local Content Requirements**") in the construction of the Modules. The Contract laid out the mandatory percentages of local content for various categories of work (Art. 4.2), indicated that the calculation of local content would be based on formulas provided by ANP[3] (Art. 4.2.1), and required that CMGT submit measurement reports

---

[3]  ANP is the acronym for the Agência Nacional do Petróleo, Gas Natural e Biocombustíveis (the Brazilian National Agency for Petroleum, Natural Gas and Biofuel), and the is counterparty in the

detailing the percentage of Brazilian local content for each delivery of materials and in each invoice (Art. 4.3). If CMGT failed to satisfy the Local Content Requirements for any of the categories of work, the Contract Price could be subject to a reduction (Art. 4.4). The Contract was clear that Article 4.4 was only meant to apply when the Contract was operating on a lump sum basis, not when Tupi invoked the Contract's provisions (Article 12, see below) that only obligated it to reimburse CMGT on a cost-only, time and material basis. *See* Contract, Article 4.4 ("Contractor's failure to satisfy such Brazilian Local Content Index requirements necessitates an adjustment to the Contract Price") and Article 9.1 (defining Contract Price as "a lump sum fixed price").

21.  Article 4.5 of the Contract, importantly, established a mechanism for opting out of the Local Content Requirements where, as happened with the GDUs, a local contractor was not available to supply a particular material for the project, and CMGT had to obtain the material from a foreign supplier. Article 4.5 reads as follows:

> Brazilian Vendors. Whenever Brazilian vendors are included in any specific item of the Vendor List found in Exhibit V - Appendix 1, and contractor intends to use equipment from a foreign vendor, Contractor shall submit, for Tupi BV approval, a report demonstrating that, after negotiations, Brazilian vendors' proposals are not feasible due to technical or commercial (price or schedule) issues. Tupi BV's approval of the above-mentioned report must be complied with before the signature of the Purchase Order.

22.  In a related provision, Article 10.13.1 provided a formula for adjusting the Contract Price based on the conversion of costs incurred by CMGT for Brazilian local content as determined under Article 4—i.e., costs incurred in Brazilian Reais—into payment by Tupi in U.S. Dollars. This mechanism was intended to address inflation in Brazil and prevent a currency arbitrage windfall where the CMGT was paid the Contract Price as a lump sum payment amount in U.S.

---

underlying concession contracts granting Tupi and Guará B.V. the right to develop the offshore oil platforms. *See* Contract pp. 11-12.

Dollars, but incurred costs in (highly variable) Brazilian Reais. *See* Award ¶ 425. Article 10.13.1 applied exclusively to the "Portion of the Contract Price … corresponding to the Brazilian Local Content … for each item and the level of Lump Sum Price Distribution … in US Dollars," meaning that if CMGT purchased materials or services in currency other than Brazilian Reais, this provision would not apply.

23.     As the Tribunal noted, "Article 10 (particularly Article 10.13.1) addresses the adjustment of the Contract Price based on the conversion into USD of LC BRL amounts certified as set forth in Article 4." Award ¶ 425. Importantly, as with Article 4.4, Article 10.13.1 of the Contract was only meant to apply when the Contract was operating on a lump sum basis, not when Tupi reimbursed CMGT on a cost-only, time and material basis pursuant to Article 12 of the Contract. *See* Contract Art. 10.13.1 (applying to the "Portion of the Contract Price … corresponding to the Brazilian Local Content … for each item and the level of Lump Sum Price Distribution … in US Dollars.").

24.     Article 12 of the Contract allowed Tupi to impose changes to the scope of work ("**Change Orders**") throughout the performance of the Contract. Following a Change Order, CMGT was obliged to provide Tupi "a written statement specifying the consequences of such Change on the Contract Price … setting out in full details an estimate of the resulting cost or savings." Contract Art. 12.1.1. Price adjustments flowing from any Change Order were to be "calculated by [CMGT] based on cost plus fee (overhead, profit, insurance)." *Id.* Art. 12.1.1.1. If the Parties were unsuccessful in negotiating the terms of a Change Order, including adjustments to the Contract Price, then Tupi had the option to unilaterally "elect in writing to have the Change performed ***on a time and materials basis***" with the changes to the "Contract Price to be determined Prior to Final Completion [of the project]." *Id.* Art. 12.5 (emphasis added). Article 12.5.1 provides

that "[i]f a Change is performed on a time and materials basis pursuant to Section 12.5, then the Contract Price shall be adjusted by an amount equal to the increase or decrease in [CMGT]'s cost of performing the Works that were affected by the Change."

25.     If Tupi and CMGT were still unable to reach mutual agreement on a price adjustment "after application of the procedures contained in … Article 12, then the issue [would have to] be resolved under the procedures set forth in Article 24." *Id.* Art. 12.5. Article 24.1 provided procedures for "Amicable Resolution", followed by "Binding Arbitration" under Article 24.3.

26.     Article 24.3 of the Contract, the Tupi Contract, and the Guará Contract defined the scope of the Tribunal's authority in a prospective arbitration, including the limitation that the "*Tribunal shall not have the power to award punitive or exemplary damages*." Contract Art. 24.3(i); Tupi Contract Art. 24.3(i); Guará Contract Art. 24.3(i). This clause prohibits the Tribunal from awarding damages that are not compensatory in nature. All of the contracts also included an express limitation on the time the Tribunal had to issue the Award: "[u]nless the Parties agree otherwise, the arbitration shall be completed within the shorter of (i) the time limit under the ICC Rules, or (ii) two hundred seventy (270) Days after the confirmation or appointment of the third arbitrator under Section 24.3(e)(ii)." *See* Contract Art. 24.3(k); Tupi Contract Art. 24.3(k); Guará Contract Art. 24.3(k). This was an express time limitation that applied to the Tribunal and required it, "unless the Parties agree[d] otherwise," to issue its Award and complete the arbitration proceeding in a period of time no later than the *shorter* of the "time limit [established] under the ICC Rules" or "two hundred seventy (270) days." Contract Art. 24.3(k); Tupi Contract Art. 24.3(k); Guará Contract Art. 24.3(k).

### B.     The Performance Of The Contract

27.    CMGT completed the assembly and construction of all 18 Modules as required by the Contract, but the scope of work and time required to complete that work expanded significantly beyond what was originally contemplated in the Contract due to changes imposed or caused by Tupi. *See, e.g.*, Award ¶¶ 102-119.

28.    Most notable among these was Change Order SMP-285 ("**SMP-285**"),[4] which was requested by Tupi in 2015 and related primarily to additional materials and installation costs CMGT incurred as a consequence of the modified GDUs obtained from EBSE/Frames and the turbo-generators being significantly larger and heavier than what was included in the design documents of the project, or FEED. Award ¶¶ 99, 102. A relevant portion of the materials related to SMP-285 were designed and manufactured outside of Brazil, including, for example, the metal structures that supported the GDUs. Tupi's own internal technical report, the PATEC, recognizes that "the acquisition with Laigang [a Chinese supplier] was in the interest of the parties" and that "the acquisition of structures abroad was exactly in the desired direction" for the project, acknowledging that "CMGT's decision was in the sense of Tupi BV's interests and for the direct benefit of the contract and the project." Exhibit 6 at p. 9.

29.    In relation to the original USD 53,200,000 Contract Price increase to indemnify for the purchase of the GDUs, Tupi additionally recognized in the PATEC that "in the GDU purchase process, item 4.5 of the contract was respected and we see merit in the exclusion of the Frames part (foreign) of the CL calculation basis of module 5 for the purpose of verifying compliance with the contractual obligations." *Id.* at p. 11.

---

[4]  SMP is the acronym for Solicitação de Modificação de Projeto (Communication to Modify the Project). Award ¶ 98.

30.    Despite extended negotiations, Tupi and CMGT were unable to agree to an adjustment of the Contract Price pursuant to Article 12.1.1.1—which would have included overhead, profit, and insurance (OPI) in addition to costs incurred—and Tupi instead applied Article 12.5, electing to have the changes related to SMP-285 completed on a time and material basis with the ultimate price adjustment to be agreed, if possible, prior to the final completion of the project.  Award ¶¶ 103-104.  For the additional work performed as a result of SMP-285, Tupi maintained exacting control over the precise equipment CMGT was directed to purchase as well as the release of funds related to the work.  CMGT would submit its time and material costs for auditing and approval by Accenture, after which Tupi would deposit the corresponding amount into the Escrow Account and then authorize the release of those funds to be paid forward to CMGT's suppliers and contractors.  *Id.* ¶ 264.

31.    CMGT understood that the Contract did not allow Tupi to apply the adjustments related to local content for SMP-285—including both Article 4.4 and Article 10.13.1.  This is because price adjustments under these mechanisms were not appropriate or contractually-allowed where (1) some of the materials were purchased outside of Brazil at Tupi's specific direction thereby negating application of the Local Content Requirements (there can be no requirement for percentages of local content for materials purchased outside of Brazil),[5] and (2) payment was provided as an ongoing reimbursement for the exact cost of time and material (i.e., a reimbursement by Tupi to CMGT of its costs only) and not on a lump sum payment basis, such that Tupi was paying the precise cost of the labor and materials with no mark up by CMGT (other than an agreed, minimal administrative expense).  *See* Award ¶¶ 107, 207, 275, 427; *see also*

---

[5]   The same rationale also applies to the original USD 53,200,000 Contract Price increase to pay for the additional cost of the GDUs, which had to be purchased outside of Brazil.

PATEC at p. 11. This understanding was based not only on the Contract's provisions, but also on agreements registered in minutes of meetings between the Parties[6] and "the fact that measurement reports were issued and approved by Tupi with the use of nil Local Content and corresponding to USD 136 Million." *See id.* ¶¶ 276, 427.

32.     During these meetings, the Parties agreed that "for the purposes of certifying the local content according to clause 4 of the contract, two calculation methods will be used: a) the one currently in force considering the GDU and increasing the sale price based on the contractual amendment (US$ 53.2 million) and b) disregarding the GDU based on the value of the Purchase Order," and Tupi agreed that "the supply of GDU, scope contracted with EBSE and FRAMES, be removed from the calculation basis of the contractual local content requirement of module 5." Arbitration Exhibit C-321.11-CB2 at 1. True and accurate copies of the meeting minutes, Arbitration Exhibits C-321.10-CB2 and C-321.11-CB2, are attached hereto as Exhibit 7 and Exhibit 8.

33.     Following the expiration of the Escrow Account, the parties had still failed to reach a final agreement on the terms of payment for SMP-285, which therefore continued to operate on a time and material basis only, with Tupi paying costs only and CMGT receiving no remuneration for OPI. On July 3, 2018—after serious delays in payment—the parties entered into a payment agreement (the "**Payment Agreement**") which indicated that, while final terms had not yet been reached, CMGT was "entitle[d] to a ***minimum reimbursement of costs*** in the amount of USD 136 million (one hundred and thirty six million dollars) for the time and materials related to SMP 285."

---

[6]  The Tribunal improperly dismissed CMGT's argument because it was "essentially premised on internal minutes of meetings of Petrobras and CMGT that took place without Tupi's participation," notwithstanding the Tribunal's recognition that Petrobras was Tupi's largest shareholder and "managed the 2012 Contracts, the Contract, and their amendments … on behalf of Tupi." Award ¶¶ 84-87, 427.

Payment Agreement Art. F (emphasis added). A true and accurate copy of the Payment Agreement is attached hereto as Exhibit 9.

34.    The Payment Agreement is very important because it is an agreement and admission by Tupi that the USD 136 million reimbursement by it to CMGT for SMP-285 was a "minimum reimbursement" for the costs incurred by CMGT in performing that work, meaning the Tribunal could not render an Award that would in any way reduce that minimum amount CMGT received from Tupi for that work. If it did so, as was ultimately the case, the Tribunal would be ordering CMGT to (i) pay for materials that the Contract required Tupi to cover; and, (ii) render services to Tupi for free while taxing the cost of those services to CMGT.

35.    The parties then entered into further negotiations seeking agreement on a final adjustment to the Contract Price that included not just "minimum reimbursement" for time and material costs, but also OPI. Award ¶¶ 105, 107, 207, 249, 263. These negotiations proved unsuccessful. Following CMGT's invocation of the Amicable Resolution procedures under Article 24.1 of the Contract, and the subsequent failure to reach agreement through those processes, CMGT initiated arbitration seeking resolution of claims related to SMP-285 as well as a series of other, smaller claims. *Id.*

### C.    The Arbitration And Award

36.    The Tupi Contract, the Guará Contract, and the Contract contained arbitration clauses requiring that any dispute arising out of the Contract be settled by arbitration in accordance with the ICC Arbitration Rules with the seat of arbitration in New York, New York. *See* Tupi Contract Art. 24.3(a); Guará Contract Art. 24.3(a); Contract Art. 24.3(a). Each of the contracts provided that any dispute arising out of those agreements was to be governed under New York

state substantive law. *See* Tupi Contract Art. 24.3(j); Guará Contract Art. 24.3(j); Contract Art. 24.3(j).

37.     CMGT initiated an arbitration proceeding against Tupi pursuant to the arbitration clause contained in the Contract on November 7, 2018. A true and accurate copy of the Request for Arbitration is attached hereto as <u>Exhibit 10</u>.

38.     The first two arbitrators, José Ricardo Feris and Elliot E. Polebaum, were confirmed by the ICC Secretary General on January 21, 2019. Award ¶ 7. The Chairman of the Tribunal, Horacio A. Grigera Naón, was appointed by the ICC pursuant to Article 24.3(e)(ii) on March 7, 2019. *Id.* ¶ 11.

39.     The first Procedural Order issued by the Tribunal established that the final award would be issued no later than December 14, 2020, 120 days after the anticipated closing of proceedings and six months following the hearing. The Parties agreed to this procedural timetable. A true and accurate copy of Procedural Order No. 1 is attached hereto as <u>Exhibit 11</u>.

40.     CMGT claimed that it was entitled to additional payments as a result of costs imposed by SMP-285 as well as various other changes and delays caused or required by Tupi, and also sought recovery of amounts that it alleged Tupi wrongfully deducted and withheld related to local content requirements. Award ¶¶ 102-126. In total, CMGT sought damages of USD 163,632,400.09 excluding interest.[7] *Id.* ¶ 101. SMP-285 was by far the largest claim submitted in the Arbitration, accounting for approximately USD 75,000,000 of the total pre-interest damages sought by CMGT. *Id.* ¶¶ 102, 109.

41.     On the other hand, Tupi argued that it had fully compensated CMGT for SMP-285, that CMGT was not entitled to additional payment for the other changes, and that CMGT had

---

[7]  CMGT also sought USD 28,752,000.04 in interest, for a total amount of USD 163,632,400.09.

accepted the risk for other foreseeable variations under the Contract. *Id.* ¶ 141. Tupi also advanced a series of counterclaims, the most significant of which were related to various adjustments of the Contract Price based on Article 4.4 and Article 10.13.1.

42. In Counterclaim 1.1, Tupi sought a USD 6,895,257 reduction in the Contract Price pursuant to Article 4.4 of the Contract for CMGT's alleged failure to meet the required percentages of local content for various categories of work as detailed in Article 4.2 of the Contract. *Id.* ¶ 375. In Counterclaim 1.2, Tupi claimed damages of USD 48,478,574 based on the proper application of Article 10.13 requiring a currency adjustment, which Tupi alleged CMGT failed to do. *Id.* ¶ 376. In pursuing Counterclaim 1.2, Tupi sought application of the Article 10.13.1 currency adjustment to work related to SMP-285—even though CMGT performed this work on a time and material basis and thus charged and was reimbursed on a cost-only basis, not a lump sum basis. Finally, in Counterclaim 1.3, Tupi requested a declaratory judgment that it was entitled to withhold USD 5,548,685 to set off amounts due as a result of Counterclaims 1.1 and 1.2. Award ¶ 377.

43. Accordingly, the principal issues in the Arbitration were CMGT's claims related to SMP-285 and Tupi's counterclaims related to the application of the Local Content Requirement (Article 4) and the Brazilian currency adjustment requirements under Article 10.13.1 (together, the "**Local Content Counterclaims**"). With respect to the SMP-285 claim, CMGT argued that SMP-285 was a change beyond the "normal development" of the project and that it was entitled to OPI in addition to actual costs related to time and material. *Id.* ¶¶ 219-221, 263-265, 270. Tupi contended that payment for SMP-285 was limited to just the actual cost of time and materials, because it was a change under Article 12.5, which called for payment "on a time and material basis" only with the final price to be determined "prior to final completion" and not Article 12.1.1.1 which provided for "cost plus fee (overhead, profit, insurance)." *Id.* ¶ 263. With respect to the

Local Content Counterclaims, CMGT maintained that Articles 4.4 and 10.13.1 did not apply to, and had been waived for, work related to SMP-285 (*id.* ¶¶ 275, 378), which had been completed on a time and material basis, while Tupi insisted that the Articles should apply. *Id.* ¶¶ 411, 427.

44.    Following multiple rounds of written briefing, as well as two separate online hearings—the merits hearing spanning ten days in December 2021 ("Merits Hearing")[8] and a second hearing on April 4, 2023, covering local content issues—the Tribunal finally issued the Award on June 16, 2025.

### a.    Extraordinary Procedural Delays And Irregularities In Issuing The Award

45.    The period between the final written submissions from the parties and issuance of the Award was plagued by procedural oddities and unimaginable delays.

46.    On April 10, 2024—nearly nine months after the Parties' submissions of their Reply Post-Hearing Briefs on August 17, 2023, and *almost two and a half years after the Merits Hearing*—the Tribunal's President, Professor Horacio A. Grigera Naón, wrote to the Parties indicating that he was unable to access "Box," the online repository with the Arbitration documents, and requesting a USB drive with a consolidated set of documents. Professor Naón did not indicate whether he had attempted to access or download the full set of Arbitration documents until that time. A true and accurate copy of that email chain is attached hereto as Exhibit 12.

47.    The original time limit set by the ICC pursuant to the ICC Arbitration Rules for rendering the final award was March 31, 2021, which was based on the time limit set by the Tribunal in Procedural Order No. 1 for issuance of the award with an additional margin for review of the Award by the ICC Court and communication of the final award to the parties. A true and accurate copy of the ICC order fixating the original time limit is attached hereto as Exhibit 13.

---

[8]    The hearing took on 6-10, 13-14, and 21-23 December 2021.

48.    Because the Tribunal did not issue the final award in the outer timeframe it and the ICC initially established, the ICC issued several successive extensions of the time limit for the Tribunal to issue the final award—including to May 31, 2022; January 31, 2023; May 31, 2024; August 30, 2024; October 31, 2024; December 31, 2024; March 31, 2025; April 30, 2025; and June 30, 2025, respectively—ultimately allowing the Tribunal until June 30, 2025, to submit the final award.  Award ¶ 81.  This amounted to ***an extension of more than five and a half years beyond the original deadline, and more than four years beyond the extended deadline set by the ICC***.  True and accurate copies of the ICC orders granting these extensions are attached hereto as Exhibits 14-22.

49.    The delays were so significant that the ICC repeatedly warned the Tribunal in the extension orders that their fees could be reduced as a result.  *See* Exhibit 16-20.  It is CMGT's understanding that these reductions are unusual and reserved for severe delays.  The financial table sent to the parties at the end of the procedure (the "**Financial Table**") shows significant reimbursements of fees advanced by CMGT and Tupi, of over BRL 1,000,000.00.  It is CMGT's understanding that these reimbursements could be related to the Arbitral Tribunal being awarded fees that are "below the amount that would otherwise be fixed," due to the significant delays.  A true and accurate copy of the Financial Table is attached hereto as Exhibit 23.

50.    Against this backdrop of significant delay, the Tribunal finally submitted the first version of the Award to the ICC for approval on January 16, 2025, at which time the ICC notified the parties it would "scrutinise the draft at one of its next sessions."  On February 10, 2025, the Parties received a letter indicating that the initial version of the would be "further scrutinised" by the Court, which suggests that the draft submitted by the Tribunal was not up to the standard imposed by the ICC.  The precise reasons for the ICC's decision to further scrutinize the initial

draft of the Award remain unknown to CMGT.  True and accurate copies of the notifications CMGT received regarding the initial draft Award are attached hereto as Exhibit 24 and Exhibit 25.

51.     The Tribunal submitted a new version of the Award to the ICC on March 24, 2025. The new version of the Award was approved by the ICC on April 22, 2025.  True and accurate copies of the ICC letters informing the parties of the new version of the Award being received and approved are attached hereto as Exhibit 26 and Exhibit 27.

52.     The approved Award was then transmitted to the Parties, on June 16, 2025.  A true and accurate copy of the ICC communication transmitting the final approved Award is attached hereto as Exhibit 28.

### b.  The Flawed Award

53.     In the Award, the Tribunal rejected CMGT's claim for additional payment for SMP-285, declining to allow CMGT to recoup any OPI on work related to SMP-285 and instead limiting it to the "minimum" cost reimbursement amount already received under the Payment Agreement for time and materials.  Award ¶¶ 273, 663.  The effect of this unusual determination is that CMGT completed years of work at cost—***without even covering its own overhead, let alone allowing for any profit***—due to extensive changes unilaterally imposed by Tupi.

54.     Conversely, and shockingly, the Tribunal accepted all of Tupi's Local Content Counterclaims in almost the exact terms in which they were advanced, granting Tupi USD 6,895,257 under Counterclaim 1.1 and USD 48,478,574 under Counterclaim 1.2, plus interest.  *Id.* ¶¶ 475-477, 663.  As a result, the Tribunal also granted Tupi the declaratory relief

sought in Counterclaim 1.3, finding that Tupi was justified in its withholding USD 5,548,685.86.[9]
*Id.* ¶¶ 474, 663.

55.    In awarding these amounts, the Tribunal granted a windfall of tens of millions of dollars to Tupi at CMGT's expense.  This is because the Tribunal applied Articles 10.13.1 and 4 relying on calculations from Tupi's expert, Mr. Gabriel Caldeira, which contained a fundamental flaw: they assumed CMGT had received USD 575,174,591 in total payments (comprising the Contract Price plus the minimum cost reimbursement for SMP-285 work under the Payment Agreement)—and failed to account for reductions resulting from the USD 10,020,953.60 damages awarded Tupi under Counterclaims 2 to 5.  *Id.* ¶¶ 405, 663.

56.    Mr. Caldeira's calculations took into account a total contract price that also included the (i) USD 136 million that the parties agreed in the Payment Agreement would be the minimum amount that Tupi would pay CMGT for a reimbursement of its costs for the SMP 285 work; and, (ii) USD 53.2 million that Tupi paid directly to EBSE/Frames or that was paid to EBSE/Frames from the Escrow Account for the GDUs, as if those amounts had been paid to CMGT on a "lump sum" basis even though they were not.  *See* Award ¶¶ 468-469, 475-476.  The The Award should not have reduced this USD 189 million by a single dollar because these amounts were not subject to either Article 4.4 or Article 10.13.1 reductions—both because the Parties agreed that these sums were pure cost reimbursements and because of the terms of the Contract..

57.    In making their determinations, the Tribunal ignored key provisions in the Contract that specify that the Article 4.4 and 10.13.1 Local Content requirements are not to be applied when Tupi was only reimbursing CMGT on a time and material basis as well as the as well as the

---

[9]  The Tribunal found that this amount would be applied as a "setoff to reduce the amount owed to Tupi in respect of [Counterclaim 1.1]," meaning that CMGT is required to pay an additional USD 1,346,571.14.  Award ¶¶ 474, 477.

Payment Agreement between the Parties.  Accordingly, the Tribunal exceeded its authority by improperly applying Article 4.4 and Article 10.13.1 to reduce (i) the USD 136 million "minimum" costs that Tupi paid to CMGT for the SMP-285 work; and (ii) the USD 53.2 million that Tupi paid to EBSE/Frames for the GDUs.  In so doing, the Tribunal dismissed CMGT's argument that Tupi had waived the Local Content requirements because it was "essentially premised on internal minutes of meetings of Petrobras and CMGT that took place without Tupi's participation," notwithstanding the Tribunal's recognition that Petrobras was Tupi's largest shareholder and "managed the 2012 Contracts, the Contract, and their amendments … on behalf of Tupi."  *Id.* ¶¶ 84-87, 427.  Instead, the Tribunal construed Tupi's conduct as an implied waiver, which it determined was not permitted under either New York law or the terms of the Contract.  *Id.* ¶ 427.

58.    The Tribunal similarly dismissed CMGT's argument that Tupi had waived the Local Content requirements based on the Technical Report for SMP-285 prepared by Tupi (the PATEC)—in which Tupi recognized that local content requirements ***should not apply*** to several items analyzed under the report—finding it was merely a preliminary technical report in the approval process rather than a final decision, and that any understanding by Petrobras compliance department members was irrelevant since they did not participate in negotiating the Contract on behalf of Tupi.  *Id.* ¶ 230; *see also* Exhibit 6 at p. 9-11.  The Tribunal particularly exceeded its authority by improperly applying Article 10.13.1, which was a mechanism limited by its own terms to the "Portion of the Contract Price … corresponding to the Brazilian Local Content … for each item and the level of Lump Sum Price Distribution … in US Dollars."  Contract, Article 10.13.1.

59.    The combined effect of the Tribunal's decisions to limit CMGT's recovery under its SMP-285 claim to a pure cost reimbursement while also granting Tupi's Local Content Counterclaims—***which had the effect of substantially reducing the minimum cost***

***reimbursement for SMP 285 as well as the costs of the GDUs purchased from EBSE/Frames***—

is stark and offends all conceptions of natural justice.  In practical terms, if the Award is allowed

to stand, CMGT not only will receive no OPI for the SMP-285 work but will further be required

to pay Tupi for the materials for the work performed, including a significant portion of the costs

of the GDUs purchased for the project, and to render services for free in connection with the SMP-

285 work.

## GROUNDS FOR VACATING THE AWARD

60.    As will be further explained in Petitioners' forthcoming Memorandum of Law,

Petitioners seek to vacate the Award under four separate grounds because: (i) the Arbitrators

exceeded their powers by improperly applying two contractual provisions (Articles 10.13.1 and 4)

to amounts paid by Tupi to CMGT on a time and materials cost reimbursement only basis even

though the Contract only authorized application of those Local Content provisions to amounts paid

on a lump sum basis to CMGT; (ii) the Award violates public policy by unjustly enriching Tupi;

(iii) the Award violates public policy by granting Tupi what amounts to punitive damages; and (iv)

the Tribunal engaged in misconduct and unfair treatment causing prejudice to CMGT and violating

its fundamental right to be heard.

**A.**    **U.S.C. § 10(a)(4): Arbitrators Exceeded Their Powers By Applying Local**
**Content Adjustments To Amounts Paid For SMP-285 and the GDUs**

61.    Petitioners incorporate all previous paragraphs as if fully set forth herein.

62.    An award may be vacated pursuant to 9 U.S.C. § 10(a)(4) "where the arbitrators

exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award

upon the subject matter submitted was not made."

63.    Arbitrators must "give effect to the contractual rights and expectations of the

parties," *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010), and

22

"[a]ccordingly, an award which 'ignores the essence of the parties' agreement'" can be vacated as exceeding the arbitrators' authority to decide an issue." *NS United Kaiun Kaisha, Ltd. v. Cogent Fibre Inc.*, 2015 WL 4393060, at \*7 (S.D.N.Y. July 14, 2015) (quoting *Ibar Ltd. v. Am. Bureau of Shipping*, 92 F. App'x 820, 821 (2d Cir. 2004) (summary order)); *see also Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 222 (2d Cir. 2002) (holding that vacatur is appropriate where the "award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract"); *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 25 (2d Cir. 1997) (awards will be overturned "where the arbitrator merely makes the right noises—noises of contract interpretation—while ignoring the clear meaning of contract terms" (cleaned up)).

64.     The Tribunal's decision to grant Tupi damages pursuant to Counterclaim 1.2 under Article 10.13.1 on amounts related to SMP-285—which was paid as a minimum reimbursement for the costs of time and materials pursuant to a Change Order under Article 12.5, and not as a lump sum—was in direct contravention of explicit language in Article 10.13.1 limiting the application of that mechanism to the "Portion of the Contract Price … corresponding to the Brazilian Local Content … for each item *and the level of Lump Sum Price Distribution ... in US Dollars*."

65.     The limitation cabining the application of Article 10.13.1 to lump sum payments as opposed to time and material reimbursements is not only explicit in the text of the Contract, but logical when considering how payment for the work related to SMP-285 ultimately occurred. CMGT did not ever receive amounts that were related to reimbursement for SMP-285, but instead submitted its time and material costs for auditing and approval by Accenture (Tupi's auditor for the project), after which Tupi would deposit the corresponding amount into the Escrow Account

***and then authorize the release of those funds to be paid directly to CMGT's suppliers and contractors, not to CMGT***.  *See* Award. ¶ 264.  Article 10.13.1—the purpose of which was preventing a currency arbitrage windfall where CMGT received the Contract Price as a lump sum payment amount in U.S. Dollars but incurred certain costs in Brazilian Reais—was thus completely obviated in the context of time and material reimbursement for the work performed by CMGT under SMP-285.  The contractual limitation of Article 10.13.1's application to lump sum USD payments by Tupi to CMGT reflect this practical reality.

66.    Moreover, Article 10.13.1's currency adjustment mechanism was inapplicable to the foreign-sourced materials related to SMP-285 by its own terms, as it only applies to "the Portion of the Contract Price ... corresponding to the Brazilian Local Content" paid in Brazilian Reais.  Contract Art. 10.13.1.  Since a relevant portion of the materials related to SMP-285 were designed and manufactured outside of Brazil, these materials fell entirely outside the scope of Article 10.13.1's adjustment mechanism.

67.    The Award itself recognizes that "Article 10.13.1 should not be applied to calculate the exchange rate relating to the full extent of price adjustments under Article 12.5, as it refers to 'the amount related to the calculation of Brazilian Local Content,'" Award ¶ 279 (quoting Article 10.13.1), despite it later contradictorily granting Tupi's claim that is premised exactly on applying Article 10.13.1 to the SMP-285 price adjustments under Article 12.5.

68.    It was, similarly, an excess of power for the Tribunal to apply Article 10.13.1 to amounts related to the USD 53.2 million for the purchase of the GDUs because, by its terms, the Article 10.13.1 mechanism applies only to "the amount related to Brazilian Local Content," and the GDUs were purchased from outside of Brazil and with currency other than Brazilian Reais. *See* Exhibit 6 at p. 11; *see also* Exhibit 5 ¶¶ 96-100.

69.    For the same reason, the Tribunal also exceeded its powers in applying Article 4.4. to amounts paid for SMP-285 and the GDU purchases because the Contract indicated Article 4.4 should not apply when Tupi was reimbursing on a cost-only, time and material basis, as opposed to a lump sum contract price basis.  Similarly, the Tribunal exceeded its powers in applying Article 4.4 to materials purchased from non-Brazilian suppliers, as it did with respect to the USD 53.2 million purchased from EBSE/Frames for the GDUs.

70.    Accordingly, the Award should be vacated in its entirety, because the Tribunal went beyond the scope of its authority by ignoring the plain language of the Contract and issuing a remedy based on the application of Articles 10.13.1 and 4.4 to amounts paid (1) on a time and material basis and (2) for the GDUs.  This resulted in the Tribunal ordering CMGT to absorb costs that the Contract exclusively required Tupi to absorb and pay as minimum reimbursement for costs, meaning that the Tribunal's Award had the effect of requiring CMGT to effectively pay for certain of the materials, including a substantial portion of the GDUs, and to render services it provided to Tupi related to SMP-285 free of charge.

**B.    Award Violates Public Policy Against Unjust Enrichment**

71.    Petitioners incorporate all previous paragraphs as if fully set forth herein.

72.    Pursuant to Article V(2)(b) of the New York Convention, an arbitral award may be vacated if "recognition or enforcement of the award would be contrary to the public policy of [the] country [in which that relief is sought]."  *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 405 (2d Cir. 2009); *see also PDV Sweeny, Inc. v. Conocophillips Co.*, 670 F. App'x 23, 24 (2d Cir. 2016).  This standard is met where "the award itself violates a well-defined constitutional, statutory or common law" of New York.  *N.Y.C. Transit Auth. v. Transp. Workers Union of Am.*,

99 N.Y.2d 1, 11 (2002) (cleaned up); *Matter of Jandrew v. Cty. of Cortland*, 84 A.D.3d 1616, 1619 (3d Dep't 2011) (same).

73.    Unjust enrichment is a well-defined legal principal under New York common law rooted in equitable principles that precludes a court or arbitration tribunal from ordering relief that unjustly enriches one party at the expense of another.  *See, e.g.*, *Miller v. Schloss*, 218 N.Y. 400, 407 (1916) (explaining that an unjust enrichment claim "rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another"); *La Rosa v. SPD Swiss Precision Diagnostics GmbH*, 2025 WL 841687, at *4 (2d Cir. Mar. 18, 2025) (describing unjust enrichment as a "New York … common law claim); *People v. Nat'l Rifle Ass'n of Am., Inc.*, 165 N.Y.S.3d 234, 259 (N.Y. Sup. Ct. 2022) (ruling on a "claim for common-law unjust enrichment").

74.    Under New York law, an unjust enrichment claim generally cannot be pursued where a valid and enforceable contract governs the subject matter of the dispute.  *See Tompkins Fin. Corp. v. John M. Floyd & Assocs., Inc.*, 144 A.D.3d 1252, 1256-57 (3d Dep't 2016).  "On the other hand, where there is a bona fide dispute as to the existence of a contract or the application of a contract in the dispute in issue, a plaintiff may proceed upon a theory of quasi contract as well as breach of contract."  *Scarola Ellis LLP v. Padeh*, 116 A.D.3d 609, 609 (1st Dep't 2014).

75.    Here, the Parties never reached a binding agreement on the compensation to be paid by Tupi for work performed by CMGT related to SMP-285, following Tupi's unilateral declaration of a shift to time and materials compensation under Article 12.5 and the parties' subsequent failure to agree upon an adjustment of the Contract Price.  As Tupi has acknowledged, the purpose of Article 12.5 is to ensure that "if the Parties are unable to agree on a Change Order Request, Tupi may pay time and material costs on a provisional basis in order for the work to continue."  Award

¶ 263.  The ultimate amount of compensation for work under Article 12.5 is reserved for further negotiation, but "[i]f the Parties cannot agree on the amount of any adjustment after application of the procedures contained in this Article 12, then the issue shall be resolved under the procedures set forth in Article 24"—i.e., arbitration.  Contract Art. 12.5.

76.    Because the Contract itself indicated that the amount of compensation due for SMP 285 was to be determined in arbitration following the failure of negotiation, and not by the terms of the Contract, there was no enforceable contract with respect to the ultimate price that Tupi would owe CMGT for the work performed pursuant to SMP-285.  Because there is the absence of a valid, enforceable contract, CMGT may base its vacatur petition on the argument that the Tribunal impermissibly awarded Tupi an unjust enrichment for the SMP-285 claim by improperly applying both Articles 4 and 10.13.1 to reduce amounts received by CMGT for SMP-285 work and thereby improperly ordering CMGT to pay for materials and costs that were only to be paid by the owner, Tupi, under Article 12.5 of the Contract.  *See Dart Brokerage Corp. v. Am. Com. Ins. Co.*, 2013 WL 5966901, at *3 (S.D.N.Y. Nov. 7, 2013) (denying motion to dismiss unjust enrichment claim despite existence of contract where plaintiff "alleged that it performed work outside of the scope of the contract for which it is owed compensation").

77.    "Under New York state law, the basic elements of an unjust enrichment claim are: 1) defendant was enriched; 2) such enrichment was at the expense of the plaintiff; and 3) the circumstances were such that in equity and good conscience the defendant should make restitution."  *Nat'l Cas. Co. v. Vigilant Ins. Co.*, 466 F. Supp. 2d 533, 543 (S.D.N.Y. 2006) (cleaned up).  Courts have imposed additional requirements under the third element, including: services must have been performed for the defendant; services must have been performed at defendant's behest; or defendant must have assumed an obligation to pay plaintiff for services it received.  *See*

*Heller v. Kurz*, 228 A.D.2d 263, 264 (1st Dep't 1996); *Prestige Caterers v. Kaufman*, 290 A.D.2d 295, 295 (1st Dep't 2002). All the elements of unjust enrichment are met.

78.     It is indisputable that Tupi was unjustly enriched by the Tribunal's Award that granted Tupi's request to apply Articles 4.4 and 10.13.1 to reduce the amount of compensation that CMGT received for the work under SMP-285, and that this unjustified enrichment of Tupi comes at CMGT's expense. This is particularly true because it is indisputable that CMGT performed the SMP-285 work at cost, meaning that CMGT made no money on this change order and only received a reimbursement of its costs. This notwithstanding, the Tribunal awarded Tupi amounts on Counterclaims 1.1 and 1.2 by exceeding its authority and impermissibly improperly applying both Articles 4.4 and 10.13.1 that had the net effect and result of ordering CMGT to pay for the costs of time and materials that were Tupi's responsibility to reimburse pursuant to Article 12.5 of the Contract. Again, it cannot be credibly disputed that the amounts awarded under these counterclaims unjustly enriched Tupi at the expense of CMGT.

79.     The final element is also satisfied—circumstances are such that, in equity and good conscience, Tupi should make restitution of amounts awarded under Counterclaims 1.1 and 1.2 because: (1) the services at issue were performed for Tupi; (2) Tupi specifically directed CMGT to make the changes in work encompassed under SMP-285; and (3) Tupi assumed the obligation to pay CMGT for SMP-285 a "minimum reimbursement of costs in the amount of USD 136 million." Payment Agreement, Art. F; Award ¶ 107, 207, 364. Consideration of other circumstances—including Tupi's assurances (through Petrobras) that it would waive local content requirements under both Articles 4.4 and 10.13.1 for work related to SMP-285, that CMGT had no option but to purchase the GDUs from outside of Brazil, and that the quantification of Counterclaims 1.1 and 1.2 was calculated based upon a Contract Price greater than what CMGT

actually received—further strongly support that equity and good conscience militate against allowing Tupi to retain amounts awarded to it by the Tribunal at CMGT's expense as a result of Counterclaims 1.1 and 1.2.

80.     Courts have long recognized that, consistent with fundamental principles of equity, it is appropriate to overturn judgments and arbitration awards, like the one at issue here, that would otherwise result in unjust windfalls. *See, e.g.*, *Socony-Vacuum Oil Co. v. Cont'l Cas. Co.*, 219 F.2d 645, 649 (2d Cir. 1955) (overturning original award that dismissed the case because to "hold otherwise ... [would] be presenting the defendant surety company with an unearned windfall"); *S. Orangetown Kitchen Workers Ass'n v. S. Orangetown Cent. Sch. Dist. of Towns of Orangetown & Clarkstown*, 101 Misc. 2d 1016, 601 (N.Y. Sup. Ct. 1979) (vacating arbitration award on public policy grounds where arbitrator's denial of offset resulted in improper windfall by allowing former employees to receive compensation from two sources); *Zarcone v. Perry*, 78 A.D.2d 70, 81 (2d Dep't 1980) (holding that "justice and fairness" prohibit double recovery in New York). Here, the Tribunal's application of local content adjustments to time and materials costs that Tupi was contractually obligated to reimburse created precisely such an impermissible windfall—allowing Tupi to recover tens of millions of dollars from CMGT for the actual costs of materials and services provided by CMGT to Tupi for work performed under SMP-285, amounts that Article 12.5 of the Contract establishes Tupi, not CMGT, had the obligation to pay.

81.     Similarly, the additional USD 53,200,000 paid to CMGT for the GDUs represented a direct reimbursement for costs beyond what was originally anticipated in the 2012 Contract and provided no OPI to CMGT. *See* Award ¶ 163(f). Part of these amounts were even assigned back to Tupi, at Tupi's direction, and paid directly to EBSE/Frames, the GDU suppliers. *See* Exhibit 5 ¶ 100. Because the Tribunal applied Articles 4.4 and 10.13.1 to these amounts, it provided Tupi

an additional impermissible windfall. This is because by applying these articles to these categories and sums, the Tribunal effectively has ordered CMGT to reimburse or pay back a significant portion of the cost-only reimbursement to Tupi, thereby shifting these costs to CMGT, the contractor.

82.     Accordingly, the Award should be vacated in its entirety because the Tribunal violated public policy by improperly applying both Articles 4.4 and 10.13.1 to SMP-285 and thereby unjustly enriched Tupi by reducing its payment to CMGT for work performed under SMP-285 below the minimum reimbursement of costs, as required by Article 12.5 of the Contract, which mandates that CMGT receive at least its costs incurred for time and materials associated with the project.

83.     The same is true for the GDU amount of USD 53.2 million, which represents a pure cost line item in the Contract for materials purchased form a foreign vendor to be borne exclusively by Tupi, to which adjustments under Article 4.4 and Article 10.13.1 are inapplicable.

## C.    Award Violates Public Policy By Granting Tupi Punitive Damages

84.     Petitioners incorporate all previous paragraphs as if fully set forth herein.

85.     Pursuant to Article V(2)(b) of the New York Convention, an arbitral award may be vacated if "recognition or enforcement of the award would be contrary to the public policy of [the] country [in which that relief is sought]." *Telenor Mobile Commc'ns*, 584 F.3d 396 at 411; *see also PDV Sweeny*, 670 F. App'x at 24.

86.     Courts in the Second Circuit have vacated the portions of awards providing punitive damages on this basis. *See, e.g.*, *Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 122 (2d Cir. 1991) (vacating punitive damages in award under NY law because "the propriety of an award of punitive damages for the conduct in question ... [is a] question [ ] of state law."); *Fahnestock &*

*Co. v. Waltman*, 935 F.2d 512, 519 (2d Cir. 1991) (affirming vacatur of punitive damages in award).

87.     Damages in an arbitration award may be punitive, even if not expressly described as such, when they are not compensating for a concrete loss but are instead a penalty intended to deter conduct.  *See Rosbaugh v. Town of Lodi*, 2025 WL 793020, *2-3 (N.Y. Mar. 13, 2025) (overturning arbitration award granting treble damages pursuant to statute because court determined they were the equivalent of punitive damages where they were not meant to compensate the harmed party but instead fit within a "theme of punishment and deterrence");  *see also John T. Brady & Co. v. Form-Eze Sys., Inc.*, 623 F.2d 261, 264 (2d Cir. 1980) (explaining when damages are punitive for the purpose of vacating an arbitration award).

88.     The principles informing when punitive damages should be granted aid in the determination as to whether certain damages are intended to be compensatory or punitive—courts should award punitive damages only if they serve a broader public purpose, not a solely private one.  *See P.W.B. Enters. v. Ark Mgmt. Corp*, 641 N.Y.S.2d 645, 646 (1st Dep't 1996); *Hobish v. AXA Equitable Life Ins. Co.*, 43 N.Y.3d 442, 453 (2025) (punitive damages in contract claims are aimed at going beyond compensatory damages redressing a private wrong and are "recoverable if necessary to vindicate a public right").

89.     Amounts awarded to Tupi as a result of Counterclaim 1.1 under Article 4.4 of the Contract for CMGT's alleged failure to mandatory percentages of local content should be construed as punitive damages because they are not compensatory but were instead aimed at serving a public purpose—stimulating economic development in Brazil by directing spending towards local providers of labor and material.  *See* Award ¶ 380.  This is especially true as it relates

to the amounts paid for SMP-285 and the purchase of the GDUs given that these were pure cost reimbursements that Tupi was obligated to pay.

90.     As the Award itself acknowledges, the regulatory framework from which the local content requirements are derived is explicitly designed to serve the broader public purpose of developing Brazilian industry.  As the Tribunal explained, "[t]he LC system set up by the federal regulatory body responsible for the regulation of the oil sector (the 'ANP'), requires that oil companies source a certain level of goods and services in Brazil, *a requirement aimed at developing the local industry*."  Award ¶ 380 (emphasis added).  Concluding improperly that this public purpose was not satisfied in relation to SMP-285 and the GDUs, the Tribunal's application of Article 4.4 served to penalize CMGT by imposing reductions in the amounts it was paid, causing it to absorb costs that Tupi was required to bear under Article 12.5 of the Contract and otherwise.

91.     There is no way to frame damages under Counterclaim 1.1 as compensatory where Tupi suffered no loss as a result of any purported failures to satisfy local content requirements. There's simply nothing to compensate.  Tupi did not pay any penalties, fees, or otherwise bear any compensable cost or damage because of CMGT's alleged failure to meet the required percentages of local content for various categories of work as detailed in Article 4.2 of the Contract.  CMGT made this point in the arbitration and Tupi did not refute it, thereby conceding it.  *See* CMGT's Statement of Defense ¶¶ 52-58.  A true and accurate copy of CMGT's Statement of Defense is attached hereto as Exhibit 29.

92.     In this context, the amounts CMGT was ordered to pay under Counterclaim 1.1 cannot possibly be aimed at compensation and thus can only have a punitive aim or effect, which is precisely what its effect is for CMGT who is being punished by virtue of the Award's

requirement that it pay for costs and materials that are solely Tupi's obligation to pay under Article 12.5 of the Contract and by requiring CMGT to renders services without any compensation at all.

93.     Accordingly, the portion of the Award granting Tupi punitive damages should be vacated because it violates public policy.

### D.     U.S.C. § 10(a)(3):  Tribunal Engaged In Misconduct And Unfair Treatment Causing Prejudice To CMGT

94.     Petitioners incorporate all previous paragraphs as if fully set forth herein.

95.     An award may be vacated pursuant to 9 U.S.C. § 10(a)(3) "where the arbitrators were guilty of … misbehavior by which the rights of any party have been prejudiced."

96.     The Second Circuit has interpreted this provision to require a violation of "fundamental fairness." *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) ("Courts have interpreted section 10(a)(3) to mean that except where fundamental fairness is violated, arbitration determinations will not be opened up to evidentiary review.").  An arbitrator's misconduct violates "fundamental fairness" when such misconduct "denies a party sufficient opportunity to present proof of a claim or defense and renders the resulting arbitral decision biased, irrational, or arbitrary." *Dolan v. ARC Mech. Corp.*, 2012 WL 4928908, at *3 (S.D.N.Y. Oct. 17, 2012) (citation omitted).

97.     While this provision "applies only in … very rare instances," a court should vacate an award in its entirety "when an arbitrator's procedural aberrations rise to the level of affirmative misconduct." *Supreme Oil Co. v. Abondolo*, 568 F. Supp. 2d 401, 406 (S.D.N.Y. 2008) (cleaned up) (quoting *United Paperworkers Int'l Union v. Misco, Inc*., 484 U.S. 29, 40-41 n.10 (1987)).

98.     Here, a series of gross procedural irregularities—including neglect, disorganization, and extraordinary delay by the Tribunal—amount to precisely the rare

circumstance in which an arbitrator's misconduct warrants vacatur under 9 U.S.C. 10(a)(3). The Tribunal issued the Award ***more than four years after the maximum time limit allowed under by the ICC***, which was itself an extension of time beyond what was initially allowed under the Contract, and almost four years after the Merits Hearing. The record also suggests that the Tribunal did not attempt to access or download the full set of Arbitration documents until April 2024 to work on the Final Award—more than nine months after the submission of the post-hearing briefs and nearly two and a half years after the Merits Hearing.

99. Facing threats of reductions in its fees for the extended, unexcused delays that required repeated extensions from the ICC, the Tribunal then apparently rushed to draft and submit an award to the ICC for approval years removed from the merits hearing. *See* Exhibits 14 and 16. Unsurprisingly, given the highly complex and technical nature of the dispute, this proved challenging. The result was an initial draft award that the ICC itself would not accept. Instead, it was subjected to months of "further scrutin[y]," with the ICC requiring the Tribunal to amend and resubmit a new draft before finally issuing its approval. *See* Exhibit 16.

100. Even after this review, the Award is still plagued by inexplicable shortcomings that reflect a Tribunal issuing an Award that did not understand the Contract or the true nature of the dispute between the Parties and that offends fundamental notions of natural justice—how otherwise can a Tribunal—as this one has done—order a contractor to pay for costs, materials, and services, that have been requested and ordered by the owner of a project and that the Contract specifies must be reimbursed by the owner? Rather than carefully considering the claims and defenses raised by each party, the Tribunal apparently found an easier way to proceed—it effectively adopted Tupi's arguments wholesale, particularly with respect to SMP-285 and the

local content counterclaims without realizing the devastating, unnatural, and prejudicial effects that this has caused.  *See e.g.*, Award ¶¶ 413, 442, 450-451, 470, 475-477.

101.    The outcome of the Tribunal's misconduct is a violation of fundamental fairness in which CMGT was effectively denied the opportunity to be heard, resulting in an Award that was biased, irrational, and arbitrary.  *See Dolan*, 2012 WL 4928908, at \*3.

102.    The arbitrary and irrational nature of the Award is exemplified by the Tribunal's decision to apply Local Content adjustments to amounts that were explicitly designated as "minimum reimbursement of costs" for time and materials under SMP-285 and for the amounts paid by Tupi to EBSE/Frames for the GDUs—a result that, as discussed in detail above, contravenes the plain language of the Contract and basic principles of equity and natural justice. This inexplicable outcome, which effectively requires CMGT to pay Tupi for materials that CMGT purchased and installed on Tupi's behalf and to render its services free of charge, reflects a Tribunal that, after years of delay, fundamentally misunderstood the nature of the dispute and simply adopted Tupi's position without adequate or meaningful consideration.

103.    Such a manifestly arbitrary result, combined with the documented procedural failures, demonstrates that CMGT was denied fundamental fairness in the arbitration process. Such an outcome cannot be allowed to stand.

104.    Accordingly, the Award should be vacated in its entirety.

## PRAYER FOR RELIEF

WHEREFORE Petitioner prays that this Honorable Court enter an Order that:

A.  Vacates the Award;

B.  Declares that the Award is null and void in all respects;

C.  Grants Petitioner its fees and costs associated with this proceeding; and,

D.  Grants such other and further relief as the Court shall deem just and proper.


DATED:    New York, New York              **QUINN EMANUEL URQUHART &**
              September 10, 2024              **SULLIVAN, LLP**


By: */s/ Gregg Badichek*
David Orta (*pro hac vice* forthcoming)
Gregg Badichek
Julia T. Rodrigues (*pro hac vice* forthcoming)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: +1 202 538 8000
Fax: +1 202 538 8100
davidorta@quinnemanuel.com
greggbadichek@quinnemanuel.com
juliarodrigues@quinnemanuel.com

Charles F. Rice
295 Fifth Avenue
New York, NY 10016
Tel: +1 212 849 7000
Fax: +1 212 849 7100
charlesrice@quinnemanuel.com

*Attorneys for Petitioner*