# EXHIBIT 2

**ENGINEERING, PROCUREMENT AND
CONSTRUCTION CONTRACT**

**Dated as of July 26th, 2012**

**By and between**

**TUPI S.V.**

**and**

**CONSORCIO MGT**

**FLOATING PRODUCTION, STORAGE AND OFFLOADING PLATFORMS
PACKAGE II & V**

# TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS AND INTERPRETATION
    1.1     Definitions
    1.2     Section and Exhibit References
    1.3     Interpretation

ARTICLE 2 RELATIONSHIPS AND ACKNOWLEDGEMENTS
    2.1     Subject Matter of this Agreement
    2.2     Status of Contractor

ARTICLE 3 OBLIGATIONS OF CONTRACTOR
    3.1     Scope of Work - General Scope
    3.2     Specific Obligations
    3.3     Contractor's Obligations Regarding the Performance of the Works
    3.4     Spare Parts
    3.5     Standard of Performance
    3.6     Contractor's Tools and Equipment
    3.7     Employment of Personnel
    3.8     Key Personnel
    3.9     Operations Personnel and Assisted Operation
    3.10 Emergencies
    3.11 Approvals, Certificates, Permits and Licenses
    3.12 Books, Records and Audits
    3.13 Tax Accounting
    3.14 Temporary Facilities
    3.15 No Liens
    3.16 Quality Assurance
    3.17 Plan & Reports
    3.18 Payment
    3.19 Progress Meetings
    3.20 Site Security
    3.21 Access to Documents
    3.22 Environmental Compliance
    3.23 Transportation of Materials and Subcontractors
    3.24 Not Applicable
    3.25 Export of FPSO PACKAGES II & V
    3.26 Tupi BV Supply

ARTICLE 4 LOCAL CONTENT REQUIREMENTS
    4.1     Local Content - General
    4.2     Brazilian Local Content
    4.3 Reporting
    4.4     Local Content Price Adjustment
    4.5     Brazilian Vendors

ARTICLE 5 OBLIGATIONS OF TUPI BV
    5.1    Payment
    **5.2 Permits**
    5.3    Temporary Asset Transfers
    5.4     Rio Grande Shipyard

ARTICLE 6 REPRESENTATIONS OF THE PARTIES
    6.1    Corporate Standing
    6.2    No Violation of Law; Litigation
    **6.3 Licenses**
    6.4    No Breach
    6.5    Corporate Action
    6.6    Financial Solvency

ARTICLE 7 TAXES AND DUTIES
    7.1    General Provision
    7.2    Improper Tax Charge
    7.3    Modification of the Tax Burden
    **7.4 Withholding**
    7.5    Provision of Documents
    7.6    Contractor Responsibility for Employees
    **7.7 Indemnification**
    7.8    Minimization of Taxes

ARTICLE 8 MEASUREMENT
    8.1    Calculation of the Works Progress
    8.2    Measurement of the Works

ARTICLE 9 CONTRACT PRICE
    9.1    Contract Price
    9.2    Price
    9.3    Payment Limit

ARTICLE 10 PAYMENTS TO CONTRACTOR
    10.1 Payments - General
    **10.2 Invoicing**
    10.3 Invoicing Documents
    10.4 Representation
    10.5 Review and Approval
    **10.6 Payments**
    10.7 Payments Not Acceptance of Work
    10.8 Payments Withheld and Deducted
    10.9 Interest on Late Payments
    10.10 Payments During Default
    **10.11 Offset**
    10.12 Payment Error

10.13 Adjustments
10.14 Final Completion

ARTICLE 11 COMMENCEMENT OF WORK: PROJECT SCHEDULE
11.1 Commencement of Work
11.2 Limited Notice to Proceed
11.3 Critical Path Schedule and Project Schedule
11.4 Project Schedule

ARTICLE 12 CHANGE ORDERS
12.1 Change
12.2 Imputed Change
12.3 Changes Caused by Tupi BV Delays
12.4 Procedures for Negotiation of Change Orders
12.5 Unsuccessful Negotiation of Change Orders
12.6 Additional FPSO Package II & V
12.7 Tupi BV's Written Consent

ARTICLE 13 TITLE AND RISK OF LOSS
13.1    Title
13.2 Contractor Waiver
13.3 Risk of Loss

ARTICLE 14 INSURANCE
14.1 Provision of Insurance
14.2 Lenders as Additional Insureds
14.3 Subrogation Waivers
14.4 New Technology
14.5 No Cancellation
14.6 Obligations Not Relieved
14.7 Failure to Provide Required Insurance
14.8 Builders' Risks Insurance
14.9 Contractor to be Insured Under Tupi BV Policy

ARTICLE 15 DOCUMENTATION
15.1 Delivery of Record As-Built Drawings
15.2 Purchasing and Subcontractor Supplied Information
15.3 Construction Drawings and Manuals
15.4 Other Information

ARTICLE 16 COMPLETION
16.1 Tupi BV Acceptance of Milestone Completion
16.2 Punch-Lists
16.3 Mechanical Completion
16.4 Substantial Completion
16.5 Handover
16.6 Final Completion

16.7 Long-Term Obligations

ARTICLE 17 INSPECTION AND WARRANTY
17.1 Scope of Warranty
17.2 Tupi BV Right to Inspect
17.3 Warranty of Defects and Services

ARTICLE 18 ASSIGNMENT AND GUARANTEE
18.1 Assignment
18.2 Guarantee
18.3 Contractor not to be Released
18.4 Assignment by Tupi BV
18.5 Right of Termination

ARTICLE 19 SUBCONTRACTING
19.1 Subcontractors
19.2 Subcontractors Qualification
19.3 Additional Proposed Subcontractors
19.4 Subcontracts

ARTICLE 20 GUARANTEE OF TIMELY COMPLETION
20.1 Guarantee of Timely Completion
20.2 Liquidated Damages for Delay
20.3 Liquidated Damages Are Not a Penalty
20.4 Sole Remedy for Delay
20.5 No Challenge
20.6 Performance Security

ARTICLE 21 DEFAULT, TERMINATION AND SUSPENSION
21.1 Default by Contractor
21.2 Termination for Convenience by Tupi BV
21.3 Suspension of Works by Tupi BV
21.4 Suspension or Termination by Contractor
21.5 Exception

ARTICLE 22 INDEMNITIES; LIMITATIONS OF LIABILITY
22.1 Contractor's Indemnification Obligation
22.2 Tupi BV's Indemnification Obligation
22.3 Intellectual Property Indemnification
22.4 Notice
22.5 Survival and Duration
22.6 Tupi BV and Contractor Limitation of Liability
22.7 Risk of Loss
22.8 Consequential Damages

ARTICLE 23 FORCE MAJEURE
23.1 No Liability

23.2 Prevention and Mitigation
23.3 Mutual Consultation
23.4 Definition

ARTICLE 24 DISPUTE RESOLUTION
24.1 Amicable Resolution
24.2 Disputes of Technical Nature
24.3 Binding Arbitration

ARTICLE 25 MISCELLANEOUS PROVISIONS
25.1 Entire Agreement
25.2 Opportunity to Review
25.3 Amendments
25.4 Captions
25.5 Notice
25.6 Severability
25.7 No Waiver
25.8 Governing Law
25.9 Successors and Assigns
25.10 Exhibits
25.11 Limitations on Third Party Beneficiaries; Independent Contractor
25.12 Further Assurances
25.13 Restrictions on Public Announcements
25.14 Confidential Information
25.15 Survival
25.16 Overall Project

ARTICLE 26 ADDITIONAL CONSIDERATIONS
26.1 Duty to Perform
26.2 Right to Negotiate
26.3 Right to Disclosure

ARTICLE 27 FOREIGN TRADE
27.1 Compliance with Brazilian Law
27.2 Contractor Responsibility for Export/Import Costs
27.3 Contractor Responsibility for Custom Duties
27.4 Contractor Customs Compliance Obligations
27.5 Contractor Responsibility for Transportation Costs
27.6 Proper Packaging of Materials
27.7 Contractor to Maintain Control
27.8 Contractor Responsibility for Notifications
27.9 Contractor Submission of Proof of Compliance
27.10 Contractor Issuance of Sales Invoices
27.11 Non-Exclusive Nature of Obligations

ARTICLE 28 NO VIOLATION OF LAW
28.1 No Violation of Applicable Law

28.2 Commercial Acts
28.3 Records and Indemnification
28.4 Representation and Warranty
28.5 Notice of Violation

## LIST OF EXHIBITS

EXHIBIT I          SCOPE OF WORK

EXHIBIT II         GENERAL TECHNICAL DESCRIPTION

EXHIBIT III        DIRECTIVES FOR ENGINEERING

EXHIBIT IV         DIRECTIVES FOR CONSTRUCTION AND ASSEMBLY

EXHIBIT V          DIRECTIVES FOR PROCUREMENT

EXHIBIT VI         DIRECTIVES FOR PLANNING AND CONTROL

EXHIBIT VII        DIRECTIVES FOR QUALITY ASSURANCE SYSTEM

EXHIBIT VIII       DIRECTIVES FOR COMMISSIONING

EXHIBIT IX         DIRECTIVES FOR HEALTH, SAFETY AND ENVIRONMENT

EXHIBIT X          WORK SITE MINIMUM REQUIREMENTS

EXHIBIT XI         FACILITIES FOR TUPI BV'S REPRESENTATIVES

EXHIBIT XII        INTERFACE RESPONSIBILITIES

EXHIBIT XIII       CONTRACTOR CONSENTS AND PERMITS

EXHIBIT XIV        TUPI BV CONSENTS AND PERMITS

EXHIBIT XV         GUIDELINE OF COMMUNICATION AND SOCIAL
                   RESPONSIBILITY

EXHIBIT XVI        DIRECTIVES FOR PACKAGE CERTIFICATION
                   CLASSIFICATION

EXHIBIT XVII       NOT APPLICABLE

EXHIBIT XVIII      PRICE SCHEDULE

EXHIBIT XIX        LUMP SUM PRICE DISTRIBUTION AND MEASUREMENT
                   CRITERIA

EXHIBIT XX         PROJECT SCHEDULE

EXHIBIT XXI        FORM OF CHANGE ORDER

EXHIBIT XXII       NOT APPLICABLE

EXHIBIT XXIII      INSURANCE REQUIREMENTS

EXHIBIT XXIV          PERFORMANCE BANK GUARANTEE

EXHIBIT XXV           FORM OF HANDOVER CERTIFICATE

EXHIBIT XXVI          FORM OF LIEN WAIVERS

EXHIBIT XXVII         FORM OF MECHANICAL COMPLETION CERTIFICATE

EXHIBIT XXVIII        FORM OF SUBSTANTIAL COMPLETION CERTIFICATE

EXHIBIT XXIX          FORM OF FINAL COMPLETION CERTIFICATE

EXHIBIT XXX           NOT APPLICABLE

EXHIBIT XXXI          ADDENDA ISSUED BY TUPI BV / GUARA BV UP TO THE
                      BIDDING DUE DATE

EXHIBIT XXXII         CORRESPONDENCE AND MINUTES OF MEETING AFTER THE
                      BIDDING DUE DATE

EXHIBIT XXXIII        TECHNICAL PROPOSAL

EXHIBIT XXXIV         COMMERCIAL PROPOSAL

EXHIBIT XXXV          REQUEST FOR PROPOSAL # 0030403.11.8

EXHIBIT XXXVI         NOT APPLICABLE

EXHIBIT XXXVII        PACKAGE II & V EPC PRICE

EXHIBIT XXXVIII       TERMS FOR ADDITIONAL FPSO PACKAGE II & V

# ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT
## (FPSO PACKAGES II & V)

THIS ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT (this "Agreement" or "EPC Contract"), is made and becomes effective as of this 26th day of July, 2012, by and between Tupi B.V., a company organized and existing under the laws of The Netherlands, having its main offices in Weenapoint, toren A, Weena 722, 3e. verdieping, 3014 DA, Rotterdam, ("Tupi BV"), herein represented by Mr. Samir Passos Awad, and **CONSORCIO MGT,** formed by and between DM Construtora de Obras Ltda, with registered office at Rua Wiegando Olsen No. 2020 in Curitiba, Parana., enrolled with the CNPJ/MF (National Register of Legal Entities of the Ministry of Finance) under no.76.483.726/0001-94, represented herein in accordance with its By-laws by Mr. Rondson de Sd Freire Ferreira, and TKK Engenharia LTDA, a company with registered office at Avenida Armando Salles de Oliveira No. 356/02 in Cubatao, Sao Paulo, enrolled with the CNPJ/MF (National Register of Legal Entities of the Ministry of Finance) under no.76.521.970/0001-02, represented herein in accordance with its By-laws by Mr. Samuel Fernando Scalise Miranda, a consortium organized and existing under the laws of Brazil, having its principal place of business at Rua Manoel Vieira Garcao, n° 82 — Conj 3 — 1° floor — Centro Itajai, Santa Catarina Zip Code: 88301-425, enrolled with the CNPJ/MF (National Register of Legal Entities of the Ministry of Finance) under no.16.100.727/0001-80, ("Contractor") and, together with Tupi BV, the "Parties," and each a "Party").

## RECITALS

**WHEREAS,** Contractor has participated in a bidding procedure promoted by Tupi BV and Guara BV for the selection of a contractor for the supply of a fully integrated set of Modules, together with all component subsystems, systems, Equipment, goods and materials and all related services, including design, engineering, fabrication, procurement, start-up, testing, and commissioning of the Modules as further described in this Agreement (collectively, the "FPSO PACKAGES II & V"), for eight (8) floating production, storage and offloading platforms, six (6) of which are owned by Tupi BV and two (2) of which are owned by Guara BV;

**WHEREAS,** the Request for Proposal expressly indicated that the winning bidder would be required to sign, at the same time, contracts with each of Tupi BV and Guara BV with regard to the eight (8) floating production, storage and offloading platforms;

**WHEREAS,** pursuant to the Request for Proposal, Guara BV and Tupi BV have decided to enter into separate engineering, procurement and construction contracts with the winning bidder for the initial supply of six (6) FPSO PACKAGES II & V, with an option for the supply of two (2) additional FPSO PACKAGES II & V;

**WHEREAS, Tupi** BV desires to enter into this Agreement with Contractor with regard to the supply of five (5) FPSO PACKAGES II & V , all as further described herein;

WHEREAS, contemporaneously with the execution of this Agreement, Guara BV and Contractor will be entering into the Guara BV PACKAGE II & V EPC Contract with respect to the remaining one (1) FPSO PACKAGES II & V;

WHEREAS, Tupi BV desires to have the right to, and Contractor agrees to grant an option to Tupi BV for Tupi BV to instruct Contractor to, supply one (1) additional FPSO PACKAGE II & V under the same terms and conditions set forth in this Agreement and according to the pricing set forth in Contractor's Commercial Proposal;

WHEREAS, the Parties acknowledge that if Tupi BV does not exercise its option, then Contractor is entitled to reimbursement of certain fixed costs incurred by Contractor as agreed by the Parties;

WHEREAS, Tupi BV desires to have the right to, and Contractor agrees to grant an option to Tupi BV for Tupi BV to instruct Contractor to supply of another FSPO PACKAGE II & V under the same terms and conditions set forth in this Agreement and for the price set forth in Contractor's Commercial Proposal;

WHEREAS, the Parties acknowledge that if Tupi BV does not exercise its option, then Contractor is entitled to reimbursement of certain fixed costs incurred by Contractor as agreed by the Parties;

WHEREAS, Tupi BY desires that Contractor provide the supply FPSO PACKAGES II & V in compliance with all Brazilian Local Content requirements for the Contract Price, with portions of the Contract Price being determined on a lump sum price basis and portions on a unit price basis, as more fully set forth in this Agreement; and

WHEREAS, Contractor has expertise and experience in carrying out the Works as defined herein and in performing fully its other obligations under this Agreement, all in accordance with the schedule set forth in this Agreement and in a suitable and efficient manner.

**NOW THEREFORE,** in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS AND INTERPRETATION

1.1 <u>Definitions.</u> In addition to other defined terms used throughout this Agreement, the following terms shall have the meanings set forth below in this <u>Article 1.</u>

"<u>A&C System</u>" shall mean Automation and Control System.

"Additional FPSO PACKAGE II & V" shall have the meaning set forth in Section 12.6(a).

"Additional FPSO PACKAGE II & V Price" shall have the meaning set forth in Section 12.6(a).

"Affiliate" shall mean (i) any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a Party; or (ii) any Person that, directly or indirectly, is the beneficial owner of fifty percent (50%) or more of any class of equity securities of, or other ownership interests in, a Party or of which a Party is directly or indirectly the owner of fifty percent (50%) or more of any class of equity securities or other ownership interests; or (iii) Tupi BV Shareholders.

"Agreement" or "EPC Contract" shall mean this Engineering, Procurement and Construction Contract, including all Exhibits attached hereto, and including all Bid Documents, and all of their respective amendments from time to time by the Parties.

"ANP" shall mean the Brazilian National Agency for Petroleum, Natural Gas and Biofuels *(Agencia Nacional do Petroleo, Gas Natural e Biocombusti'veis)*.

"ANVISA" shall have the meaning set forth in Section 3.3.10.1.

"Applicable Codes and Standards" shall mean the codes, standards or requirements, effective on the Proposal Submission Date, set forth herein or in any Applicable Law, as amended from time to time, which include, but are not limited to, those listed in the Exhibits hereto and which, together with the other requirements established in this Agreement, govern, apply to or have jurisdiction over Contractor's performance of the Works. In the event of an inconsistency or conflict between any of the Applicable Codes and Standards, the highest performance standard shall govern Contractor's performance under this Agreement.

"Applicable Law" shall mean any treaty, law, statute, code, ordinance, decree, injunction, judgment, order, license, permit, Consent, Environmental Law, Applicable Code and Standard, rule or regulation (including those relating to taxes), policies having the force of law, or collective labor agreement, in each case promulgated, entered into, or endorsed by any Governmental Authority having jurisdiction over the matter in question, of any Governmental Authority, including any requirements and rules of a relevant flag authority (such as the Marshall Islands Flag Authority) and the permits, approvals and licenses described in Sections 3.2(j) and 5.2 herein, any or all of which relate to the performance of the Works or the interpretation or application of this Agreement, in each case as amended, modified or supplemented from time to time. The conduct adjustment commitment *(Termo de Ajustamento de Conduta,* "TAC"), as issued, amended, modified or supplemented from time to time, shall also be considered Applicable Law. For the avoidance of doubt, Applicable Law shall include the requirements of Brazilian Local Content and any other matter that falls under the jurisdiction of Brazilian laws.

"ART" shall have the meaning set forth in Section 3.7.7.

"Bid Documents" shall mean those documents set forth in the schedules attached hereto as Exhibits XXXI through XXXV together with the Circular Letters.

"BM-S-11 Concessionaires" shall mean Petroleo Brasileiro S.A. — Petrobras, BG E&P Brasil Ltda. and Petrogal Brasil Ltda. and their successors and permitted assigns, who have totally or partially succeeded as concessionaire or concessionaires to the rights and obligations set forth under the Contrato de Concessao para Exploracao, Desenvolvimento e Producao de Petroleo e Gas Natural no. 48610.003886/2000, concluded between ANP, Petroleo Brasileiro S.A. — PETROBRAS, BG E&P Brasil Ltda. and Petrogal Brasil Ltda. on September 15, 2000.

"Brazilian Local Content" shall have the meaning set forth in Section 4.2.1.

"Brazilian Local Content Index" shall have the meaning set forth in Section 4.42.

"Business Day" shall mean any day other than a Saturday, Sunday or a day that is an official holiday in Rotterdam, The Netherlands, Rio de Janeiro, Brazil or New York City, United States of America.

"CEI" shall have the meaning set forth in Section 3.7.5.2.

"Centre" shall have the meaning set forth in Section 24.2(b).

"Certification Agency" shall have the meaning set forth in Section 4.2.1.

"Change" shall have the meaning set forth in Section 12.1.

"Change Order" shall mean a written order issued and signed in accordance with Article 12 hereof and in the form set forth in Exhibit XXI that authorizes an addition to, deletion from, or revision of, the Scope of Work or any other change expressly permitted by this Agreement.

"Classification Society" shall mean the Classification Society indicated in Exhibit I.

"CND" shall have the meaning set forth in Section 3.7.5.8.

"CNEN" shall have the meaning set forth in Section 3.7.8.

"CONFEA" shall have the meaning set forth in Section 3.7.7.

"Confidential Information" shall mean any proprietary information, technical data, trade secrets or know-how, including without limitation research, product ideas, product plans, products, services, customers, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, hardware configuration information, marketing, finances or other business information disclosed by Tupi BV, its Affiliates and/or any other member of Tupi BV Group either directly or indirectly either orally, in writing or by drawings or inspection of parts or equipment, including (i) economic

projections and/or financial modeling prepared by Contractor and/or its Affiliates on the basis of the foregoing, and (ii) the project plan. Confidential Information does not include information which (x) is already known to the non-disclosing Party at the time of disclosure by the disclosing Party as evidenced by written records of the non-disclosing Party, (y) has become publicly known and made generally available through no wrongful act or inaction of the non-disclosing Party, or (z) has been rightfully received by the non-disclosing Party from a third party who is authorized to make such disclosure.

"Consent" shall mean any approval, consent, authorization, permit, license, certificate or other requirement that is required from any Governmental Authority or from any other applicable third party under Applicable Law with respect to the prosecution of the Works or of the activities related thereto.

"Contract Price" shall have the meaning set forth in Section 9.1.

"Contractor" shall have the meaning set forth in the preamble hereto, its successors and permitted assigns.

"Contractor Group" shall mean Contractor, its Affiliates, officers, directors, employees and agents (including Subcontractors).

"Contractor Project Manager" shall mean that person designated by Contractor and approved by Tupi BV pursuant to Section 3.3.5 who shall have complete authority to act on behalf of Contractor on all matters pertaining to this Agreement or to the performance of the Works, including giving instructions and making changes previously approved by Tupi BV in the Works.

"Court" shall have the meaning set forth in Section 24.3(d).

"CREA" shall have the meaning set forth in Section 3.7.7.

"Critical Path Schedule" shall have the meaning set forth in Section 11.3(a).

"Day" or "ay" shall mean a calendar day.

"Decision" shall have the meaning set forth in Section 242(c).

"Default" shall have the meaning set forth in Section 21.1(a).

"Defect" or "Defective" shall mean any design, plan, specification, engineering, Equipment, material, tool, supply, test, procedure, component, part or assembly which does not materially conform to the Scope of Work, Applicable Law or Good Industry Practices, including any improper or inferior workmanship that is inconsistent with the Scope of Work, Applicable Law or Good Industry Practices, and "Defective" shall have a correlative meaning.

"Defective Works" shall mean any Works that are Defective as determined pursuant to the terms of this Agreement.

"Demonstration Tests" shall have the meaning set forth in Exhibit VIII.

"Dispute" shall have the meaning set forth in Section 24.1(a).

"Dispute Notice" shall have the meaning set forth in Section 24.1(a).

"Dissatisfaction Notice" shall have the meaning set forth in Section 24.2(d).

"Environmental Law" shall mean any Applicable Law relating in any way to the environment, preservation or reclamation of natural resources, to the management, Release or the threatened Release of any Hazardous Materials, or to the health and safety matters attending to the personnel working at the Site, to the extent applicable to the Works and/or the Site, as amended from time to time.

"Equipment" shall mean all equipment, materials and supplies required for the full and timely completion of the Works, all of which are to be provided by Contractor except as set forth in Exhibit I.

"Expert" shall have the meaning set forth in Section 24.2(b).

"FGTS" shall have the meaning set forth in Section 3.7.5.1.

"Final Completion" shall mean, for each of the FPSO PACKAGES II or FPSO PACKAGES V individually or collectively as the context indicates, the full and complete performance of all Works in accordance with the terms of this Agreement for such FPSO PACKAGE II or such FPSO PACKAGE V, including: (i) the successful achievement of Mechanical Completion for all FPSO PACKAGE II Module subsystems or for all FPSO PACKAGE V Module subsystems, Substantial Completion of all FPSO PACKAGE II Modules or all FPSO PACKAGE V Modules and Handover of all FPSO PACKAGE II or all FPSO PACKAGE V Modules; (ii) the completion of all Punch-List items; (iii) receipt by Tupi BV of a final Lien waiver in accordance with Exhibit XXVI, in relation to such FPSO PACKAGE II or such FPSO PACKAGE V; (iv) the transfer from Contractor to Tupi BV of all final documentation, records, Record As-Built Drawings and test reports for such FPSO PACKAGE II or such FPSO PACKAGE V as required by this Agreement; (vi) the removal of all of Contractor's and each Subcontractor's personnel, supplies, waste, materials, rubbish, and temporary facilities from such FPSO PACKAGE II or such FPSO PACKAGE V and from the Site; (vii) the receipt by Tupi BV of any and all classification certificates from the relevant Classification Society; (viii) execution of all training programs; and (ix) full provision of all technical assistance to be provided under this Agreement.

"Final Completion Acceptance Notice" shall mean, for each FPSO PACKAGE II or each FPSO PACKAGE V, the notice given by Tupi BV through which it accepts the Final Completion of each FPSO PACKAGE II or each FPSO PACKAGE V in the form specified in Section 16.6.

"Final Completion Certificate" shall mean the document issued by Contractor and accepted by Tupi BV pursuant to the Final Completion conditions agreed between Tupi BV and Contractor pursuant to Section 16.6.

"Final Completion Date" shall have the meaning set forth in Section 11.3(c).

"Fixed Costs" shall have the meaning set forth in Section 12.6(b).

"Force Majeure" shall have the meaning specified in Section 23.4.

"FPSO PACKAGES II" shall mean, individually or collectively as the context indicates, the Package II described in Exhibit I and the Bid Documents for each of the FPSOs, and all Equipment and goods integrated into Package II, both during the construction phase and after each Package II has been built.

"FPSO PACKAGES V" shall mean, individually or collectively as the context indicates, the Package V described in Exhibit I and the Bid Documents for each of the FPSOs, and all Equipment and goods integrated into Package V, both during the construction phase and after each Package V has been built.

"FPSO PACKAGES II & V" shall mean, individually or collectively as the context indicates, the FPSO PACKAGE II and the FPSO PACKAGE V for each of the FPSOs.

"FPSO PACKAGE II Module" shall mean each Module that comprises each FPSO PACKAGE II, as described in Exhibit I.

"FPSO PACKAGE V Module" shall mean each Module that comprises each FPSO PACKAGE V, as described in Exhibit I.

"FPSO PACKAGE II & V Module" shall mean, individually or collectively as the context indicates, each Module that comprises each FPSO PACKAGE II and each FPSO PACKAGE V.

"FPSOs" shall mean individually or collectively, as the context indicates, the floating production, storage and offloading platform identified in the Bid Documents as FPSO #2 (FPSO P-67), FPSO #3 (FPSO P-68), FPSO #4 (FPSO P-69), FPSO #5 (FPSO P-70), FPSO #6 (FPSO P-71), and, if the option set forth in Section 12.6(a) is exercised, the floating production, storage and offloading platform identified in the Bid Documents as FPSO #7 (FPSO P-72).

"GFIP" shall have the meaning set forth in Section 3.7.5.1.

"Good Industry Practices" shall mean the more stringent of either (i) any applicable requirements of any Governmental Authority; or (ii) internationally accepted professional

practices, methods, techniques and standards observed by the petroleum construction and production industries in the world, particularly those carried out in the Gulf of Mexico, United States, United Kingdom or in the offshore waters of Brazil, and with respect to the design, construction, commissioning, testing, operation of, and integration into, floating production, storage and offloading units, of subsystems, systems and modules similar in type, size, and scale to the proposed FPSO PACKAGES II & V, as in effect from time to time.

"Governmental Authority" shall mean any national, regional or other government of any country, state, province, county, municipality, or other political subdivision thereof; any government body, agency, authority, division, department, board or commission, or any instrumentality, officer or official of any of the foregoing, including any court, tribunal or committee, in each case having administrative or regulatory power over a Party, the FPSOs, an FPSO PACKAGE II & V, any FPSO PACKAGE II & V Module, the Site or any portion of the Works.

"GPS" shall have the meaning set forth in Section 3.7.5.2.

"Guara BV" shall mean Guard B.V., a company organized and existing under the laws of The Netherlands, having its main offices in Weenapoint, toren A, Weena 722, 3e. verdieping, 3014 DA, Rotterdam.

"Guara BV PACKAGE II & V EPC Contract" shall mean the Engineering Procurement and Construction contract, including all Exhibits attached thereto, and including all Bid Documents, and all of their respective amendments from time to time, executed by Contractor and Guara BV for the engineering, procurement, construction, commissioning, start-up and testing of one (1) FPSO PACKAGES II & V.

"Handover" shall mean, individually or collectively for each of the FPSO PACKAGES II and each FPSO PACKAGES V as the context indicates, the handover of each FPSO PACKAGES II Module and each FPSO PACKAGE V Module from Contractor to Tupi BV as set forth in Section 16.5.

"Handover Certificate" shall mean the document issued by Contractor and accepted by Tupi BV pursuant to the Handover conditions agreed between Tupi BV and Contractor pursuant to Section 16.5.

"Handover Date" shall mean the date on which the last Handover occurs, which shall be on or before the date indicated in Section 11.4.5 for each FPSO PACKAGES II and for each FPSO PACKAGE V.

"Hazardous Materials" shall mean any hazardous, toxic, or polluting substance, material, waste or contaminant as defined or regulated pursuant to Environmental Law or Applicable Law, including but not limited to asbestos or asbestos containing material, and polychlorinated biphenyls.

"ICC" shall have the meaning set forth in Section 24.1(b).

"ICC Rules" shall have the meaning set forth in Section 24.3(a).

"Initial Performance of the Works" shall mean all preliminary work performed by Contractor necessary for the execution of the Works.

"INSS" shall have the meaning set forth in Section 3.7.5.1.

"Integration" shall mean the activities undertaken by the contractor selected by Tupi BV to integrate the FPSO PACKAGES II & V with the FPSO hulls.

"Invoice" shall mean Contractor's request for a payment in accordance with Section 10.2.

"Lender" shall mean any entity or entities providing temporary or permanent financing for the FPSO PACKAGES II & V.

"Lien" shall mean an encumbrance of any kind, including any mortgage, lien, pledge, security interest, deed of trust, claim or any charge of any type on property for payment of some debt, obligation or duty.

"Limited Notice to Proceed" shall have the meaning set forth in Section 11.1.

"Liquidated Damages for Delay" shall have the meaning set forth in Section 20.2.

"Local Content Certification" shall have the meaning set forth in Section 4.2.1.

"Local Content Price Adjustment" shall have the meaning set forth in Section 4.4.

"LTCAT" shall have the meaning set forth in Section 3.7.5.5.

"Lump Sum Price" shall have the meaning set forth in Schedule A of Exhibit XIX.

"Major Subcontract" shall mean any agreement between Contractor and a Subcontractor as defined herein having an aggregate value in excess of thirty million United States Dollars (US$30,000,000.00) for performance of any part of the Works under this Agreement.

"Major Subcontractor" shall mean any approved Subcontractor with whom Contractor enters, or intends to enter, into a Major Subcontract.

"Measurement Report" or "MR" shall have the meaning set forth in Section 8.2.

"Mechanical Completion" shall mean, for each subsystem of an FPSO PACKAGE II Module and for each subsystem of an FPSO PACKAGE V Module individually or collectively, as the context indicates, the completion of the procurement, fabrication, installation, and pre-commissioning of such subsystem, except for those items that do not affect the operation, safety, and mechanical and electrical integrity of the Module, FPSO

PACKAGE II or the FPSO PACKAGE V, including all operating, protection, fire, safety, and other related systems required prior to start-up. Prior to Mechanical Completion of a subsystem of an FPSO PACKAGE II Module or of a subsystem of an FPSO PACKAGE V Module, the subsystem shall undergo all pre-commissioning checks and tests required to ensure that such subsystem was correctly installed and is capable of being operated safely and reliably within the specifications contained in this Agreement and in  Exhibit VIII and according to Good Industry Practices and without damage to the FPSO PACKAGE II Module or to the FPSO PACKAGE V Module or any other property and without injury to any person, and documentation shall be provided to Tupi BV which establishes and verifies that all such pre-commissioning activities have been performed.

"Mechanical Completion Certificate" means the document issued by Contractor and accepted by Tupi BV when the applicable Mechanical Completion is agreed between Contractor and Tupi BV pursuant to Section 16.3.

"Milestone" shall mean, as the context indicates, each Mechanical Completion, each Substantial Completion, each Handover, and each Final Completion.

"Milestone Completion Certificate" shall mean, as the context indicates, each Mechanical Completion Certificate, Substantial Completion Certificate, Handover Certificate, and Final Completion Certificate.

"Milestone Completion Certificate Acceptance Notice" shall have the meaning set forth in Section 16.1.

"Milestone Completion Date" means the date on which each Milestone shall be completed, as indicated in the Project Schedule and the Critical Path Schedule.

"Module" shall mean a specific module of an FPSO PACKAGE II or of an FPSO PACKAGE V, as more fully described in the Bid Documents and Exhibit I.

"Monthly Progress Reports" or  "MPR" shall have the meaning set forth in  Section 3.17(d).

"New Owner" shall have the meaning set forth in Section 18.4.

"Notice to Proceed" shall have the meaning set forth in Section 11.1.

"Operational Tests" shall have the meaning set forth in Exhibit VIII.

"Option Notice" shall have the meaning set forth in Section 12.6(a).

"Party" or "Parties" shall mean Tupi BV and/or Contractor and their successors and permitted assigns.

"PCMAT" shall have the meaning set forth in Section 3.7.5.5.

"PCMSO" shall have the meaning set forth in Section 3.7.5.6.

"Performance Security" shall mean the performance security furnished by Contractor in benefit of both Tupi BV and Guara BV in accordance with the Instructions to Bidders released by Tupi BV and Guara BV, in connection with Request for Proposal Tupi BV and Guara BV # 0030403.11.8, and any and all performance securities issued subsequently by Contractor to supplement or replace such original performance security. The Performance Security shall guarantee the performance by Contractor under this Agreement and under the Guara BV PACKAGE II & V EPC Contract, and Tupi BV or Guara BV shall act as the authorized representative of Contractor before the issuer bank for the purpose of drawing upon such Performance Security.

"Performance Tests" shall mean those tests performed to ensure that an FPSO meets the performance and operational criteria set forth in this Agreement, including those set forth in Exhibit I and in Exhibit VIII.

"Person" shall mean any natural or legal person or entity.

"Petrobras" shall mean PETROLEO BRASILEIRO S.A., a company organized and existing under the laws of Brazil, having its main offices in Avenida Republica do Chile 65, Rio de Janeiro, RJ, Brazil.

"PNBV" shall mean PETROBRAS NETHERLANDS B.V., a company organized and existing under the laws of The Netherlands, having its main offices in Weenapoint, toren A, Weena 722, 3e. verdieping, 3014 DA, Rotterdam.

"PPRA" shall have the meaning set forth in Section 3.7.5.5.

"Progredir Program" shall mean a program for credit/loan concessions to suppliers of raw materials, goods and/or services to the FPSOs that integrate the production chain, by participating financial institutions.

"Project Schedule" shall have the meaning set forth in Section 11.3(b).

"Proposal Submission Date" shall have the meaning set forth in Section 3.1.1.1 of the Instructions to Bidders and referenced in Exhibit XXXV.

"Punch-List" shall mean, for each Milestone, a list of items required to complete the Works applicable to such Milestone, all registered on SISPEN, as more fully described in Section 16.2 of this Agreement.

"RC" shall have the meaning set forth in Section 3.25.

"RDO" shall have the meaning set forth in Section 3.3.8.

"RE" shall have the meaning set forth in Section 3.25.

"Record As-Built Drawings" shall mean, with respect to each FPSO PACKAGE II or to each FPSO PACKAGE V, record drawings (but not field mark-ups) of such FPSO PACKAGE II or of such FPSO PACKAGE V showing current and accurate "as-built" conditions.

"Release" shall mean any release, spill, emission, leaking, pumping, injection, pouring, emptying, deposit, disposal, discharge, dispersal, dumping, escaping, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"Request" shall have the meaning set forth in Section 24.3(d).

"Request for Proposal" shall mean the request for proposal #0030403.11.8, issued by Tupi BV and Guara BV, including its instructions to bidders, in respect of the FPSO PACKAGE II & Vs.

"RFB" shall have the meaning set forth in Section 27.1.1.

"Scope of Work" shall mean the description of the Works to be performed by Contractor as set forth herein and as detailed in Exhibit I, which may include designs and specifications, and which may be adjusted pursuant to this Agreement.

"SISBACEN" shall have the meaning set forth in Section 10.13.1.

"SISCOMEX" shall mean the Brazilian electronic foreign trade information system (Sistema Integrado de Comercio Exterior), jointly operated by the Brazilian Central Bank, the Brazilian Federal Tax Revenue Agency and the Brazilian Foreign Trade Agency.

"SISPEN" shall mean the software provided by Tupi BV to be the official record of outstanding items of this Agreement.

"Site" shall mean any and all Sites where the Works are performed on or for the FPSO PACKAGES II & V.

"Statement of Price Formation" shall have the meaning set forth in Section 12.1.1.1.

"Subcontract" shall mean any agreement by Contractor with a Subcontractor for the performance of any portion of the Works.

"Subcontractor" shall mean any Person with whom Contractor has entered into any Subcontract, purchase order or other agreement for such Person to perform any part of the Works, or to provide any materials, equipment or supplies, including any Person at any tier with whom any Subcontractor has further subcontracted any part of the Works.

"Substantial Completion" shall mean that the following have occurred for an FPSO PACKAGE II Module or for an FPSO PACKAGE V Module: (i) Mechanical Completion of all FPSO PACKAGE II Module subsystems or of all FPSO PACKAGE V Module

subsystems has been achieved; (ii) the portion of the Works related to the FPSO PACKAGE II Module or to the FPSO PACKAGE V Module has been completed (including manuals and the delivery of all documentation required for operation) except for Works on the Substantial Completion Punch-List; (iii) Contractor has delivered to Tupi BV the Substantial Completion Certificate for the FPSO PACKAGE II Module or for the FPSO PACKAGE V Module and Tupi BV has reviewed and approved such certificate pursuant to Section 16.4; and (iv) any other requirement set forth under Exhibit VIII has been duly complied with.

"Substantial Completion Certificate" means the document issued by Contractor and accepted by Tupi BV when the applicable Substantial Completion is agreed between Contractor and Tupi BV pursuant to Section 16.4.

"TAC" shall have the meaning set forth in Section 3.3.10.1.

"TEC" shall have the meaning set forth in Section 27.7.1.

"Technical Dispute" shall have the meaning set forth in Section 24.2(a).

"Tribunal" shall have the meaning set forth in Section 24.3(e).

"Tupi BV" shall mean Tupi B.V. as set forth in the preamble hereto.

"Tupi BV Delay" shall mean events of significant interference in the progress of the Works, significant delay or material failure of performance caused solely by Tupi BV, the Tupi BV Project Manager, or their respective employees or agents that affect the Project Schedule and/or the Critical Path Schedule.

"Tupi BV Group" shall mean Tupi BV, its Affiliates, BM-S-11 Concessionaires and their Affiliates, officers, directors, employees, agents (including Subcontractors) and any Person legally authorized to act in the name of Tupi BV.

"Tupi BV Policies" shall mean the policies of Tupi BV relating to employee health, safety, security and the environment, and any other matters as Tupi BV may direct from time to time by notice to Contractor.

"Tupi BV Project Manager" shall mean the Person designated by Tupi BV in a written notice to Contractor from time to time to act on behalf of Tupi BV in all matters relating to the Works.

"Tupi BV Shareholders" shall mean, collectively, PNBV, BG Overseas Holdings, Ltd., a company incorporated under the laws of England and Wales, and Galp Energia E&P B.V., a company incorporated under the laws of the Netherlands.

"Unrealized Brazilian Local Content Percentage" or "%NR" shall mean the percentage of the Brazilian Local Content Index in respect of a category of Works identified in Section 4.2 that is not Brazilian Local Content as of the respective date of its determination.

"Warranty Period" shall have the meaning set forth in Section 17.3(a).

"WBS" shall have the meaning set forth in Section 11.3(b).

"Work" or "Works" means all activities that have to be done or performed by Contractor or its Subcontractors under this Agreement and as more fully described in Section 2.1 and Exhibit I, and all other activities necessary to provide Tupi BV with complete FPSO PACKAGES II & V.

"Work Authorization Initial Date" shall mean the date on which the Works shall commence, according to Article 11 and as more fully described in Exhibit I.

1.2   Section and Exhibit References. Any reference to a particular Article, Section, subsection, paragraph, subparagraph, Exhibit or schedule, if any, shall be a reference to such Article, Section, subsection, paragraph, subparagraph, Exhibit, or schedule in and to this Agreement.

1.3   Interpretation.

  (a)   References in the singular shall include the plural and vice versa.

  (b)   Any reference to this Agreement or to any other agreement, document or drawing defined or referred to in  Section 1.1 shall include each amendment, modification and supplement thereto and waiver thereof as may become effective from time to time in accordance with the terms hereof or thereof, except where otherwise indicated.

  (c)   Any term defined by reference to any other agreement or document shall have such meaning whether or not such agreement or document remains in effect.

  (d)   The words "include" and "including" shall include the phrase "not limited to". The terms "hereof" or "thereof", "herein" or "therein", "hereunder" or "thereunder" and comparable terms refer to the entire Agreement with respect to which such terms are used and not to any particular article, section or other subdivision thereof.

  (e)   A reference to any Governmental Authority includes any Governmental Authority succeeding to such agency's or authority's functions and capabilities. Any reference to a Person shall include that Person's successors and permitted assigns or to any Person succeeding to that Person's functions.

  (f)   If any provision of this Agreement contemplates that the Parties shall negotiate as to any matter after the date that this Agreement is effective, such provision shall be construed to include an obligation of the Parties to negotiate in good faith and within the spirit and intent of this Agreement.

(g)     Except as otherwise expressly indicated herein, any reference in this Agreement to any Applicable Law shall be considered as including a reference to any amendment or supplement then in force, as well as a reference to all norms or regulations then in force and enacted in connection with the Applicable Law and whose validity derives therefrom.

(h)     All schedules, Exhibits or attachments to this Agreement shall be read in conjunction with the body of this Agreement, and such schedules, Exhibits or attachments shall be interpreted so as to give effect to the intent of the Parties as evidenced by their terms when taken as a whole; provided however, that in the event of an express and irreconcilable conflict between the terms of any schedules, Exhibits or attachments and the provisions of the body of this Agreement, the provisions of the body of this Agreement shall control.

(i)     Conflicts between the terms of two or more Exhibits and/or attachments shall be controlled as follows:

   - In all events the terms and provisions of Exhibit I shall prevail over any other Exhibit and/or attachment of this Agreement.

   - In all events the terms and provisions of Exhibit II shall prevail over any other Exhibit (except Exhibit I) and/or attachment of this Agreement.

   - The Letters or Addenda issued by Tupi BV and Guara BV, related to clarifications and answers made during the Bid process attached as Exhibit XXXI shall have priority over the terms and provisions of the documents specifically modified by the Letter or Addenda. However, the priority of the modified document is not changed.


## ARTICLE 2

## RELATIONSHIPS AND ACKNOWLEDGEMENTS

2.1     Subject Matter of this Agreement. The subject matter of this Agreement is supply of five (5) FPSO PACKAGES II & V, including all the activities necessary to provide Tupi BV with them, and the supply of operational spare parts, training, and technical assistance to be supplied by Contractor and its vendors at the Contractor's Site, the Site of the Integration and the offshore final location. Contractor shall perform the Works (i) in accordance with the Scope of Work, the Project Schedule, the Critical Path Schedule, and the terms and conditions of this Agreement, (ii) in compliance with Applicable Law, and (iii) consistent with Good Industry Practices.

2.2     Status of Contractor. The relationship between Contractor and Tupi BV shall be that of an independent contractor and nothing contained herein shall be construed as constituting any relationship between the parties other than that of arms-length of owner and independent contractor. Any provisions of this Agreement which may appear to give Tupi BV or the Tupi

BV Project Manager the right to direct or control Contractor as to details of performing the Works, or to exercise any measure of control over the Works, shall be deemed to mean that Contractor shall follow the desires of Tupi BV or the Tupi BV Project Manager in the results of the Works only, and not in the means by which the Works are to be accomplished. Nothing herein shall be interpreted to create a master-servant or principal-agent relationship between Contractor or any of its Subcontractors and Tupi By. Without prejudice to the foregoing, Contractor shall strictly comply with all provisions, terms and conditions of this Agreement, and the fact that Contractor is an independent contractor shall not relieve it from its responsibility to fully, completely, timely and safely perform and complete the Works in strict compliance with this Agreement and be responsible for all Subcontractors' performance and supply requirements.


# ARTICLE 3

## OBLIGATIONS OF CONTRACTOR

3.1     Scope of Work — General Scope. Contractor agrees that the requirements of the Scope of Work are consistent with Good Industry Practices and its obligations under  Section 2.1 above, and are capable of supporting the timely completion of the FPSO PACKAGES II & V to be provided under this Agreement and the Guara BV PACKAGE II & V EPC Contract. Contractor is fully capable of performing its obligations hereunder in accordance with Good Industry Practices, Applicable Law, and all other terms and provisions of this Agreement, excluding only those items which Tupi BV has specifically agreed to provide under the terms of this Agreement. The Works are more fully described in Exhibit I.

3.2     Specific Obligations. Without limiting the generality of  Section 3.1 or the requirements of any other provision of this Agreement, as part of the Works Contractor shall:

(a)     Procure, supply, transport, handle, insure, and properly store and preserve the Equipment (other than Equipment supplied by Tupi BV), and receive, store and preserve the Equipment supplied by Tupi BV;

(b)     Be responsible for the detailed engineering design in accordance with the specifications provided in this Agreement;

(c)     Be responsible for the construction and construction management, including furnishing of all management, labor, all Site supervision and craft labor, Equipment, tools, field supplies, warehousing and facilities necessary for the FPSO PACKAGES II & V, all necessary power (electrical or otherwise), and all inspections (excluding inspections performed by Tupi BV hereunder) and quality control services required to ensure that the Works are performed in accordance herewith;

(d)     Take into consideration and comply with all Applicable Law in order to make feasible the exportation of the FPSO PACKAGES II & V, which shall be physically

delivered to Tupi BV in the FPSO PACKAGES II & V's construction yard's quay, over a barge to be supplied by Contractor, not cleared for import;

(e) Negotiate all guarantees, warranties, delivery schedules and performance requirements with all Subcontractors so that all Subcontracts are consistent with this Agreement;

(f) Be responsible for ensure that the work of the Subcontractors all of the requirements of the FPSO PACKAGE II & V;

(g) Contact the Classification Society and provide the FPSO PACKAGES II & V's certification, as indicated in this Agreement, especially in Exhibits I and III;

(h) Ensure that the Works are performed in accordance with the Project Schedule and the Critical Path Schedule;

(i) Conduct and manage all pre-commissioning activities;

(j) Obtain the Consents listed in Exhibit XIII, and any other permits, approvals or licenses required for performance of the Works for which Tupi BV has not assumed responsibility under Exhibit XIV;

(k) Obtain any and all Consents including, without limitation, completion certificates, and operating permits as required by Applicable Law to conduct the Performance Tests, Demonstration Tests, and Operational Testsexcept for the test performed at the final location of the FPSOs;

(1) Provide information, assistance and documentation to Tupi BY as reasonably requested in connection with the permits and Consents to be obtained by Tupi BV hereunder as listed on Exhibit XIV;

(m) Provide training for Tupi BV's operating and maintenance personnel in accordance with Exhibit V, for the Equipment supplied by Contractor;

(n) Replace any Subcontractor(s) that fails to perform its Subcontract obligations;

(o) Handle all customs issues and be responsible for all duties related to imported Equipment;

(p) At the request of Tupi BV, cooperate with and respond to inquiries from any Lender or any Lender agent relating to the Works and any other Contractor's activities being undertaken under this Agreement;

(q) Be responsible for and pay any and all applicable taxes, including withholding taxes, related to the Works; and

(r) Pay all Subcontractors and employees in a timely fashion.

3.3 <u>Contractor's Obligations Regarding the Performance of the Works.</u> Without limiting the generality of <u>Section 3.1</u> or the requirements of any other provision of this Agreement, as part of the Works Contractor shall further:

3.3.1 Perform the Works in due time and in compliance with the provisions of this Agreement, the Project Schedule, the Critical Path Schedule, the detailed Works schedule provided by Contractor, Environmental Law and any other Applicable Law.

3.3.2 Undertake all necessary activities for the pre-commissioning and commissioning of the FPSO PACKAGES II and FPSO PACKAGES V, and provide assistance to Tupi BV during the commissioning of the FPSO PACKAGES II and FPSO PACKAGES V, as well as provide assistance on integration, commissioning and operation to Tupi BV's operations personnel during the technical assistance period, as set forth in <u>Exhibits I</u> and VIII.

3.3.3 Supply to Tupi BV all documents and information necessary for the inspection of the Works (including the exercise by Tupi BV of its rights as contemplated in <u>Section 17.2),</u> granting access to the Sites where any portion of the Works is being carried out, as well as promptly complying with Tupi BV's remarks and contractual requirements regarding the Works.

3.3.4      Without prejudice to the Milestone Completion Dates, remake or repair, at its own expense and within a schedule mutually agreed between Tupi BV and Contractor, any irregularities in any portion of the Works that may have been rejected by Tupi BV or that have been carried out without due regard to the terms of this Agreement. If Contractor fails to completely correct any Defects or complete any necessary repairs for an FPSO PACKAGE II Module or an FPSO PACKAGE V Module before its respective Handover Date, Contractor shall undertake such correction or repair at the site where the Integration is taking place. If TUPI BV determines that Contractor will not or cannot undertake such corrections or repairs, then Tupi BV will have the right, but not the obligation, to complete such Works at the expense of Contractor.

3.3.5 For the entire term of this Agreement in its dealings with Tupi BV in regard to the performance of the Works, be represented by a qualified professional, duly certified, licensed and in good standing with an internationally recognized professional organization. The name of such professional accompanied by the relevant curriculum vitae shall be submitted to Tupi BV for prior approval, and when so approved by Tupi BV such individual shall become the "Contractor Project Manager". Any proposed substitution, provisional or permanent, of Contractor Project Manager shall be submitted to Tupi BV for Tupi BV's prior approval.

3.3.6 Correct any errors, discrepancies or omissions in any documents prepared by Contractor or Subcontractors in accordance with this Agreement.

3.3.7 Not applicable.

3.3.8 Prepare and maintain, at each Site, a Report of Daily Operations ("RDO") for each phase of the Works, as described in Exhibit IV, in Contractor's own form prepared in accordance with the format provided by Tupi BV, containing records on the service orders, remarks on irregularities found and other events concerning the performance of this Agreement. The RDO shall be issued and delivered to Tupi BV on a daily basis, or other period agreed between the Parties, in two counterparts (the first one to Tupi BV and the second to Contractor) duly executed by Contractor Project Manager and by Tupi BV.

3.3.9 Defend, indemnify and hold Tupi BV and each member of the Tupi BV Group free and harmless against any and all claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or tribunal and related attorneys' fees), suffered or incurred by any member of the Tupi BV Group or by any third party and arising out of or resulting from the failure by any member of Contractor Group to observe any Applicable Law or the provisions of this Agreement.

3.3.10 Obtain all Consents listed in Exhibit XIII, and any other permits, approvals or licenses required for performance of the Works for which Tupi BV has not assumed responsibility under Exhibit XIV. Notwithstanding the generality of the foregoing, Contractor shall, in a manner to enable the performance of the Works to comply with the Project Schedule and the Critical Path Schedule, obtain and maintain all Consents required for the performance of the Works, including all licenses for river crossings, road, railway and transmission line crossings, as well as licenses for disposal and storage of materials and/or all other special services required for the construction or assembly of the Works.

3.3.10.1 Maintain the validity of and compliance with all Consents and environmental licenses issued by the respective Governmental Authority, and comply with any Term of Commitment and Behavior Adjustment *(Termo de Ajustamento de Conduta,* "TAC"), operating licenses, or requirements of *Agencia Nacional de Vigildncia Sanitaria* ("ANVISA"), among others, during the entire term of this Agreement, referring to the Site where the Works shall be performed, and providing copies thereof to Tupi BV and the Lenders, whenever requested.

3.3.11 Comply with the Project Schedule and the Critical Path Schedule.

3.3.12 Carry out the quality control of the Works and commissioning in accordance with the provisions of the Quality Assurance System and Commissioning System as described in Exhibit VII and Exhibit VIII.

3.3.13 Submit for Tupi BV's review, on the dates indicated in Exhibit VI, the documents concerning the Quality Assurance System and Commissioning System.

3.3.14 Supply all materials, tools, Equipment and appliances necessary for the quality assurance activities and commissioning activities, which shall include any such materials, tools, Equipment and appliances used in qualification tests of its own staff and the qualification of its employees and procedures.

3.3.15 Consult all Brazilian companies considered in the Vendor List set forth in Exhibit V, whenever Contractor obtains price quotations from at least one non-Brazilian company, in order to grant equal opportunities among all the suppliers.

3.3.16 Implement and maintain, at its own expense, during the entire term of this Agreement, a Quality Assurance System and Commissioning System as per Exhibit VII and Exhibit VIII, as well as:

(a)     Carry out all required qualifications of specialized workers and the assembly and welding procedures pursuant to the guidelines prescribed by the applicable norms and issue the relevant certificates required by the Quality Assurance System and Commissioning Systems, bearing all the qualifications costs including traveling, materials and Equipment expenses used in the centralized qualification of workers and procedures); and

(b)     Carry out all additional experiments and tests that Tupi BV may deem necessary to evidence the compliance with the quality levels required for the Works, in accordance with the Quality Assurance System and the Commissioning System. If such additional experiments and tests do not demonstrate the non-compliance with the quality levels required for the Works, in accordance with the Quality Assurance System and the Commissioning System, Tupi BV shall reimburse such costs and allow reasonable extension of time to Contractor.

3.3.17 Subject to the provisions of Article 7, pay and bear all taxes and expenses, including import duties, payable as a consequence of the performance of the Works in accordance with the terms of this Agreement to all local, state or federal Governmental Authorities, as the case may be, both in Brazil and abroad.

3.3.18 Provide the insurances set forth in Article 14 and bear all expenses related to any insurance contracted in accordance with Article 14.

3.3.19 Cany out the final inspection of the Works at the Site and at the locations of vendors or suppliers to confirm compliance with the requirements of Brazilian Occupational Health and Safety Regulation NR-13 (Boilers and Pressure Vessels) by equipment inspectors in compliance with Brazil's INMETRO Regulation - *Portaria* INMETRO 349/2009, Appendix B and/or by engineers in compliance with item 13.1.2 of NR-13.

3.4     Spare Parts.

    (a)     Contractor shall provide to the Tupi BV Project Manager a list of factory recommended operating spare parts for each FPSO PACKAGE II and for each FPSO PACKAGE V for two (2) years of operation and their corresponding best available prices for the Equipment that Contractor is obligated to provide, with sufficient lead time to permit the Tupi BV Project Manager to review and authorize Contractor's procurement of long lead-time items no later than each applicable Substantial Completion date. Upon Tupi BV's submission of a purchase order, Contractor shall procure and deliver to Tupi BV such spare parts.

    (b)     Not applicable.

The spare parts may be procured and purchased by Contractor or Tupi BV, at Tupi BV's sole discretion. Contractor shall provide the recommended spare part list after ninety (90) Days from placement of each applicable purchase order.

3.5     Standard of Performance. Without limiting the breadth of Contractor's obligations set forth in Section 2.1 and other provisions of this Article 3, Contractor shall perform the Works, in a good and workmanlike manner, in accordance with the terms and conditions of this Agreement, and shall cause all Subcontractors of any tier to perform all elements of the Works to be performed by them, in compliance with this Agreement, all Applicable Law and Good Industry Practices. Notwithstanding the generality of the foregoing, in all activities related to the performance of the Works, Contractor shall refrain from using the work of minors and shall ensure that the same requirement be adopted in the agreements executed with its Subcontractors and suppliers.

3.6     Contractor's Tools and Equipment. Contractor shall furnish all tools and Equipment necessary and appropriate for the timely and safe completion of the Works in strict compliance with this Agreement. Contractor shall be responsible for damage to or destruction or loss of, from any cause whatsoever (other than the acts of Tupi By), all construction tools and Equipment owned, rented or leased by Contractor for use in accomplishing the Works without additional costs to Tupi BV.

        3.6.1 Contractor shall ensure that all Equipment for the FPSO PACKAGES II and for the FPSO PACKAGES V, including those supplied by Tupi BV, is stored, protected and preserved in accordance with the manufacturer's written instructions and so as to maintain intact all warranties related thereto.

3.7     Employment of Personnel. Contractor shall not employ, or permit any Subcontractor to employ, in connection with its performance under this Agreement any unfit person or anyone not skilled in the work assigned to such person. Contractor shall promptly remove (or to require any Subcontractor to remove) from the Site in connection with the Works any employee who does not meet the foregoing requirements or, if contracted, any person who obstructs or is disruptive to the Works, or whose presence at the Site, under justified reason, is not necessary. In addition, Contractor agrees that within 24 (twenty-four) hours after receipt of written notice from Tupi By, it will remove from the Works and the Sites any

employee or agent of Contractor or of Contractor's Subcontractors, who in Tupi BV's opinion is interrupting, interfering or impeding the timely and proper completion of the Works. Tupi BV and any other member of Tupi BV Group shall have no liability and Contractor shall defend, indemnify and hold each member of Tupi BV Group harmless from and against any and all claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or tribunal and related attorneys' fees) suffered or incurred by any member of Tupi BV Group arising out of or resulting from Contractor's or any Subcontractor's termination of the employment of any such employee following a request by Tupi BV to have such employee removed from the Works or the Site.

3.7.1 Contractor shall, with respect to its employees and its Subcontractors' employees:

3.7.1.1 Be solely responsible for the supervision, technical and administrative guidance and labor required for the performance of the Works.

3.7.1.2 Refrain from using, in all activities related to the performance of this Agreement, forced labor and work of minors as well as to cause the above-mentioned requirement to be adopted in the agreements executed with suppliers and/or service providers.

3.7.1.3 Whenever requested by Tupi BV, issue a written statement representing that it has complied or is complying with the requirement contained in Section 3.7.1.2.

3.7.1.4 Submit for approval by Tupi BV, the curriculum vitae of the key personnel that will carry out the Works as well as inform Tupi BV, in writing, of any proposed changes to such key personnel list, and when applicable pursuant to other provisions of this Agreement, including Section 3.8, obtain the approval of Tupi BV prior to making such personnel change.

3.7.1.5 Submit for approval by Tupi BV, before the commencement of the Works, a forecast for mobilization and demobilization of its key personnel, including those in charge of supervision and inspection, based on the Project Schedule and the Critical Path Schedule.

3.7.1.6 Submit for approval by Tupi BV, the documents indicated in Exhibit VI, on the dates there established.

3.7.1.7 Entrust the Works to reputable professionals qualified to use techniques in accordance with Applicable Law and Good Industry Practices. Tupi BV may request evidence of any professional's technical qualifications.

3.7.2 Contractor shall cause its employees and its Subcontractors' employees, as well as their respective contractors and subcontractors, when working at any Tupi BV facility, to use identification badges furnished by

Tupi By, which must be returned to Tupi BV after termination of this Agreement or upon termination of the employee or contractor from the activities related to this Agreement.

3.7.3 Not applicable.

3.7.4 Contractor shall comply, in a timely manner with, all social security and labor-related tax obligations, submitting, whenever requested by Tupi BV, the documentation evidencing such compliance in regard to its employees and Subcontractors, as applicable.

3.7.4.1    Contractor shall pay and bear all charges and expenses deriving from lodging, boarding, transportation, medical assistance and emergency medical assistance to its employees, including those due to the allocation of Contractor's workers to any training provided or required by Tupi BV or through any other entity.

3.7.5 For the Works carried out in Brazil, Contractor shall provide, or cause to be provided to Tupi BV, as a condition precedent for the issuance of the Measurement Report referred to in Section 8.2, and in accordance with applicable Brazilian law:

3.7.5.1    Together with the calculations contemplated by Section 8.1, a certified copy of the social security collection form *(Guia de Recolhimento do Fundo de Garantia por Tempo de Servico e Informaccies a Previdencia Social,* "GFIP") of the employee severance fund *(Fundo de Garantia por Tempo de Servico,* "FGTS") and information to the social security administration *(Institute Nacional do Seguro Social,* "INSS") of the month preceding the one to which the measurement refers, duly completed, filed and paid, together with the proof of receipt.

3.7.5.2    Together with the calculations contemplated by Section 8.1, a certified copy of the social security collection form *(Guia da Previdencia Social,* "GPS") of the month preceding the one to which the measurement refers, containing the amount indicated in the report of the relevant GFIP, duly completed and paid, and containing the enrollment of the Works *(Cadastro Espec(fico do INSS,* "CEI").

3.7.5.3    Together with the calculations contemplated by Section 8.1, a statement, issued on a yearly basis, executed by Contractor Project Manager and its accountant, certifying the accuracy and completeness of Contractor's books and records.

3.7.5.4    No later than thirty (30) Business Days after the period prescribed by Brazilian law for the authentication of the ledger *(Livro Dicirio)* at the Brazilian Commercial Board, a certified copy of the balance sheet extracted from the ledger and certified at the Brazilian Commercial Board, reflecting the previous fiscal year.

3.7.5.5    Subject to the provisions of Exhibit XIII, annually, during the period of validity of this Agreement, a certified copy of the following documents, duly filed with the appropriate Governmental Authority: (i) environmental risk prevention program *(Programa de Prevencelo de Riscos Ambientais,* "PPRA"), (ii) working

conditions technical report *(Laudo Tecnico de Condiedes Ambientais de Trabalho,* "LTCAT"), (iii) construction industry working conditions and environment program *(Programa de Condicdes e Meio Ambiente do Trabalho na Inchistria de Construed°,* "PCMAT") and {iv) medical control and occupational health program *(Programa de Controle Medico e da SaUde Ocupacional,* "PCMSO").

3.7.5.6      No later than thirty (30) Business Days after the date of execution of this Agreement, evidence of the enrollment of the Works at the CEI.

3.7.5.7      In case of suspension of the Works, a copy of the GFIP containing a code reflecting the cause of the Works' suspension, with the proof of delivery within the maximum term of five (5) Business Days after the date of delivery of the GFIP to the relevant Governmental Authority.

3.7.5.8      For the final Measurement Report, in addition to the documents indicated in the previous subsections of this Section 3.7.5, the documents referring to the month of the final measurement must also be delivered, no later than three (3) Business Days prior to the due date of the collection document, as well as the evidence of termination of the Works at the CEI and the government debt clearance certificate *(Certiddo Negativa de Dehitos,* "CND").

3.7.5.9      In case of subcontracting services in Brazil, according to Article 19, in addition to the documents indicated above, the following documents related to the Subcontracts:

(a)      Copies of each Subcontractor's invoices and/or receipts, related to the services provided by such Subcontractor, showing clearly the connection of such services with the Works and the amount related to INSS taxes withheld by Contractor, according to Applicable Law.

(b)      Copies of collection documents, related to the amount withheld by Contractor according to paragraph (a) above, showing the evidence of payment of such amount to INSS, according to Applicable Law.

(c)      A certified copy of the relevant GFIP regarding the FGTS and information to INSS for the month immediately preceding the month to which the measurement refers, issued by the Subcontractor, duly completed and paid, together with the proof of receipt.

3.7.6 Contractor shall undertake and pay any and all civil, labor, social security, tax and FGTS obligations deriving from the performance of the Works, together with any costs and expenses related to any administrative, judicial, and arbitration procedures before any court or tribunal in any level of jurisdiction that may be filed against any member of the Tupi BV Group or their respective Affiliates. Contractor also undertakes to assume, either in or out of court, any and all liability related to any claims that may arise owing to Contractor's responsibility during the performance of this EPC Contract,

including by requesting the exclusion of any member of the Tupi BV Group and its respective Affiliates from such procedures, at the request of Tupi BV, and by offering the necessary guarantees or bonds required to release any such member of the Tupi BV Group, and also bearing the costs and expenses incurred by any of them in such procedures.

3.7.6.1     If a claim referred to in <u>Section 3.7.6</u> is made against any member of Tupi BV Group, Tupi BV shall immediately give notice to Contractor and Contractor shall be entitled to contest any such claim in good faith by appropriate judicial or administrative procedures. If any member of the Tupi BV Group is found liable for any claim described in <u>Section 3.7.6,</u> Contractor shall pay to such member of the Tupi BV Group, as the case may be, the liability amount attributable to it in the decision rendered by a court, arbitration panel or any other competent Governmental Authority.

3.7.7 Contractor shall arrange for the technical responsibility annotation *(Anotacao de Responsabilidade Tecnica,* "ART") concerning this Agreement to be obtained at the appropriate engineering, architecture and agronomy regional council   *(Conselho Regional de Engenharia, Arquitetura e Agronomia,* "CREA"), forwarding a copy thereof to Tupi BV before the commencement of the Works, as well as provide evidence to Tupi BV of its compliance with any other such requirements whenever any amendments are introduced in this Agreement or in any of the cases provided for in the resolutions of the engineering, architecture and agronomy federal council *(Conselho Federal de Engenharia Arquitetura e Agronomia,* <u>"CONFEA").</u>

3.7.8 Contractor shall deliver to Tupi BV: (i) a letter by the nuclear energy national commission *(Comissilo Nacional de Energia Nuclear,* "CNEN"), approving the physical control system and the contingency plan adopted by Contractor; (ii) industrial safety prescriptions adopted by it in accordance with Applicable Law; (iii) instructions furnished to its employees, delegates and Subcontractors regarding the risks and precautions to be observed; and (iv) affidavits reflecting the verification and assessment of monitoring and measurement equipment, all in accordance with Applicable Law (including CNEN norms), in any event prior to the performance of any portion of the Works involving any industrial X-ray and/or gamma-ray service.

3.7.8.1     Contractor shall have an X-Ray and/or gamma-ray Protection Superintendent, whose name and resume shall be submitted to Tupi BV together with the names and resumes of the Protection Superintendent's delegates at the time of the submission of the documents listed in <u>Section 3.7.8.</u> The Protection Superintendent shall be responsible for ensuring, especially in emergency cases, the safety of all persons who, given the place and conditions of the activity performed by them, may be exposed to the radiation emitted in connection therewith.

3.7.9 Contractor shall arrange and maintain in full force and effect all the documentation related to any expatriate employees that take part in the

performance of any portion of the Works, including the necessary work visas, according to Applicable Law.

3.7.10 Contractor shall:

3.7.10.1    Furnish monthly, or whenever requested by Tupi BV in accordance with the terms and conditions of this Agreement, reports in writing, on the development of the several stages of the Works, as well as of the elements required for the adequacy thereof and preparation of information of a statistical nature, in accordance with Tupi BV's requirements.

3.7.10.2    Assist Tupi BV during the issuance of the pertinent Measurement Report in accordance with Exhibit XIX.

3.7.10.3    Not applicable.

3.7.10.4    Correct, immediately and at its own expenses, any and all portions of the Works, Equipment or engineering documents that are not in accordance with this Agreement and/or remake the part of the Works that have justifiably been rejected by Tupi BV as not in accordance with the requirements contained in this Agreement for engineering documents, specifications, rules and applicable standards or with Good Industry Practices, including repairs in welding and the relevant X-ray and/or gamma-ray inspection.

3.8    Key Personnel. In addition to the list of Contractor's employees responsible to supervise and carry out the Works, Exhibit XXXIII sets forth Contractor's organizational chart to be implemented for the Works. Contractor shall not reassign any such employee without Tupi BV's prior written consent.

3.9    Operations Personnel and Assisted Operation. Contractor shall provide Tupi BV with any orientation and training concerning the FPSO PACKAGES II & V's Equipment and systems of sufficient scope so that Tupi BV's designated personnel can fully and safely operate and maintain the FPSO PACKAGES II and the FPSO PACKAGES V in accordance with this Agreement, Applicable Law and Good Industry Practices. The training shall be performed in accordance with a training plan submitted to Tupi BV for approval not less than three (3) months prior to the anticipated Mechanical Completion of each FPSO PACKAGES II subsystem and of each FPSO PACKAGES V subsystem. Contractor shall provide such training and orientation to all individuals identified in the list provided by Tupi BV according to the requirements of Exhibit V. Notwithstanding the foregoing, neither the removal nor the replacement of the individuals designated by Tupi BV for training shall result in additional training obligations on the part of Contractor with respect to the individuals substituted for those removed or replaced.

3.10    Emergencies. In the event of any emergency endangering life or property, Contractor shall take such action as may be reasonable and necessary to prevent, avoid or mitigate injury, damage, or loss and shall, as soon as possible, report any such incidents, including Contractor's response thereto, to Tupi BV. If Contractor has not taken reasonable

precautions for the safety of the public or the protection of the Works, and such failure creates an emergency requiring immediate action, then Tupi BV, with or without notice to Contractor, may, but shall be under no obligation to, provide reasonable protection as required to control such emergency. The taking of any such action by Tupi BV, or Tupi BV's failure to take any action, shall not limit Contractor's liability. Contractor shall reimburse Tupi BV and any other member of Tupi BV Group for the performance of any such Works or the furnishing of any such Equipment in connection with any emergency in an amount equal to the reasonable costs incurred by Tupi BV or any other member of Tupi BV Group, as the case may be, in such performance of Works or furnishing of Equipment. The taking by Contractor or Tupi BV of any actions pursuant to this Section 3.10 to prevent, avoid or mitigate injury, damage, or loss as a result of an emergency shall in no way alter or excuse any of Contractor's obligations under this Agreement and/or the Guara BV PACKAGE II & V EPC Contract.

3.11    Approvals, Certificates, Permits and Licenses. Other than those permits and consents listed in Exhibit XIV, which shall be the responsibility of Tupi BV, Contractor shall obtain all Consents required to perform the Works, including but not limited to, the Consents listed on Exhibit XIII. Contractor shall provide Tupi BV with copies of such Consents as soon as they are obtained. Contractor shall provide information, assistance and documentation to Tupi BV as reasonably requested in connection with the permits and consents to be obtained by Tupi BV hereunder as listed on Exhibit XIV.

3.12    Books, Records and Audits.

    (a)    Contractor shall keep such full and detailed books, construction logs, records, daily reports, accounts, payroll records and other pertinent documents as may be necessary for proper financial management under this Agreement and as required under Applicable Law. Contractor shall maintain all such books and records in accordance with applicable generally accepted accounting principles, or otherwise in the ordinary course of business, and shall retain all such books and records for a minimum period of ten (10) years following the issuance of the Notice to Proceed, or such greater period of time as may be required under Applicable Law.

    (b)    Not applicable.

    (c)    Upon reasonable notice, Tupi BV shall have the right to examine or audit (or to have examined or audited) the books and records of Contractor which in any way relate to this Agreement. When requested by Tupi BV, Contractor shall provide the examiners and auditors (including Tupi BV's personnel) with full access to all personnel, property, and records and Contractor's personnel shall cooperate with the auditors to effect the audit or audits hereunder. The examiners and auditors shall have the right to copy any and all documentation relating to performance under this Agreement. Contractor shall pay for all costs incurred by it in assisting Tupi BV with examinations and audits performed pursuant to this Section 3.12. Contractor shall ensure that similar audit provisions to this Section 3.12 are included in all Subcontracts.

3.13    Tax Accounting. Contractor shall provide Tupi BV with any information regarding quantities, descriptions and costs of any Equipment installed in each FPSO PACKAGES **II** and in each FPSO PACKAGES V as Tupi BV may deem necessary in connection with its tax planning or the preparation of its tax returns.

3.14    Temporary Facilities. Contractor shall provide Tupi BV, in the form established in Exhibit **XI**, with sufficient office space at the time of Site mobilization to accommodate Tupi BV's site representative(s) and support staff (as well as any Lender representatives). Contractor shall provide any other temporary facilities required for the execution of the Works.

3.15    No Liens.

    (a)    Contractor shall keep the FPSO PACKAGES II, the FPSO PACKAGES V, the Site and all Equipment free and clear of any and all Liens arising out of the performance of the Works by Contractor, its Subcontractors and suppliers and their respective personnel, employees, agents, representatives and/or by operation of law and/or as the direct or indirect result of any claims, judicial or court decision or arbitral award issued in connection therewith.

    (b)    Contractor shall notify Tupi BV immediately of the filing of any Liens, or possible filing of Liens, upon any subsystem, system, Module, FPSO PACKAGE **II**, FPSO PACKAGE V, the Site, any Equipment, or any moneys due to Contractor by Tupi BV under this Agreement. If any such Liens are filed, Contractor shall arrange for the removal of such Lien not later than thirty (30) days after such filing. **In** the event that Contractor fails or refuses to remove such Lien within thirty (30) Days, then Tupi BV shall have the right (but not the obligation) to pay any sums necessary to obtain prompt release of such Lien, in which case Tupi BV may withhold or deduct payments to Contractor to cover payments made by Tupi BV or any other member of Tupi BV Group, as applicable, for the release of such Lien in accordance with Section 10.8(0. Contractor shall reimburse Tupi BV or such other member of Tupi BV Group for any sums so paid within thirty (30) Days of a demand therefore or to be deducted by Tupi BV hereunder in accordance with Section 10.8.

3.16    Quality Assurance. No later than the date indicated in Exhibit VI (Directives for Planning and Control), Contractor shall submit to Tupi BV for its approval: (i) a Quality Assurance System as set forth in Exhibits VI and VII; (ii) a detailed inspection plan; and (iii) any other required documentation pursuant to Exhibits VI and VII. Contractor shall provide for each Site a quality assurance manager to supervise the implementation of the Quality Assurance System, the inspection plan, and the inspection procedures in the corresponding Site.

3.17    Plan & Reports. Contractor shall provide Tupi BV with all Plan & Documents set forth in Exhibit VI (Directives for Planning and Control) on the dates there indicated, with progress reports and such other information as requested by Tupi BV, including the following:

(a)    Minutes for all status and other project meetings within seven (7) Days following any such meeting;

(b)    Weekly progress reports, in form and substance reasonably acceptable to Tupi BV, of the progress of the Works for each FPSO PACKAGE II & V during the preceding week and on all matters deemed significant by Tupi BV or Contractor. Contractor shall, as may be requested from time to time by Tupi BV, deliver to Tupi BV, on a daily basis, a written report, in form and substance reasonably acceptable to Tupi BV, of the Works during the preceding day and on all matters deemed significant by Tupi BV or Contractor;

(c)    Safety incident reports according to <u>Exhibit IX;</u>

(d)    Monthly Progress Reports <u>("Monthly Progress Reports"</u> or "MPR"), in form and substance acceptable to Tupi BV, in accordance with <u>Exhibit VI</u> and containing the following information for each FPSO PACKAGE II & V:

(i)    an executive summary with a description of overall Project Schedule and Critical Path Schedule status;

(ii)    a description, compared against the Project Schedule and the Critical Path Schedule, of engineering status including actual percentage completed, document status, significant activities accomplished in the previous month and significant activities planned for the current month and next 3 months;

(iii) a description, compared against the Project Schedule and the Critical Path Schedule, of procurement activities including actual percentage completed, manufacturing and delivery status, significant activities accomplished in the previous month and significant activities planned for the current month and next 3 months;

(iv) a description, compared against the Project Schedule and the Critical Path Schedule, of construction activities, including actual percentage completed, progress summary, numbers of skilled, unskilled, and supervisory staff on Site, as compared to planned levels, significant activities accomplished in the previous month and significant activities planned for the current month and next 3 months;

(v)    a description, compared against the Project Schedule and the Critical Path Schedule, of start-up activities, including actual percentage completed, progress summary, significant activities accomplished in the previous month and significant activities planned for the current month and next 3 months;

(vi) a description of critical items, including evaluation of problems and, to the extent applicable, of strategies to accelerate the performance of the Works in order to comply with the Project Schedule and the Critical Path Schedule;

(vii)    a description of all permitting and environmental issues and their

current status;

(viii)     a description of all safety and security issues;

(ix)      a description of quality assurance activities;

(x)       a description of areas of concern for discipline;

(xi)      a description of billing forecasting for the next 3 months;

(xii)     presentation of monthly and cumulative S-curves comparing scheduled progress to actual progress of the activities of contract management;

(xiii)    a critical path analysis; and

(xiv)     any other information reasonably requested by Tupi BV, including any material information of which Contractor is aware that could reasonably be foreseen to adversely affect the performance of the Works.

Contractor shall provide the Monthly Progress Report on or before the twenty-fifth (25th) Day of each Month. Each Monthly Progress Report shall cover activities up to the end of the previous month. Contractor shall provide Tupi BV with copies of the MPR to any other persons as Tupi BV may reasonably request.

(e)     Reports on Force Majeure duly notified as provided for in Article 23 and Section 25.5 hereof, in a form reasonably acceptable to Tupi By, detailing the status and developments of any significant problem, strike, injury, work stoppage, legal problem which occurs or may be anticipated, and any emergency or other unanticipated event which might adversely affect Contractor's ability to perform its obligations hereunder. The report shall detail all available information and steps being taken to correct or address such Force Majeure, significant problem, strike, injury, work stoppage, legal problem, emergency or other unanticipated event, and in each case shall be submitted by Contractor as soon as practicable. Tupi BV may at any time request a report on any event that Tupi BV reasonably regards as significant. Notwithstanding delivery of such reports, all events of Force Majeure claimed by Contractor shall be handled in accordance with Article 23.

(f)     Reports on damage if any Equipment or any portion of the FPSO PACKAGES II or the FPSO PACKAGES V is materially damaged or is destroyed, as soon as practicable after the occurrence of such damage or destruction, detailing such occurrence, any required repairs or replacement and the estimated duration of such repairs or replacement, including any estimated impact on the Project Schedule and/or on the Critical Path Schedule. Without limiting the foregoing, such damage report shall be in a form acceptable to any insurance company against which a claim is to be made for coverage of such damage.

(g)     Written notice to Tupi BV of any unanticipated significant changes or developments in the Works. Contractor shall make available, and upon Tupi BV's

request shall furnish, to Tupi BV such documents as may be necessary at Tupi BV's sole discretion for Tupi BV to inspect, evaluate or review the performance of the Works.

(h)    Copies of technical correspondence between Contractor and its Subcontractors of any tier, or their respective suppliers, upon request of Tupi BV, including all notes, designs, drawings, specifications and other technical data pertaining to the technical aspects of the Works, provided that receipt by Tupi BV of such technical correspondence shall not be deemed a consent to or approval by Tupi BV of such technical correspondence and shall not limit any of the obligations of Contractor under this Agreement or any of the rights of Tupi BV to enforce the provisions of this Agreement.

(i)    Reports in form and substance reasonably satisfactory to Tupi BV discussing compliance by Contractor and its Subcontractors with health, safety and environmental standards and procedures required pursuant to this Agreement and by Applicable Law.

3.18    <u>Payment.</u> Contractor shall timely make all payments required to be paid to Tupi BV pursuant to the terms of this Agreement.

3.19    <u>Progress Meetings.</u> During performance of the Works, periodic progress meetings shall be held at a place mutually agreeable to the Parties. Such meetings shall be at least weekly or as otherwise agreed. All matters bearing on the progress and performance of the Works and the Project Schedule and/or the Critical Path Schedule since the preceding progress meeting shall be discussed and resolved, including any previously unresolved matters, deficiencies in the Works or the methods being employed for the Works, and problems, difficulties, or delays which may be encountered. Tupi BV shall provide Contractor with minutes of all progress meetings. All decisions taken at such progress meetings shall be recorded in the minutes. Contractor shall initial and sign the minutes, noting any disagreements. The minutes shall be considered the definitive record of what occurred and what was decided at the meetings.

3.20    <u>Site Security.</u> The following shall apply to the Site:

(a)    Contractor shall be responsible for all security matters at the Site during all times prior to the last Handover Date, which shall include measures reasonably required to prevent vandalism, sabotage, loss, theft and danger or any adverse impact on the Site, Equipment, the Works and personnel.

(b)    Contractor shall coordinate entrance and exit from the Site so as to minimize disruption to the Works.

(c)    Contractor shall exercise its best efforts to investigate all Works-related claims of injury to persons and claims of damage to property and Equipment to discover and determine any unsafe conditions that might involve such risks and

shall be solely responsible for resolving all such claims and for the discovery, determination and correction of any such conditions.

(d)     Contractor shall cooperate with Tupi BV on all security matters and shall promptly comply with any reasonable security requirements for the FPSO PACKAGES II, the FPSO PACKAGES V, the Site and the Works established by Tupi BV. Such compliance shall not relieve Contractor of its responsibility for maintaining proper security as required by the foregoing subsections, nor shall it be construed as limiting in any manner Contractor's obligation to comply with Applicable Law and to undertake reasonable action to establish and maintain secure conditions at the Site.

(e)     Contractor shall not be entitled to any extension of time or compensation on account of Contractor's failure to exercise reasonable care to protect the FPSO PACKAGES II, the FPSO PACKAGES V, the Site, the Works, personnel and all Equipment as described herein.

(f)     Contractor shall, and shall cause its Subcontractors to, comply with all Tupi BV Policies when performing any Works at the Site.

(g)     Contractor recognizes and agrees that safety is of paramount importance in the performance of the Works and that Contractor is responsible for performing (and causing the performance of) the Works in a safe manner. Contractor shall implement a safety program that is to be submitted to Tupi BV for its approval prior to the commencement of the Works. Contractor shall perform the Works in such a manner as to minimize impact upon human health, safety and the natural environment. In carrying out the foregoing, Contractor shall comply with Good Industry Practices, Tupi BV Policies, and Applicable Law, including, without limitation, the Environmental Laws, and any other regulations governing the environment, health and safety such as Contractor's safety program, as approved by Tupi BV, which approval shall not be unreasonably withheld, and Tupi BV's standards as set forth herein and in  Exhibit IX. Such submission shall not be construed as limiting in any manner Contractor's obligation to undertake all reasonable actions toward maintaining safe working conditions at the Site, nor as imposing upon Tupi BV responsibility to review, or for the adequacy of, the environment, health and safety program at the Site. Contractor shall assume all costs associated with compliance therewith. Contractor shall also provide necessary training to its employees and Subcontractors to ensure their compliance with the foregoing safety and health rules and standards. Should Tupi BV at any time observe Contractor, or any of its Subcontractors, performing the Works in an unsafe manner, or in a manner that may, if continued, become unsafe, then Tupi BV shall notify Contractor of the unsafe or potentially unsafe condition. Tupi BV's notification shall establish a deadline for Contractor to remedy or rectify such condition. If Contractor fails to remedy the unsafe or potentially unsafe condition in such time, Tupi BV shall have the right (but not the obligation) to require Contractor to stop the Works until such time as the manner of performing the Works complies with the requirements of this Agreement; provided, however, that

at no time shall Contractor be entitled to an adjustment of the Contract Price or the Project Schedule and/or the Critical Path Schedule based on such work stoppage. Nothing in this  Section 3.20 shall affect Contractor's status as an independent contractor.

(h)    Contractor represents and warrants that it knows and has carefully reviewed and taken account of all matters concerning the performance of the Works fully and completely, and in accordance with the Project Schedule and the Critical Path Schedule. Contractor has had the opportunity to investigate and has carefully reviewed and taken account of all matters concerning the Site, including the topography and weather patterns at the Site and surrounding area, the management and storage of materials, the availability of labor, water, electricity, and communications, the access routes to the Site (including the suitability of those routes, with such modifications or reinforcements as Contractor has identified as part of the Works, for delivery of Contractor's Equipment and plant) and soil and subsoil conditions and characteristics and accepts them for such performance. Contractor's failure to acquaint itself with such general or local conditions or circumstances affecting the Works existing as of the effective date of this Agreement shall neither relieve it from the responsibility for successfully performing this Agreement nor entitle Contractor to a Change. Contractor is responsible for the pertinence, sufficiency and accuracy of all information used in the performance of the Works. Contractor acknowledges that all appropriate allowances for these conditions have been taken into account in the Contract Price and in determining the Project Schedule and the Critical Path Schedule. No discrepancy between the actual conditions encountered by Contractor and the conditions that Contractor anticipated or allowed for shall excuse Contractor from any failure to perform the Works in accordance with the Project Schedule and/or the Critical Path Schedule. In addition, no claim shall be considered for any increase in the Contract Price or for any extension of the Project Schedule and/or the Critical Path Schedule, or any other claim, relief or remedy whatsoever, based in whole or in part upon any such discrepancy.

(i)    Contractor shall not, nor shall it permit or allow any Subcontractor to, transport any Hazardous Materials to the Site, except to the extent necessary to the performance of the Works. Contractor shall remove, transport and dispose of, in accordance with any Applicable Law any Hazardous Materials transported onto the Site or generated in the performance of the Works, and so long as the same is done in compliance with Applicable Law, Contractor shall remain responsible and strictly liable for all such Hazardous Materials. Contractor and, on behalf of itself and the Contractor Group, shall defend, indemnify, and hold harmless each member of Tupi BV Group from and against any and all claims, losses and/or liabilities, (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or tribunal and related attorneys' fees) suffered or incurred by any member of Tupi BV Group arising out of or resulting from Contractor's use, handling, or disposal of Hazardous Materials on the Site.

(j)     Contractor shall at all times keep the Site free from waste materials caused by its activities. As soon as practicable, after the completion of all Punch-List items, Contractor shall remove all of its Equipment and materials not constituting part or otherwise embodied in the FPSO PACKAGES II or in the FPSO PACKAGES V, and remove, at its own cost, all waste and Hazardous Materials from the Site so as to bring the Site into full compliance with Applicable Law and this Agreement. Contractor shall be responsible for all costs associated with removal of any waste or Hazardous Materials from the Site, including costs associated with permitting and transportation.

(k)     Contractor shall ensure that the performance of the Works does not interfere with any other work related to the FPSO PACKAGES II & V performed by Tupi BV or its subcontractors. If Contractor's performance of the Works interferes with a commercially operable facility adjoining the Site, notwithstanding anything to the contrary in this Agreement, Contractor shall be responsible for the payment of any damages suffered or incurred by any member of the Tupi BV Group or any other Person resulting from such interference. At no time may Contractor utilize any Tupi BV systems or assets at a Site unless specifically authorized by the Scope of Work or as approved by Tupi BV in writing.

(l)     Contractor shall make the Site available to Tupi BV, or to any person at the request of Tupi BV, including but not limited to the Tupi BV Project Manager and other Tupi BV personnel, or its agents, representatives and subcontractors, for the purpose of carrying out services related to the ownership or operation of the Site.

3.21    Access to Documents. Tupi BV, as represented by the Tupi BV Project Manager or any of its officers, or any person authorized in writing by Tupi BV, shall have access, at all times, when Works are being performed, to inspect and make copies of all notes, designs, drawings, specifications and other technical data pertaining to the technical aspects of the Works, equipment specifications, performance guarantee data, warranties, shop and field performance test and field representative reports; provided, that Contractor shall not be obligated to provide access to proprietary technical data regarding equipment manufactured by or for Contractor and not provided by Contractor to other persons so long as Contractor provides the non-proprietary portion of such technical data and the non-proprietary data provided by Contractor shall be of such type and detail as is customarily provided by vendors and provides Tupi BV with a reasonable basis for technical review of the design of the FPSO PACKAGES II or of the FPSO PACKAGES V. Drawings representing the latest modifications to or the current as-built status of the FPSO PACKAGES II or of the FPSO PACKAGES V required pursuant to Exhibit III, shall be available for Tupi BV's inspection at the Site at all times during any Site working day.

3.22    Environmental Compliance. Contractor shall perform the Works in such a manner as to minimize impact upon human health, safety and the natural environment. In carrying out the foregoing, Contractor shall comply with Good Industry Practices, Tupi BV Policies, and Applicable Law, including, without limitation, the Environmental Law, and any other regulations governing the environment, health and safety such as Contractor's safety program, as approved by Tupi BY, which approval shall not be unreasonably withheld, and

Tupi BV's standards as set forth herein and in <u>Exhibit IX.</u> Such submission shall not be construed as limiting in any manner Contractor's obligation to undertake all reasonable actions toward maintaining safe working conditions at the Site, nor as imposing upon Tupi BV responsibility to review, or for the adequacy of, the environment, health and safety program at the Site. Contractor shall dispose of any waste buildup in the water or wastewater treatment systems included in the Site and waste from the sanitary sewer or any other source at the Site resulting from Contractor's performance of the Works. Contractor shall dispose of all non-hazardous wastes and Hazardous Materials generated or encountered during performance of the Works only at disposal facilities approved and permitted to receive such wastes and Hazardous Materials. Contractor shall be liable, indemnify and hold Tupi BV and/or each other member of Tupi BV Group harmless for any losses and/or damages arising, directly or indirectly, out of violation of applicable Environmental Laws, in which case, except for <u>Section 22.6.2,</u> limitations of liability set forth under <u>Section 22.6</u> shall not apply.

3.23 <u>Transportation of Materials and Subcontractors.</u> Contractor shall be responsible for the transportation to, from and among any of the Sites of all Equipment, Subcontractors and personnel used to perform any Works in connection with the FPSO PACKAGES II & V.
3.24 <u>Not Applicable.</u>

3.25 <u>Export of FPSO.</u> Contractor shall take all the necessary steps and shall obtain the necessary authorization for the timely export of each FPSO PACKAGE II Module and of each FPSO PACKAGE V Module, at its Handover, including but not limited to its registration in all the relevant registries, such as the *Registro de Operac5es de Credit°* ("RC") and the *Registro de Exportacao* ("RE") with SISCOMEX. Contractor, on behalf of itself and its affiliates, shall defend, indemnify and hold each member of Tupi BV Group harmless from and against any and all claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or tribunal and related attorneys' fees) suffered or incurred by any member of Tupi BV Group arising out of or resulting from Contractor's failure to obtain all such authorizations, including the RC and/or RE permit.

3.26 <u>Tupi BV Supply.</u> Tupi BV shall be responsible to provide the following: (i) PRINTED CIRCUIT HEAT EXCHANGER (PCHE), (ii) TURBOGENERATOR and (iii) A&C System, in each case in the following conditions (and to the extent not defined in this Agreement, defined terms in this <u>Section 3.26</u> shall have the meanings given them in the Bid Documents):

- - The **PRINTED CIRCUIT HEAT EXCHANGER (PCHE)** and the **TURBOGENERATOR** will be delivered cleared for export, at a bonded warehouse *("recinto alfandegado"),* in a place in Brazil to be notified to Contractor by Tupi BV;

- The **A&C System** will be delivered cleared for export, at a bonded warehouse *("recinto alfandegado"),* in the city of Novo Hamburgo, RS, Brazil.

3.26.1 Contractor shall be responsible to (i) collect all of the items listed in <u>Section 3.26</u> and other materials that will be installed within the Modules or within any area for which Contractor is responsible, (ii) provide all required

custom clearances and (iii) transport all of the items listed in <u>Section 3.26</u> and other materials to the Site.

3.26.1.1    Contractor shall maintain an up-to-date record of all Customs documentation.

3.26.1.2    Contractor shall bear all costs related to its obligations under this <u>Section 3.26</u>, including any extra costs resulting from Contractor's delay in collecting the items listed in <u>Section 3.26.</u>

3.26.2 The PRINTED CIRCUIT HEAT EXCHANGER (PCHE) shall be collected within +/- 15 Days from the dates indicated below and only after Tupi BV's issuance of a notice to Contractor authorizing Contractor's mobilization for this activity:

|  | FPSO | P-67 | P-68 | P-69 | P-70 | P-71 |
|---|---|---|---|---|---|---|
| Dates | PACKAGE II | 08-Aug-2013 | 05-Jan-2014 | 04-Jun-2014 | 01-Nov-2014 | 31-Mar-2015 |

3.26.3 The TURBOGENERATOR shall be collected within +/- 15 Days from the dates indicated below and only after Guara BV's issuance of a notice to Contractor authorizing Contractor's mobilization for this activity:

|  | FPSO | P-67 | P-68 | P-69 | P-70 | P-71 |
|---|---|---|---|---|---|---|
| Dates | PACKAGE V | 16-Aug-2013 | 11-Jan-2014 | 12-Jun-2014 | 08-Nov-2014 | 08-Apr-2015 |

3.26.4 The A&C System shall be collected by Contractor within +1- 30 Days from the dates indicated below and only after Tupi BV's issuance of a notice to Contractor authorizing Contractor's mobilization for this activity:

|  | FPSO | P-67 | P-68 | P-69 | P-70 | P-71 |
|---|---|---|---|---|---|---|
| Dates | PACKAGE II | 19-Apr-2013 | 16-Sep-2013 | 13-Feb-2014 | 13-Jul-2014 | 30-Dec-2014 |
|  | PACKAGE V | 19-Apr-2013 | 16-Sep-2013 | 13-Feb-2014 | 13-Jul-2014 | 30-Dec-2014 |

3.26.5 After receiving the items supplied by Tupi BV pursuant to this <u>Section 3.26</u>, Contractor shall be solely responsible for their preservation, storage, transportation, packing, unpacking, inspection, installation, assembly, integration, commissioning, pre-commissioning, start-up phases and field acceptance tests, in order to guarantee the contracted performance of the items.

## ARTICLE 4

## LOCAL CONTENT REQUIREMENTS

4.1    Local Content — General. The Parties acknowledge and agree that, in conformance with Tupi BV's internal policies, external commitments and obligations, and as an important element the value of its reputation and goodwill, it is essential to Tupi BV that the performance of the Works and the construction of the FPSO PACKAGES II & V be comprised of goods, materials and services of Brazilian origin. Accordingly, and without prejudice to any other provision in this  Article  4, Contractor agrees to comply with all Brazilian Local Content requirements and acknowledges that the Contract Price has been agreed by Tupi BV in reliance on the satisfaction by Contractor of all Brazilian Local Content requirements, including the procurement of Brazilian-sourced goods and materials and the performance in Brazil of services and other operations related to the Works. Contractor shall perform, in Brazil, all engineering, all construction and assembly, integration, commissioning, pre-operation, start-up and assisted operation related to the Works.

4.2 Brazilian Local Content. The  required percentage of Brazilian Local Content in respect of the specified category of Works (the "Brazilian Local Content Index" *(indice de Nacionalizacao))*  for certain Equipment, for each Module of FPSO Package II and for each Module of FPSO Package V, shall be at least the percentages established below:

| Description | Contractor Scope of Work for the whole Module | Brazilian Local Content Index |
|---|---|---|
| Package II | M05 - Gas Dehydration & Fuel Gas | 76.0% |
| Package V | M15 — Power Generation | 82.5% |
|  | Ml 6 — Power Generation | 82.0% |

| Equipment and Materials | | Brazilian Local Content Index |
|---|---|---|
| Steel Structure | Furnaces | 80.0% |
|  | Tanks | 83.0% |
|  | Pressure Vessels | 70.0% |
| Instrumentation | | 20.0% |
|  | Filters | 80.0% |
|  | Cathodic Protection | 90.0% |
| Static Mechanical | Flare | 14.0% |
|  | Valves up to 2" (Index per Module)    M05 | 46.0% |
|  | Valves up to 24" (Index per module)    M15 | 13.5% |
|  | M16 | 22.5% |

| | | |
|---|---|---|
| Rotary Mechanical | Pumps | 70.0% |
| | Reciprocating Compressors | 70.0% |
| | Rotary Screw Compressors | 70.0% |
| | Diesel Engines (up to 600 hp) | 62.0% |
| Fiscal Measurement System | | 60.0% |
| Telecommunication System | | 40.0% |
| Electrical System | | 70.0% |
| Process Tower | | 65.0% |
| Cooling Tower | | 85.0% |
| Heat Exchangers | | 40.0% |

4.2.1 The determination of actual "Brazilian Local Content" shall be made according to the formulas for calculation of Brazilian Local Content established by ANP from time to time. Contractor shall provide to Tupi BV certification of Brazilian Local Content ("Local Content Certification") from a company properly qualified by ANP to make such a determination (the "Certification Agency").

4.2.2 The Certification Agency shall operate as Contractor's subcontractor. Contractor shall not replace such Certification Agency without Tupi BV's prior written consent, in accordance with Article 19 (Subcontracting) of this Contract.

4.3     Reporting. Contractor shall inform Tupi BV in writing, upon each measurement of the Works carried out and on each delivery of materials, the percentage of Brazilian Local Content achieved for such Measurement Period or such materials. Contractor shall also include such percentage of Brazilian Local Content on all of its invoices and, when applicable, shall attach the Local Content Certification provided by the Certification Agency to such invoice.

4.3.1 To be considered valid, the Local Content Certification must conform in all respects with the requirements of the *"Resoluciio 36 da ANP, de 13.11.2007."*

4.3.2 Contractor shall maintain all information related to Brazilian Local Content in connection with this Contract and shall promptly make such information available upon request at any time to Tupi BV, to ANP, and to the Certification Agency.

4.3.3 Contractor is fully responsible for the accuracy and completeness of all information relating to Brazilian Local Content that is provided to Tupi BV, to ANP and to the Certification Agency.

4.4     Local Content Price Adjustment. The Parties acknowledge and agree that the initial Contract Price has been agreed based on the premise that Contractor will satisfy all of the Brazilian Local Content Index requirements as set forth in Section 4.2, and that Contractor's

failure to satisfy such Brazilian Local Content Index requirements necessitates an adjustment to the Contract Price. Accordingly, if Contractor fails to achieve the Brazilian Local Content Index required for any of the categorycategories of Works set forth in Section 4.2, then the price for any such category of Works shall be adjusted according to the following (any of the adjustments set forth below, a "Local Content Price Adjustment"):

4.4.1 If the Unrealized Brazilian Local Content Percentage of a category of Works identified in Section 4.2 is less than sixty-five percent (65%) of the Brazilian Local Content Index for that category of Works, then the portion of the price for that category of Works that is required to be Brazilian Local Content shall be reduced by the Local Content Price Adjustment determined as an amount equal to sixty percent (60%) of the difference between (a) the value of the Brazilian Local Content Index Index for such category of Works and (b) the value of the actual Brazilian Local Content for such category of Works.

*Example:*
*price of category of Works: $1,000,000*
*Brazilian Local Content Index: 80% ($800,000)*
*actual Brazilian Local Content achieved by Contractor: 70% ($700,000)*
*Unrealized Brazilian Local Content Percentage:*
*(%NR) = (80%-70%) / 80% = 12.5%*
*Because the percentage of Brazilian Local Content that is not achieved (%NR) is less than 65%, this Section 4.4.1 applies.*
*Local Content Price Adjustment:*
*($800,000 x 12.5%) x 60% = $60,000*
*adjusted price for that category of Works:*
*$1,000,000 — $60,000 = $940,000*

4.4.2 If the Unrealized Brazilian Local Content Percentage of a category of Works identified in Section 4.2 is equal to or greater than sixty-five percent (65%) of the Brazilian Local Content Index, then the portion of the price for that category of Works that is required to be Brazilian Local Content shall be reduced for the individual category of Works according to the following:

%LCPA =(1.143 x %NR) — 14.285

Local Content Price Adjustment = %LCPA x value of the Brazilian Local Content Index

*Example:*
*price of category of Works: $1,000,000*
*Brazilian Local Content Index: 80% ($800,000)*
*actual Brazilian Local Content achieved by Contractor: 20%*
*Unrealized Brazilian Local Content Percentage:*
*(%NR) = (80%-20%) / 80% = 75%*
*Because the percentage of Brazilian Local Content that is not achieved (%NR) is greater than 65%, this Section 4.4.2 applies.*

*%LCPA = (1.143 x 75) — 14.285 = 71.44%*
*Local Content Price Adjustment:*
 *71.44% x $800,000 = $571,520*
*adjusted price for that category of Works:*
 *$1,000,000 — $571,520 = $428,480*

4.4.3 The Local Content Price Adjustments set forth in this <u>Section 4.4</u> are cumulative and shall be calculated for each Invoice separately.

4.5 <u>Brazilian Vendors.</u> Whenever Brazilian vendors are included in any specific item of the Vendor List found in <u>Exhibit V</u> - Appendix 1, and Contractor intends to use equipment from a foreign vendor, Contractor shall submit, for Tupi BV approval, a report demonstrating that, after negotiations, Brazilian vendors' proposals are not feasible due to technical or commercial (price or schedule) issues. Tupi BV's approval of the above mentioned report must be complied with before the signature of the Purchase Order.

# ARTICLE 5

# OBLIGATIONS OF TUPI BV

Tupi BV shall comply with the following provisions in a timely manner:

5.1 <u>Payment.</u> Tupi BV shall timely pay the Contract Price and all other sums, if any, required to be paid by Tupi BV to Contractor pursuant to the terms of this Agreement, and in accordance with the provisions of <u>Articles 9</u> and 10 hereof.

5.2 <u>Permits.</u> Tupi BV shall be responsible for obtaining the permits and consents listed in <u>Exhibit XIV</u> in accordance with the schedule contained therein. Tupi BV shall provide Contractor with copies of such permits and consents. Tupi BV shall provide information, assistance and documentation to Contractor as reasonably requested in connection with the Consents to be obtained by Contractor hereunder.

5.3 <u>Temporary Asset Transfers.</u> Tupi BV may transfer custody of certain assets required by Contractor to complete the Works to Contractor. Such transfer shall not include title to the relevant asset. Contractor shall return promptly each such asset to Tupi BV upon the completion of the portion of the Works for which the custody of such asset was required by Contractor. Contractor shall be liable for any damage to the asset occurring during the time the asset is in Contractor's custody. Prior to any transfer, Contractor shall demonstrate to Tupi BV's satisfaction (in Tupi BV's sole and absolute discretion) that it possesses sufficient insurance to cover any damage to the asset.

## ARTICLE 6

### REPRESENTATIONS OF THE PARTIES

In addition to their individual representations and warranties in other provisions of this Agreement, each Party further represents and warrants, with respect to itself only, that:

6.1 <u>Corporate Standing.</u> It is a corporation duly organized, validly existing and in good standing under the laws of The Netherlands (for Tupi BV) or the Federative Republic of Brazil (for Contractor). It is authorized and qualified to do business in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary and where failure so to qualify would have a material adverse effect on its financial condition, operations, prospects, taxes or business.

6.2 <u>No Violation of Law; Litigation.</u> It is not in violation of any Applicable Law or judgment entered by any Governmental Authority, which violations, individually or taken together, would affect its performance of any obligations under this Agreement. There are no legal or arbitration proceedings or any proceeding by or before any Governmental Authority, now pending or (to its best knowledge) threatened against it that, if adversely determined, could reasonably be expected to have a material adverse effect on its financial condition, operations, prospects or business, as a whole, or its ability to perform under this Agreement.

6.3 <u>Licenses.</u> It is the holder of all Consents, licenses, permits, or other authorizations required to permit it to operate or conduct its business now and as contemplated by this Agreement and to carry out the provisions of this Agreement.

6.4 <u>No Breach.</u> Neither the execution and delivery of this Agreement, nor the consummation of the transactions herein contemplated, or compliance with the terms and provisions hereof, will conflict with, or result in a breach of, or require any consent under, its charter or by-laws, or any Applicable Law or regulation or any order writ, injunction or decree of any court, or any agreement or instrument to which it is a party or by which it is bound or to which it is subject, or constitute a default under any such agreement or instrument.

6.5 <u>Corporate Action.</u> It has all necessary power and authority to execute, deliver and perform its obligations under this Agreement; its execution, delivery and performance of this Agreement has been duly authorized by all necessary action on its part; and this Agreement has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation enforceable against it in accordance with its terms.

6.6 <u>Financial Solvency.</u> Contractor is financially solvent, able to pay all debts as they mature, and possesses sufficient working capital to complete the Works as provided in this Agreement and perform its obligations hereunder.

The foregoing representations and warranties are in addition to, and not in lieu of, any and all other liability imposed upon Contractor by law with respect to Contractor's duties, obligations and performance hereunder. Contractor's liability hereunder shall survive Tupi

BV's final acceptance of and payment for the Works. All representations and warranties set forth in this Agreement shall survive as provided in Section 25.15.

# ARTICLE 7

## TAXES AND DUTIES

7.1     General Provision. All taxes levied and directly due to the execution of this Agreement and/or its performance are the exclusive responsibility of the taxpayer as defined by Applicable Law, without a right of reimbursement from the other Party except as expressly provided for in this Agreement. Contractor confirms that it has taken into account in its proposal all taxes applicable to the performance of the Works (including sales, works, use, value added or similar taxes), and waives and releases any claim to have the Contract Price revised or to have collections reimbursed for any taxes it is required to pay as a result of any activities related to this Agreement.

7.2     Improper Tax Charge. If Tupi BV becomes aware, during the term of this Agreement, that Contractor added any taxes improperly, or failed to make proper deductions or to offset tax credits authorized by Applicable Law, the Contract Price will be subject to reduction to the extent of the improper addition, deductions not made or tax credits not offset, with consequent reimbursement or reparation to Tupi BV of any amounts eventually paid to Contractor or on Contractor's behalf.

7.3     Modification of the Tax Burden. If the tax burden applicable to this Agreement is raised or diminished as a result of enactment or amendment of tax legislation on or after the date of execution of this Agreement, the Contract Price will be increased or decreased as appropriate so that the amount received by Contractor from Tupi BV hereunder, determined after taking into account such increase or decrease in the Contract Price, will be the same as it would have been had such enactment or amendment not taken effect. No increase in the Contract Price shall be implemented under the preceding sentence as a result of any increase in the Contract Price for which Contractor is eligible to receive, directly or indirectly, as a refund, recovery or reimbursement (whether by payment, credit, offset or otherwise).

> 7.3.1 In the event of the enactment or amendment of tax legislation to which Section 7.3 applies, Contractor shall use reasonable endeavors to take actions or measures so as to minimize the amount of taxes imposed in connection with this Agreement as a result of such enactment or amendment if such actions or measures would not be materially disadvantageous to Contractor.

> 7.3.2 The revision of the original Contract Price due to an increase in the tax burden applicable to this Agreement will not happen if this increase results from Contractor's action or decision, such as a change in the location of its establishment or voluntary changes in the taxation method, or even in the case of changes in the economic circumstances of Contractor.

7.4     <u>Withholding.</u> Tupi BV shall deduct or withhold any applicable taxes from or in respect of any amount payable to Contractor hereunder.

7.5     <u>Provision of Documents.</u> Contractor shall provide to Tupi BV all documents necessary to reduce or eliminate withholding of taxes to be made by Tupi BV from any payment to be made by Tupi BV to Contractor hereunder before such payment is due, without the requirement of any request by Tupi BV.

7.6     <u>Contractor Responsibility for Employees.</u> Except as otherwise expressly stated in this Agreement, Contractor shall be solely responsible for itself, its employees, Subcontractors and third parties contracted by Contractor for the payment of all taxes and governmental charges of whatever nature imposed or assessed by any Governmental Authorities.

7.7     <u>Indemnification.</u> Contractor shall defend, indemnify and hold each member of the Tupi BV Group harmless from and against any and all claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or tribunal and related attorneys' fees) suffered or incurred by any member of Tupi BV Group arising out of or resulting from any assessment or levy made against any member of the Tupi BV Group with regard to any and all taxes, charges, use fees, duties or customs charges, harbor taxes or any other governmental charges, existing or to be created related to this Agreement, including interest or fines and penalties related thereto and imposed upon Contractor, Contractor's personnel, and all other third parties contracted by Contractor in connection with the performance of this Agreement, and/or arising out of or in connection with Contractor's failure to comply with any Applicable Law concerning such taxes, customs, charges and duties.

7.8     <u>Minimization of Taxes.</u> Contractor shall, and shall cause Contractor's Affiliates to, use reasonable efforts to minimize taxes with respect to this Agreement, including, but not limited to, cooperating and reasonably assisting Tupi BV in supporting claims for exemptions and tax credits. Tupi BY and Contractor shall cooperate with each other as may be reasonably requested in connection with the preparation of tax returns and filings and defending tax audits relating to this Agreement and the payments hereunder.


# ARTICLE 8

## MEASUREMENT

8.1     <u>Calculation of the Works Progress.</u> Contractor shall submit, no later than the eighteenth (1 8th) day of each month, the detailed calculations reflecting the Works carried out in the applicable period for each FPSO PACKAGE II & V. Failure to meet such deadline shall cause proportional delay in the corresponding payment of the Invoice submitted by Contractor for such period.

    8.1.1 The calculation of the Works progress:

    (a)     Shall be based on the planning and control systems developed according to the requirements set forth in <u>Exhibit VI</u>; and

(b) Shall comply with the progress measurement criteria established in this Agreement.

8.2 <u>Measurement of the Works.</u> With the assistance and cooperation of Contractor, Tupi BV shall verify the calculation of the Works progress and measure the portion of Works performed and of the events completed and accepted during the period between the sixteenth (16th) Day of the prior month to the fifteenth (15th) Day of the month of reference, for each FPSO PACKAGE II & V, which calculation shall be made as result of the application of item 4 of <u>Exhibit VI.</u> The results shall be provided in a document (the <u>"Measurement Report"</u> or "MR"), pursuant to the provisions of this <u>Article 8.</u> No later than five (5) Business Day after Contractor has complied with the requirements of <u>Section 8.1</u> above, GuaraTupi BV shall deliver to Contractor a Measurement Report indicating the Works performed for the FPSO PACKAGES II and V during the applicable period. Such MR shall be the basis of Contractor's Invoice for the relevant period.

8.2.1 The measurement of the Works for each FPSO PACKAGE II & V in relation to a certain period shall be carried out taking into consideration:

(a) The requirements indicated in <u>Exhibit XIX</u> and <u>Exhibit VI;</u>

(b) Not applicable; and

(c) The amount of the estimated Brazilian Local Content for each FPSO PACKAGE II Module and for each FPSO PACKAGE V Module, together with corresponding calculations.

8.2.2 The Works recorded in the MR shall be deemed provisionally accepted, and acknowledged to be invoiced by Contractor, provided, however, that Tupi BV will be entitled to subsequently reject such recorded Works if any failure, discrepancy, fault or defect is ascertained, in which case Contractor shall be required to remake or correct such failure, discrepancy, fault or defect at its sole expense.

8.2.3 Contractor may provide feedback to the inspection carried out by Tupi BV by providing to Tupi BV, within five (5) Business Days from Contractor's receipt of the MR, a response to the MR setting forth any claims, comments or considerations that Contractor may deem appropriate for Tupi BV's consideration.

8.2.4 The execution of the Measurement Report by the Tupi BV Project Manager will be deemed to be Tupi BV's acknowledgement of the accuracy thereof.

ARTICLE 9

CONTRACT PRICE

9.1     Contract Price. The Contract Price is determined as further set out in Section 9.2, based on a lump sum fixed price basis and as may be further adjusted pursuant to any Local Content Price Adjustments (as further described in Section 4.4) or other adjustments hereunder. The estimated total amount to be paid to Contractor under this Agreement as further set forth in the Price Schedule attached as Exhibit XVIII, is three hundred and fourteen million, five hundred and thirty five thousand, two hundred and thirty five United States Dollars and eight five cents (US$ 314,535,235.85) (the "Contract Price") as compensation for the full and satisfactory completion of the Works and the full and satisfactory performance by Contractor of all of its obligations set forth in this Agreement. The breakdown of the Contract Price corresponding to each of the five (5) FPSO PACKAGES II & V is further described under Exhibit XXXVII.

        (a)     The price established in Section 9.1 of the Agreement is inclusive of all the necessary overhead, personnel (supervision, direction, administration, labor), Equipment, taxes due to labor and Social Security obligations, costs, supplies, transportation of items supplied by Tupi BV according to Article 3.26 from any location in Brazil, tools, expenses, taxes, licenses, insurance and Contractor's profit, all as required for the performance of the Works under this Agreement including, but not limited to, its provisions relating to Contractor's performance (Article 3); Brazilian Local Content (Article 4); Taxes (Article 7), Good Industry Practices, and compliance with all Applicable Law.

9.2     Price. The Contract Price comprises the following elements:

        9.2.1 The Lump Sum Price of three hundred and one million, nine hundred and sixty three thousand, six hundred and eighty seven United States Dollars fifty cents (US$ 301,963,687.50), as set forth in Price Schedule A of Exhibit XVIII (Price Schedule), corresponding to all Works required to be performed by Contractor, as provided in this Agreement for the successful completion of all five (5) FPSO PACKAGES II & V fully functional, operable, and delivered to Tupi BV, after the Final Completion Acceptance Notice at the FPSO PACKAGES II & V construction yard quay, and that fully meet all of the requirements set forth in this Agreement. This Lump Sum Price excludes only the following:

        9.2.1.1     The items to be specifically provided by Tupi BV, as indicated in Exhibit I, (Tupi BV Scope of Work).

        9.2.2 Not applicable.

        9.2.3 Not applicable.

        9.2.4 Not applicable.

9.2.5    The amount of one million United States Dollars (US$ 1,000,000.00), as set forth in Price Schedule A of  Exhibit XVIII (Price Schedule), as consideration for the option granted by Contractor in favor and for the benefit of Tupi BV, as set forth in Section 12.6(a).

9.2.6 Any Local Content Price Adjustments calculated pursuant to  Section 4.4 shall be subtracted from the Contract Price, and the resulting revised amount shall be deemed for all purposes under this Agreement to be the Contract Price.

9.2.7    If Tupi BV does not exercise the option set forth in Section 12.6(a), the amount of eleven million, five hundred and seventy one thousand, five hundred and forty eight United States Dollars and thirty five cents (US$ 11,571,548.35), as set forth in Exhibit XVIII, Price Schedule E, as Fixed Costs incurred by Contractor.

9.3    Payment Limit. Notwithstanding the provisions of Section 9.1, when the aggregate of all payments made by Tupi BV hereunder reaches the total amount of the Contract Price, Tupi BV's payment responsibilities shall cease except as otherwise provided in this Agreement. Notwithstanding the foregoing, Contractor shall be responsible to carry out the Works and its obligations and responsibilities under this Agreement to Final Completion.

# ARTICLE 10

## PAYMENTS TO CONTRACTOR

10.1    Payments — General. Payments shall be made by Tupi BV to Contractor in accordance with Article 9, Exhibit XVIII and Exhibit XIX, and shall comply with all other terms of this Agreement. Payments shall be made to an account designated by Contractor and shall be in United States Dollars except as otherwise agreed by the Parties.

10.2    Invoicing. No later than the four (4th) Business Day after GuaraTupi BV delivered to Contractor a Measurement Report indicating the Works performed for the FPSO PACKAGES II & VV, Contractor shall submit to Tupi BV, with a copy to Tupi BV Project Manager, its Invoice accompanied by any necessary supporting documents, in a form reasonably acceptable to Tupi BV and previously approved by Contractor Project Manager.

10.2.1 In the event invoicing occurs on a later date than that set forth in Section 10.2, is not provided in a form acceptable to Tupi BV, or is missing necessary supporting documents, the due date for payment of the Invoice shall be postponed by as many days as the number of days of delay in the delivery of an acceptable Invoice and/or of any required supporting documents in accordance with Section 10.5.

10.2.2 In case the issuance of the Measurement Report is delayed for any reason attributable to Tupi BV, the respective payment shall not be delayed as a consequence of such delay.

10.3 <u>Invoicing Documents.</u> The Invoice shall be issued to Tupi BV and must contain the following information:

(i) Tupi BV's address;

(ii) Reference to this Agreement with effective dates and any amendment or addendum pursuant to which the Invoice is issued;

(iii) Reference to the Measurement Report to which the Invoice refers with indication of the period covered by such Measurement Report, and any numbering system used to identify such Measurement Report;

(iv) Contractor's bank account information;

(v) Evidence of compliance by Contractor with its FGTS and INSS obligations as required by Applicable Law;

(vi) Any other data required to enable the making of the payment corresponding to the applicable invoicing documents.

10.4 <u>Representation.</u> Each Invoice shall constitute a representation by Contractor that:

(i) The quality of all Works described in the Invoice is in accordance with the terms of this Agreement;

(ii) Contractor is entitled to payment of the amount invoiced;

(iii) The Works (or any portion thereof) described in the statement accompanying the Invoice and all previous Invoices are free and clear of all Liens; and

(iv) All of Contractor's employees and Subcontractors have been paid the monies due and payable to them for their work and supplies in connection with the respective FPSO PACKAGE II & V (except for such amounts as may be disputed in good faith by Contractor).

The amount of the Invoice and the Works described therein shall correspond to the relevant Measurement Reports. Tupi BV may, at its sole discretion, request that any Invoice be accompanied by a Lien waiver corresponding to all Works performed in the invoiced period.

10.5 <u>Review and Approval.</u> Each Invoice shall be reviewed by Tupi BV in order to be compared with the Measurement Report for the corresponding period. Upon Tupi BV's request, Contractor shall furnish supporting documentation, including certificates, and provide any further information as may be reasonably requested by Tupi BV. Unless disputed pursuant to <u>Article 24,</u> each Invoice shall be due and payable within thirty (30) Days

of its receipt by Tupi BV (such payment due date to be adjusted pursuant to  Section 10.2 above to reflect any delays in Contractor's Invoice issuance and delivery of requested documentation). If an Invoice is disputed by Tupi BV, payment shall be made on its undisputed portion. Payment on disputed amounts shall be made as soon as the dispute is resolved, but without any interest payable by Tupi BV on such amounts.

10.6    Payments. The payment amount due to Contractor based on the Invoice shall be effected by Tupi BV by means of a bank receipt document issued by a banking institution in the name of Contractor, payable within thirty (30) Days from the date of Tupi BV's receipt of the Invoice, with due regard for the provisions of Section 10.2, or by wire transfer in favor of Contractor. Contractor hereby notifies Tupi BV that payment shall be made to the following bank and account:

Please credit Banco do Brasil S.A. — Curitiba- PR- Brazil
BIC/SWIFT Code BRASBRRJCTA
Through BANCO DO BRASIL S.A. NEW YORK —USA
BIC/SWIFT Code BRASUS33
(U.S. Correspondent Bank — only for payments in USD)
FedWire ABA Number: Fw026003557

With advice to Curitiba Branch
Beneficiary Customer swift Field:

001340450000064521 (IBAN CODE)
Beneficiary: DM CONSTRUTORA DE OBRAS LTDA


Whenever Contractor desires to utilize bank information different from that indicated above, it shall notify Tupi BV in accordance with Section 25.5 indicating the new bank information concurrent with an Invoice.

10.7    Payments Not Acceptance of Works. No payment made hereunder shall be considered as approval or acceptance of the Works or any portion of the Works by Tupi By, or a waiver of any claim or right that Tupi BV may have hereunder. All payments shall be subject to correction and adjustment to be effected in subsequent payments.

10.8    Payments Withheld and Deducted. In addition to (i) disputed amounts set forth in the Invoice; (ii) any Local Content Price Adjustment pursuant to  Section 4.4; and (iii) the amounts corresponding to any Punch-List items not completed by Contractor, Tupi BV may withhold or deduct payment on Invoices or portions thereof in an amount and to such extent as may be reasonably necessary to protect Tupi BV and any other member of Tupi BV Group from loss due to:

> (a) Defective Works not remedied as required under this Agreement and for which Tupi BV has incurred expenses to correct such Defective Works, after Contractor has been duly notified and given a reasonable term for remedying any such Defective Works, and to the extent (i) any Defective Works are due to

Contractor's or Contractor's Subcontractors' fault, and (ii) such Defective Works have been or are being corrected by Tupi BV or by any third parties engaged by Tupi BV;

(b)     Any material breach by Contractor of any term or provision of this Agreement;

(c)     Amounts incorrectly paid by Tupi BV to Contractor in the month immediately preceding or for which there was insufficient or inaccurate supporting information;

(d)     Liquidated Damages for Delay as described in Section 20.2;

(e)     Any other expenses, costs or liabilities that Tupi BV or any other member of Tupi BV Group has incurred and for which Contractor is legally or contractually responsible;

(f)     Amounts corresponding to the satisfaction of any judicial or administrative decision, Liens, or liabilities to third parties for which Contractor is solely responsible (whether directly or under any provision of this Agreement, including any provisions relating to Contractor's duty to indemnify Tupi BV or any other member of the Tupi BV Group), in each case that is brought against or charged to any member of the Tupi BV Group or, in the case of any Lien, created on any property of a member of the Tupi BV Group, provided that the withholding of payments under this subsection (f) shall be limited to the corresponding value thereof;

(g)     Any undisputed amounts due and payable by Contractor to Tupi BV;

(h)     Not applicable;

(i)     If Tupi BV has already paid Contractor for Defective Works, an amount equal to the amount paid to Contractor for the Defective Works until such Defective Works has been corrected and confirmed by Tupi BV;

(j)     Any Default by Contractor pursuant to Section 21.1 that has not been cured within the time set forth in Section 21.1; and

(k)     Contractor's failure to obtain, maintain or pay the premiums on any insurance policy pursuant to Section 14.7.

10.9     Interest on Late Payments. Any undisputed amounts due, but not paid hereunder, shall bear interest at a rate equivalent to the six (6) month London Interbank Offering Rate (LIBOR), published by the Financial Times, London edition, plus two percent (2%) per annum. Payments withheld or set off by Tupi BV, including pursuant to Sections 10.8, 10.10 and 10.12 of this Agreement, are not subject to the foregoing interest.

10.10   Payments During Default. Tupi BV shall not be obligated to make any payments hereunder at any time in which a Default shall have occurred and is continuing, except for any payments due for those services that have been completed as of such date of Default and/or are not related to the Default.

10.11   Offset. Tupi BV may, upon prior written agreement with notice to Contractor, offset any amount due and payable from Contractor to Tupi BV or Tupi BV Group against any amount due and payable to Contractor hereunder, without prejudice to Tupi BV's right to offset in Section 10.8, hereunder.

10.12   Payment Error. Payments made in error shall be immediately returned by the Party receiving the payment in error. Notwithstanding the generality of the foregoing, in the event Tupi BV discovers that a milestone associated with a payment was not in fact achieved, Tupi BV may off-set such payment against future payments until the milestone is achieved.

10.13   Adjustments. Except as otherwise provided in Sections 4.4, 7.3, 9.2.6, 10.13.1, 12.1.2 and 12.5, the Contract Price shall not be subject to any adjustment for any reason, including fluctuations of exchange rates, inflation, or price escalations.

> 10.13.1 Notwithstanding the foregoing, the amount related to the calculation of Brazilian Local Content shall be subject to adjustments according to the following formula:

$$PM = PO \times \frac{PTAXo}{PTAXp} \times Fy$$

> Where:

> PM = Monthly Adjusted Brazilian Local Content Amount in US Dollars.

> PO = Portion of Contract Price (without taking into account any Local Content Price Adjustments) corresponding to the Brazilian Local Content, duly certified by the Certification Agency as per Article 4 for each item and the level of Lump Sum Price Distribution, per Appendix I of Exhibit XIX, as included in the MR and certified as per Exhibit XVI, in US Dollars .

> PTAXo = The exchange rate of the US Dollar offered for sale in the Brazilian market, published by the Brazilian Central Bank on the database system *Sistema de Informacoes do Banco Central do Brasil* ("SISBACEN"), *site* PTAX 800 — Option 5, corresponding to three (3) Business Days before the date of submission of Contractor's Commercial Proposal (1 USD = 1.7326 REAL — date of rate February 02[nd] 2012).

> PTAXp = The exchange rate of the US Dollar offered for sale in the Brazilian Market, published by SISBACEN, site PTAX 800 — Option 5, corresponding to the last Business Day of the measurement period, between

the eleventh (11th) Day of the prior month to the tenth (10th) Day of the month of reference.

Fy = Yearly adjustment factor determined by the following parametric formula, calculated every twelve months, and counted from the date of submission of Contractor's Commercial Proposal, to reflect the escalation of costs related to the Brazilian Local Content:

$$Fy = 0,40 \times \frac{MOn}{MOo} + 0,40 \times \frac{FAn}{FAo} + 0,20 \times \frac{En}{Eo}$$

Where:

MOn = Definitive value of the Price Index corresponding to *"Custo de construclio - o-de-obra — MuniciPio do Rio de Janeiro — Coluna 10 — FGV (codigo A0159401)"* representing the cost of man-power, in the month preceding the month to which the adjustment is due.

MOo = Definitive value of the Price Index corresponding to *"Custo de Construe& - Mdo-de-obra - MuniciPio do Rio de Janeiro — Coluna 10 — FGV (codigo A0159401)"* representing the cost of man-power, in the month preceding the month in which the Contractor Commercial Proposal was submitted.

FAn = Definitive value of the Price Index corresponding to *"IPA-ORIGEM- OG -DI - PRODUTOS INDUSTRIALS - INDUSTRIA DE TRANSFORMACAO - METAURGICA BASICA - FGV - (codigo 1006823)",* representing the cost of raw materials in the price composite in the month preceding the month in which the adjustment is due.

FAo = Definitive value of the Price Index corresponding to *"IPA-ORIGEM- OG -DI - PRODUTOS INDUSTRIALS - INDUSTRIA DE TRANSFORMACAO - METAORGICA BASICA - FGV - (codigo 1006823)",* representing the cost of raw materials in the price composite in the month preceding the month in which the Contractor Commercial Proposal was submitted.

En = Definitive value of the Price Index corresponding to *"IPA - EP BENS FINALS - BENS DE INVESTIMENTO - MAQUINAS E EQUIPAMENTOS - FGV (Codigo 1004812)",* representing the cost of construction equipment in the price composite in the month preceding the month in which the adjustment is due.

Eo = Definitive value of the Price Index corresponding to *"IPA - EP BENS FINALS - BENS DE INVESTIMENTO - MAQUINAS E EQUIPAMENTOS - FGV ((Wig° 1004812)",* representing the cost of construction equipment

in the price composite in the month preceding the month in which the Contractor Commercial Proposal was submitted.

10.13.2 Each Measurement Report which shall specify the estimated Brazilian Local Content for each FPSO PACKAGE II & V, in United States Dollars, adjusted in accordance with Section 10.13.1.

10.13.3 Any discrepancies between the estimated Brazilian Local Content set forth in the MR and the actual Brazilian Local Content approved by the Certification Agency shall be adjusted in the next following MR, and, if applicable, any Local Content Price Adjustment based on the estimated Brazilian Local Content shall be revised accordingly.

10.14   Final Completion. Together with issuing the Final Completion Certificate for each FPSO PACKAGE II and for each FPSO PACKAGE V, Contractor shall submit a statement summarizing and reconciling all previous Invoices, payments received and Change Orders together with an affidavit affirming that all payrolls, taxes, Liens, claims, demands, judgments, bills, Equipment, and any and all indebtedness connected with the Works for the applicable FPSO PACKAGE II or FPSO PACKAGE V have been paid or otherwise satisfied and discharged and shall provide a final Lien waiver in the form set forth in Exhibit XXVI.

# ARTICLE 11

# COMMENCEMENT OF WORK: PROJECT SCHEDULE

11.1   Commencement of Works. Contractor shall commence the Works upon the earlier of receipt from Tupi BV of (i) a limited notice to proceed ("Limited Notice to Proceed"), or (ii) a notice to proceed ("Notice to Proceed"), with the Works. The Work Authorization Initial Date of this Agreement shall be the date that Contractor receives the first of a Limited Notice to Proceed or a Notice to Proceed.

11.2   Limited Notice to Proceed. At any time prior to the date of issuance of the Notice to Proceed, TUPI BV may issue a Limited Notice to Proceed which shall authorize Contractor to commence performance of a specified portion of the Works. A Limited Notice to Proceed shall specify the maximum total cost of such specified Works, and Contractor shall be paid for such specified Works pursuant to the terms and conditions of this Agreement, with all such payments credited against the Contract Price and the first milestone payments to become due hereunder.

11.3   Critical Path Schedule and Project Schedule.

(a)   Critical Path Schedule. No later than thirty (30) days after signature of this Agreement, Contractor shall provide to Tupi BV a Critical Path Schedule, providing for the relationship and dependences of the Works and the work to be performed under the Guara BV PACKAGE II & V EPC Contract, as well as a description of

all activities required to complete the performance of both agreements and the time that each activity is estimated to be completed.

(b)    Project Schedule. Contractor shall perform the Works in accordance with the Critical Path Schedule and the schedule and management plan set forth in Exhibit XX (the "Project Schedule"). No later than thirty (30) days after signature of this Agreement, Contractor shall submit for Tupi BV's review and approval the detailed Project Schedule, in accordance with the requirements defined in this Agreement, and in particular Exhibit VI, Section 11.4 and the Critical Path Schedule. The Project Schedule shall include a Precedence Diagram, showing the critical path of the Works for all six (6) of the FPSO PACKAGES II & V, indicating the execution time for all activities of the Works detailed in the Works Breakdown Schedule ("WBS"), and the logical interrelationship of such activities, all in compliance with the dates indicated in Exhibit VI, Section 11.4 and the Critical Path Schedule. The Project Schedule will be the baseline of the Works and will be revised only pursuant to Sections 12.1, 12.3, and 21.3.

(c)    Final Completion. Each Final Completion shall occur no later than the days indicated in the table below after the date of issuance of the Notice to Proceed for each FPSO PACKAGE II and each FPSO PACKAGE V (each such date, the "Final Completion Date"). The Final Completion Date shall be adjusted only as provided in Sections 12.1, 12.2, 12.3, 12.4, 12.5 and 21.3.

| FPSO | P-67 | P-68 | P-69 | P-70 | P-71 |
|------|------|------|------|------|------|
| Days | 1,481 | 1,586 | 1,691 | 1,821 | 1,966 |

(d)    Milestones. The last Handover of all FPSO PACKAGE II Modules and of all FPSO PACKAGE V Modules shall occur for each FPSO PACKAGE II and for each FPSO PACKAGE V on or before the dates specified in Section 11.4.5, and each Final Completion shall occur on or before the dates specified in Section 11.3(c). If Contractor fails to complete any Handover or Final Completion on or before their respective Milestone Completion Dates, then the provisions of Section 20.2 shall apply and such failure also shall constitute a Default under Section 21.1.

(e)    Acceleration. If at any time the progress of any portion of the Works is delayed by more than sixty (60) Days from the applicable date referenced in the Project Schedule and/or the Critical Path Schedule, then Contractor shall promptly notify Tupi BV of the delay and the event or events causing such delay, and shall present an acceleration plan to Tupi BV for approval, specifically identifying the steps to be taken and the resources to be committed to accelerate the progress of such affected portion of the Works in order to bring such portion of the Works back into compliance with the Project Schedule and/or the Critical Path Schedule. All additional costs related to the implementation of any such acceleration plan shall be borne by Contractor, but only to the extent that Tupi BV is not responsible for the delay.

11.4    Project Schedule. Each FPSO PACKAGE II and each FPSO PACKAGE V shall be completed and transferred to Tupi BV according to the Project Schedule in Exhibit XX. As set forth in the Project Schedule, and subject to any subsequent Changes thereto, Contractor shall commence and perform the Works in compliance with the events described below:

11.4.1    Plans, procedures and documentation. Complete issuance of plans, procedures and documentation, no later than the dates indicated on Exhibit VI.

11.4.2 Not applicable.

11.4.3 Not applicable.

11.4.4 Not applicable.

11.4.5    Handover Dates. The full and complete performance of the last Handover for each FPSO PACKAGE II and for each FPSO PACKAGE V shall be completed as per the Project Schedule and the Critical Path Schedule, as set forth in the table below and as may be revised in connection with any subsequent Changes:

| | |
|---|---|
| FPSO P-67 Handover | 815 (eight hundred fifteen) Days from the issuance date of the earlier of the Notice to Proceed or the Limited Notice to Proceed |
| FPSO P-68 Handover | 920 (nine hundred twenty) Days from the issuance date of the earlier of the Notice to Proceed or the Limited Notice to Proceed |
| FPSO P-69 Handover | 1,025 (one thousand twenty-five) Days from the issuance date of the earlier of the Notice to Proceed or the Limited Notice to Proceed |
| FPSO P-70 Handover | 1,155 (one thousand one hundred fifty-five) Days from the issuance date of the earlier of the Notice to Proceed or the Limited Notice to Proceed |
| FPSO P-71 Handover | 1,300 (one thousand three hundred) Days from the issuance date of the earlier of the Notice to Proceed or the Limited Notice to Proceed |

11.4.6    Final Completion. Final Completion of each FPSO PACKAGE II and of each FPSO PACKAGE V shall occur no later than the respective date specified in Section 11.3(c).

11.4.7    Training Programs. The training programs described in Exhibit V shall be provided by Contractor during the period of time when the Integration is being provided for each FPSO PACKAGE II and for each FPSO PACKAGE V.

11.4.8 <u>Contractor's Onshore Technical Assistance.</u> Contractor shall provide onshore technical assistance to the Integration contractor, upon request by Tupi BV, during the transportation, storage and Integration activities for each FPSO PACKAGE II Module and for each FPSO PACKAGE V Module, including vendor support, until the handover of the fully-integrated FPSO to Tupi BV by the Integration contractor.

11.4.9 <u>Contractor's Offshore Technical Assistance.</u> Contractor shall provide offshore technical assistance to the Integration contractor and Tupi BV, upon request by Tupi BV, during the commissioning, start-up and assisted operational phase of each FPSO, including vendor support, until the effective date of the completion of the Integration phase and final acceptance by Tupi BV of the fully-integrated FPSO.

# ARTICLE 12

## CHANGE ORDERS

12.1 <u>Change.</u> Tupi BV shall have the right to make, from time to time, any change, modification, addition, reduction or deletion to, in or from the Works, or to adjust the Project Schedule and/or the Critical Path Schedule for performance thereof (each, a <u>"Change"</u>).

12.1.1 As soon as possible, and in any event not later than fourteen (14) Days after Tupi BV's notice to Contractor of a Change, Contractor shall prepare and furnish to Tupi BV a written statement specifying the consequences of such Change on the Contract Price, the Project Schedule and the Critical Path Schedule, setting out in full details an estimate of the resulting cost or savings from such Change in the Project, and any proposed modification, as applicable, in the Project Schedule and the Critical Path Schedule or in the estimated value of the Agreement. The written statement shall contemplate any requisite adjustment to the time for completion, any proposed modifications to this Agreement and/or any effect that such Change would imply to the Project, the Works and/or on any other provisions of this Agreement and/or the Guara BV PACKAGE II & V EPC Contract. Except as set forth in <u>Section 12.5,</u> the Change shall be mutually agreed to by the Parties and set out in a Change Order in accordance with the following:

12.1.1.1 The price adjustment in any Change Order shall be calculated by Contractor based on cost plus fee (overhead, profit, insurance) according to the Statement of Price Formation as presented in Contractor's original bid proposal (<u>"Statement of Price Formation"</u>). With regard to new Equipment not referred to in the Statement of Price Formation, Contractor shall present three quotations for Tupi BV's analysis and decision. Each Change Order shall present a complete breakdown showing detailed quantities, unit prices and taxes, taking into consideration any savings or costs not incurred by Contractor due to such Change.

12.1.1.2     The Project Schedule will only be adjusted in any Change Order to the extent that Contractor can demonstrate that the Change would affect the Critical Path Schedule. If it is possible to maintain the Project Schedule by accelerating the performance of the Works, then Contractor shall propose such acceleration as an option for Tupi BV, and give Tupi BV the cost impact of performing the Works on an accelerated basis as opposed to the cost impact without acceleration. Contractor shall use its best efforts to minimize the impact of any Change on the Project Schedule and the Critical Path Schedule.

12.1.2 If Tupi BV and Contractor reach agreement on all matters identified in the written statement furnished by Contractor under the terms of  Section 12.1.1 above, then Tupi BV shall issue a Change Order giving effect to the Change. Such Change Order shall contain full particulars of the modifications, any adjustments of the Contract Price and/or the time for completion of the Change and all other modifications to this Agreement and shall be signed by Tupi BV and by Contractor. Such Change Order shall thereupon be deemed to form part of this Agreement and the Works. Upon receipt of a Change Order, Contractor shall be obligated to perform the Works as changed by Tupi BV without deficiency or delay. Any Change shall only be executed after issuance of the Change Order by Tupi By. Without prejudice to Section 12.5, in the event that the Parties are unable to agree on the Change Order price resulting from a Tupi BV-initiated change, Contractor shall proceed with the Change implementation even if the cost, or responsibility, of paying for such Change is disputed by the Parties.

12.2     Imputed Change. If Contractor believes that any action, directive, order, or other communication of or from Tupi BV constitutes a Change but is not formally identified as such, then Contractor shall so inform Tupi BV in writing as soon as possible and not later than fifteen (15) Days after receipt of such action, directive, order or other communication, and prior to performing the corresponding tasks. After such notice, within fifteen (15) Days or other period of time to be agreed between the Parties, Contractor shall provide Tupi BV with a detailed estimated cost and other consequences of the alleged Change, in accordance with the requirements of Sections 12.1.1.1 and 12.1.1.2. Failure to so notify Tupi BV shall operate as a final waiver of any right to request an adjustment in the Contract Price, the Project Schedule and/or the Critical Path Schedule or any of the other terms and conditions hereof associated with such Change.

12.3     Changes Caused by Tupi BV Delays. As soon as possible, and in any event not later than ten (10) Days after the occurrence of the applicable event, Contractor shall give notice to Tupi BV of any Tupi BV Delay which may affect the Contract Price, the Project Schedule and/or the Critical Path Schedule. Such notice shall specify the estimated effect on the Contract Price and/or Project Schedule, in accordance with Sections 12.1.1.1 and 12.1.1.2. In the event that it is impossible to estimate the impact on the Contract Price, the Project Schedule and/or the Critical Path Schedule at the time such notice is delivered, Contractor shall provide Tupi BV with periodic supplemental notices during the period over which the event continues. Such supplemental notices shall keep Tupi BV informed of any change,

development, progress or other relevant information concerning the event of which Contractor is aware.

12.4   Procedures for Negotiation of Change Orders. If either Party believes it is entitled to an adjustment in the Contract Price, the Project Schedule or the Critical Path Schedule as a result of a Change or a Tupi BV Delay, then upon the written request of either Party Tupi BV and Contractor shall undertake reasonable efforts to meet and negotiate the terms of the proposed Change Order in respect of such Change.

12.5   Unsuccessful Negotiation of Change Orders. If the Parties are unable to agree on the terms of a Change Order, then Tupi BV may elect in writing to have the Change performed on a time and materials basis in accordance with  Sections 12.5.1 and  12.5.2 with the consequences on the Project Schedule, Critical Path Schedule or Contract Price to be determined prior to Final Completion. In such case, the Parties shall enter into a Change Order that states that any modification in the Contract Price, Project Schedule or Critical Path Schedule will be determined after completion of the Works as changed. If the Parties cannot agree on the amount of any adjustment after application of the procedures contained in this Article 12, then the issue shall be resolved under the procedures set forth in  Article 24. Pending resolution of the dispute, Contractor shall perform the Works including any Changes as directed by Tupi BV.

> 12.5.1 If a Change is performed on a time and materials basis pursuant to Section 12.5, then the Contract Price shall be adjusted by an amount equal to the increase or decrease in Contractor's cost of performing the Works that were affected by the Change or Tupi BV Delay, as provided in Section 12.5.2, on an open book basis (showing, among other things, the basis of the costs, including supporting information on man-hour and material costs). Contractor shall use its best efforts to minimize such costs, and shall provide Tupi BV with options whenever possible for reducing costs. Contractor shall maintain proper and detailed documentation of all such costs and shall provide such documentation and other information reasonably requested by Tupi BV to substantiate any adjustment. Documentation shall include invoices and timesheets that specifically identify that such amounts relate to the Change or Tupi BV Delay. To the extent that Contractor has not properly documented such costs, then such costs shall be disregarded.

> 12.5.2 Not applicable.

12.6      Additional FPSO Package II & V.

> (a)    In exchange for the consideration set forth in Section 9.2.5 and other good and valuable consideration, Contractor hereby grants to Tupi BY the right, exerciseable by Tupi BV in its sole and absolute discretion at any time within eighteen (18) months of the effective date of this Agreement, to instruct Contractor by written notice (the "Option Notice") to supply an additional FPSO PACKAGE II & V with respect to FPSO P-72 (the "Additional FPSO PACKAGE II & V") under the same terms and conditions set forth in this Agreement. Contractor hereby unconditionally

and irrevocably agrees that, upon the delivery of such Option Notice, Contractor will promptly enter into an amendment to this Agreement pursuant to <u>Section 25.3</u> to reflect (i) that the Scope of Work has been modified to include such Additional FPSO PACKAGE II & V, (ii) a revised Project Schedule for the Additional FPSO PACKAGE II & V (including establishment of Milestones for the Additional FPSO PACKAGE II & V and other related changes as set forth in Exhibit XXXVIII) and (iii) that Tupi BV shall pay to Contractor, as an element of the Contract Price, the additional amount of sixty million, five hundred and ninety two thousand, seven hundred and thirty seven United States Dollars and fifty cents (US$ 60,592,737.50) as consideration for the supply of the Additional FPSO PACKAGE II & V (the <u>"Additional FPSO PACKAGE II & V Price")</u>. Contractor will take all steps necessary to perform its obligation under this Agreement to enter into such amendment and to supply such Additional FPSO PACKAGE II & V; *provided,* that except with regard to the Scope of Work, the Project Schedule and other related changes as set forth in Exhibit XXXVIII and the Contract Price, the amendment to this Agreement to include the supply of the Additional FPSO PACKAGE II & V shall not change any of the other terms and conditions set forth in this Agreement, and the Parties shall not be required to issue a Change Order or to observe the procedure for Changes set forth in this <u>Article 12.</u>

(b)    If Tupi BV does not exercise the option set forth in <u>Section 12.6(a)</u> within eighteen (18) months of the effective date of this Agreement, Tupi BV will reimburse Contractor for certain of Contractor's fixed costs as set forth in <u>Exhibit XVIII, Price Schedule E</u> (the <u>"Fixed Costs")</u>. The Fixed Costs shall be paid by Tupi BV in a single payment within sixty (60) days after the expiration of the eighteen (18) month option exercise period [and shall be subject to adjustment according to the yearly adjustment factor (Fy) calculated according to the formula set forth in <u>Section 10.13.1]</u>. Any Fixed Costs paid by Tupi BV to Contractor pursuant to this <u>Section 12.6(b)</u> shall be part of the Contract Price, as set forth in <u>Section 9.2.7.</u>

(c)    The Parties acknowledge and agree that the option granted to Tupi BV by Contractor pursuant to <u>Section 12.6(a)</u> is a material inducement for Tupi BV to enter into this Agreement and that the performance by Contractor of its obligations pursuant to <u>Section 12.6(a)</u> is a fundamental component of Contractor's performance of this Agreement.

12.7    <u>Tupi BV's Written Consent.</u> Notwithstanding anything in this Agreement to the contrary, no variations to the Project, Works, drawings, schedules, prices, delivery or any other data or information provided by Tupi BV will be allowed without the prior written consent of Tupi BV, unless in case of emergency that puts at risk the safety of the FPSO PACKAGES II & V or any Equipment or persons. In such cases Contractor shall submit a report with all necessary evidence to Tupi BV according to <u>Section 3.17</u> hereof and the Parties will discuss the pertinent matters in good faith. Should Tupi BV disagree with any such variations, Contractor will proceed to reestablish the prior conditions thereof.

## ARTICLE 13

### TITLE AND RISK OF LOSS

13.1  Title.

(a)  Clear Title. Contractor warrants and guarantees that Tupi BV's legal title to, and ownership of, the Works and the FPSO PACKAGES II & V shall be free and clear of any and all Liens when the title thereto passes to Tupi BV.

(b)  Title to Works. Title to all or any portion of the Works shall pass to Tupi BV upon the earlier of (i) payment by Tupi BV therefor, (ii) incorporation of such Work into the FPSO PACKAGE II & V or (iii) storage at the Site. For purposes of this Section 13.1(b) "incorporation into the FPSO PACKAGES II & V" shall occur when each FPSO PACKAGE II & V is safely and properly ready for transportation in the FPSO PACKAGES II & V construction yard, as provided in Section 16.5.1(iv). Transfer of title to Works shall be without prejudice to Tupi BV's right to reject Defective Works, or any other right in the Agreement.

(c)  Title to Drawings. Title to drawings, reports, data (including data contained on any storage media), specifications and the like which are furnished or produced pursuant to this Agreement, or required or produced primarily for the performance of Contractor's obligations under this Agreement, shall be the sole and exclusive property of Tupi BV. Notwithstanding the foregoing, it is not the intent of the Parties for Contractor to provide title to Tupi BV for any equipment manufacturing drawings or vendor documentation containing proprietary information of such vendors. With respect thereto, Contractor shall grant or procure for Tupi BV an irrevocable, non-exclusive, royalty-free and perpetual license to use such proprietary information for operating and maintaining the FPSO PACKAGES II & V, and for training engineers and operators for that purpose.

13.2  Contractor Waiver. Contractor hereby irrevocably waives all rights of any kind and nature, in law or equity, to claim at any place and before any jurisdiction, any Lien or retention rights to any parts of the Works or to the FPSO PACKAGES II & V based on whatever reasons or allegations. Contractor shall also require from its Subcontractors, suppliers, agents or any other persons to equally waive any such rights in their respective agreements and contracts.

13.3  Risk of Loss. Notwithstanding passage of title as provided in Section 13.1 of this Agreement, Contractor shall bear the risk of loss and damage with respect to the Works until issuance of the Final Completion Acceptance Notice.

## ARTICLE 14

## INSURANCE

14.1 <u>Provision of Insurance.</u> Contractor and Tupi BV shall provide, at a minimum, the insurance specified in <u>Exhibit XXIII</u> on terms and conditions there stated (which, in the case of Contractor, shall include Tupi BV and the other members of Tupi BV Group as loss payees under the insurance policy, where applicable).

14.2 <u>Lenders as Additional Insureds.</u> The insurance provided by the Parties pursuant to <u>Section 14.1</u> shall list any and all Lenders as additional insureds, where applicable.

14.3 <u>Subrogation Waivers.</u> The Parties shall provide, whenever applicable, subrogation waivers from the insurers contracted pursuant to <u>Section 14.1</u> in form and substance reasonably acceptable to the other Party.

14.4 <u>New Technology.</u> Notwithstanding Contractor's representation in <u>Section 17.1</u> that it will not install unproven or prototype equipment, if the insurance provider characterizes certain technologies installed and which comprise the Works as being new technologies, and such insurance provider restricts, denies, limits, or is unwilling to provide insurance coverage in connection with such new technology, then the Party that is requiring the related new technologies shall secure such additional coverage and pay any additional or increased insurance premiums that may be charged by an insurance provider as a result of the use of such new technology.

14.5 <u>No Cancellation.</u> All policies providing coverage hereunder shall contain a provision that no cancellation or material change to any policy shall become effective except upon thirty (30) Days advance written notice thereof to the other Party, where applicable.

14.6 <u>Obligations Not Relieved.</u> Notwithstanding anything in this Agreement to the contrary, the occurrence of any of the following events shall not relieve a Party from any of its obligations under this Agreement: (i) failure by a Party to secure the required insurance coverage hereunder; (ii) failure by a Party to fully comply with any of the insurance requirements of this Agreement; (iii) failure by a Party to secure such endorsements on the policies as may be necessary to carry out this Agreement; (iv) the insolvency, bankruptcy or failure of any insurance company providing insurance to a Party; or (v) failure of any insurance company to pay any claim accruing under its policy.

14.7 <u>Failure to Provide Required Insurance.</u> In the event that coverage for any loss or damage is denied by the underwriter or underwriters due to, in whole or in part, the breach of the insurance policy terms and conditions by a Party, or for any other reason attributable to a Party, or in case the Party required to maintain the insurance fails to do so, then the defaulting Party shall defend, indemnify and hold the other Party harmless from and against any and all claims, losses and\or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or tribunal and related attorneys' fees) suffered or incurred by the other Party which would otherwise have been covered by said insurance. In the event Contractor fails to maintain the required insurance, Tupi BV may

obtain the required insurance and may demand reimbursement of such premiums and related expenses, together with interest in accordance with <u>Section 10.9.</u> Tupi BV also reserves the right to withhold any such amounts (including interest) in accordance with <u>Section 10.8</u> hereof

14.8    <u>Builders' Risks Insurance.</u> Tupi BV and Guara BV or any other member of the Tupi BV Group or the Guara BV Group shall obtain Builders' Risks Insurance as per Exhibit XXIII, listing both Tupi BV and Guara BV as insured parties. The coverage period will start six (6) months after the date hereof and shall end when coverage by the Builders' Risks Insurance is replaced by coverage by the offshore operations insurance.

14.9    <u>Contractor to be Insured Under Tupi BV Policy.</u> Contractor and its officers, directors, employees, agents and representatives shall be named as other insureds in Tupi BV's Builders' Risks Insurance policy or, at Tupi BV's discretion, in an insurance policy to be contracted by members of Tupi BV Group.


# ARTICLE 15

# DOCUMENTATION

15.1    <u>Delivery of Record As-Built Drawings.</u> Contractor shall deliver to Tupi BV its Record As-Built Drawings in accordance with <u>Exhibit III</u> immediately before Substantial Completion of each FPSO PACKAGE II Module and of each FPSO PACKAGE V Module.

15.2    <u>Purchasing and Subcontractor Supplied Information.</u> As more fully set forth in <u>Exhibits III</u> and V, Contractor shall deliver to Tupi BV copies of all purchase documents, vendor operating and maintenance information manuals, material and fabrication certifications as applicable, installation instructions, and specific guarantee and warranty information documentation before, and as a condition to, Substantial Completion of each FPSO PACKAGE II Module and of each FPSO PACKAGE V Module.

15.3    <u>Construction Drawings and Manuals.</u> Contractor shall promptly provide Tupi BY with all construction and erection drawings for each FPSO PACKAGE II and for each FPSO PACKAGE V, as specified in <u>Exhibits III</u> and IV, upon their completion but no later than Substantial Completion of each FPSO PACKAGE II Module and of each FPSO PACKAGE V Module, respectively.

15.4    <u>Other Information.</u> Contractor shall promptly provide all other information and documentation as may be reasonably requested by Tupi BV.

## ARTICLE 16

## COMPLETION

16.1   <u>Tupi BV Acceptance of Milestone Completion.</u> Tupi BV shall notify Contractor whether it accepts or rejects each Milestone Completion Certificate no later than sixty (60) Days following receipt of the applicable Milestone Completion Certificate. If Tupi BV agrees that the respective Milestone has been met, it shall issue to Contractor a certificate to such effect (the <u>"Milestone Completion Certificate Acceptance Notice"</u>). If Tupi BV does not agree that the Milestone has been fully achieved, then Tupi BV shall state the basis for its rejection in reasonable detail in a written notice provided promptly to Contractor. The Parties shall thereupon promptly and in good faith confer and undertake all reasonable efforts to resolve any issues preventing the acceptance by Tupi BV of the Milestone Completion Certificate. In the event such issues are not resolved within twenty (20) Days of the delivery by Tupi BV of its notice of rejection, or in the period of days agreed by the Parties to enable any correction in order to achieve the Milestone, then Tupi BV and Contractor shall resolve the dispute in accordance with the dispute resolution procedures provided for in <u>Article 24.</u>

16.2   <u>Punch-Lists.</u> Prior to the issuance of each Milestone Completion Certificate, Tupi BV and Contractor shall inspect the Works to identify the pending items, if any, to be included in the applicable Punch-List. As a result of such inspection, Contractor shall prepare the applicable Punch-List, with all its items registered in SISPEN for the applicable Milestone and the Works to be performed with respect to such Milestone. Contractor shall promptly provide the applicable Punch-List to Tupi BV for each Milestone, together with an estimation of the time and cost necessary to complete or correct each applicable Punch-List item. Tupi BV shall review the applicable Punch-List to ensure that it includes only items of a minor nature, and shall approve or reject each applicable Punch-List item in its sole discretion. After Tupi BV's approval in writing of a Punch-List, Contractor shall immediately initiate measures to complete or correct, as appropriate, any item Tupi BV requires to be completed to ensure the proper operation of each subsystem, system, or Module, or the FPSO PACKAGE II or FPSO PACKAGE V as a whole, the protection of all Equipment and the safety of all personnel. The failure to include any item on a Punch-List shall not alter the responsibility of Contractor to complete all Works in accordance with the terms and provisions of this Agreement. All applicable Punch-List items shall be completed no later than ninety (90) Days following achievement of the respective Milestone, or such other period of time as agreed by the Parties. If Contractor fails to fully complete the applicable Punch-List items during such period of time, Tupi BV will have the right, but not the obligation, to complete any such unfinished Punch-List items at the expense of Contractor.

16.3   <u>Mechanical Completion.</u> Contractor shall give Tupi BV not less than twenty (20) Days prior written notice of its intention to commence any pre-commissioning activities required for each subsystem Mechanical Completion. Contractor shall achieve Mechanical Completion of each Module subsystem in time to permit Substantial Completion to occur in accordance with the Project Schedule and the Critical Path Schedule. Upon satisfaction of all requirements for Mechanical Completion of each Module subsystem, Contractor shall certify to Tupi BV that all of the requirements for Mechanical Completion have occurred by delivering a Mechanical Completion Certificate in the form specified in  <u>Exhibit XXVII.</u>

Contractor shall comply with all procedures and requirements for the achievement of each Mechanical Completion as set forth herein and in Exhibit VIII.

16.4     Substantial Completion.     Contractor shall comply with all requirements for Substantial Completion for each FPSO Package II Module and for each FPSO Package V Module set forth herein and in Exhibit VIII. To the extent not specified in Exhibit VIII, the Parties shall agree upon procedures for the pre-commissioning activities of each Module. Contractor shall provide labor, Equipment, supplies, and all other items necessary for the pre-commissioning activities. Contractor shall be responsible for analyzing the data obtained during the pre-commissioning and for ensuring that such data reflects the standards required hereunder. A complete copy of all raw data and a detailed listing of all testing instrumentation utilized shall be provided to Tupi BV at the completion of the pre-commissioning. Upon satisfaction of all requirements for the respective Substantial Completion of an FPSO Package II Module or of an FPSO Package V Module, Contractor shall certify to Tupi BV that all of the requirements for Substantial Completion have occurred by delivering a Substantial Completion Certificate in the form specified in Exhibit XXVIII and shall provide a related test report and analysis to Tupi BV. At minimum, the test report shall include (i) the raw data; (ii) detailed descriptions of the instrumentation utilized; (iii) detailed descriptions of the procedures utilized, together with all correction curves and formulas; (iv) a full explanation of all corrections and calculations required to correct the test data to site conditions; and (v) detailed descriptions of any other supporting information used to demonstrate that each system tested has met the performance standards required under the terms of this Agreement. The Substantial Completion Certificate of an FPSO Package II or of an FPSO Package V Module shall be accompanied by all other supporting documentation as may be required to establish that the requirements for Substantial Completion of the respective FPSO Package II Module or of the respective FPSO Package V Module has been met.

16.5     Handover. Handover of each FPSO PACKAGE II or of each FPSO PACKAGE V Module will only occur after following events are completed: (i) completion of all the Works corresponding to the Scope of Work as established in Exhibit I and in this Agreement; (ii) Substantial Completion of each FPSO PACKAGE II Module or of each FPSO PACKAGE V Module has been achieved; (iii) Contractor has delivered to Tupi BV the Handover Certificate in the form specified in  Exhibit XXV and its terms have been reviewed and accepted by Tupi BV; (iv) a Handover Punch-List for the FPSO has been agreed between Contractor and Tupi BV; (v) the FPSO PACKAGE II Module or the FPSO PACKAGE V Module is safely and properly ready to be transferred to the Integration site, is positioned and fastened on the barge without any damage and is cleared for towing by the MWS (Marine Warranty Surveyor); (vi) Contractor has taken all necessary steps, according to this Agreement, customs requirements and Applicable Law for the export of the Module; and (vii) full and complete transfer of custody of the FPSO PACKAGE II Module or of the FPSO PACKAGE V Module to Tupi BV or to the Integration contractor.

16.6     Final Completion. Final Completion for each FPSO PACKAGE II & V shall be achieved when all Works are done with no remaining outstanding items, all requirements for Final Completion for the FPSO PACKAGE II and for the FPSO PACKAGE V have been fully satisfied in Tupi BV's sole discretion, Contractor has delivered a Final Completion

Certificate in the form specified in  Exhibit XXIX, and Tupi BV has accepted such Final Completion Certificate (the  "Final Completion Acceptance Notice"), attesting that Final Completion of the Works has occurred for the FPSO.

16.7    Long-Term Obligations. Final acceptance and payment shall not in any way release Contractor or any surety of Contractor from any unperformed obligations of this Agreement, including but not limited to warranties, obligations, or any other liabilities for which insurance is required, or any other responsibility of Contractor, including the payment of any and all fines and penalties assessed as a result of Contractor's failure to comply with Applicable Law. It is expressly understood and agreed to by the Parties that nothing in this Article 16 shall in any way modify or alter Contractor's obligations under Articles 17 and 20 hereof.

## ARTICLE 17

## INSPECTION AND WARRANTY

17.1    Scope of Warranty.

(a)    General Standards. Contractor shall ensure that all Works performed hereunder, all Equipment supplied hereunder, the FPSO PACKAGES II, and the FPSO PACKAGES V shall comply with all requirements set forth in this Agreement. Without limiting the preceding sentence, Contractor warrants (i) that the Equipment and all other items furnished hereunder shall be new, of first class quality, and free from Liens; (ii) that only proven technology, in commercial operation at the time of execution of this Agreement, with conditions substantially similar to those contained herein, shall be used; (iii) that the Works and the Equipment shall be free from defects in materials and/or workmanship, including, but not limited to, any latent defects that may not be readily evident, and shall conform in all respects with the Scope of Work; and (iv) that the Works shall conform to Good Industry Practices and Applicable Law. Any Equipment or Works that do not meet the standards set forth in this  Section 17.1 is  "Defective" and contains (or is deemed to contain) a "Defect".

(b)    Equipment Quality. Contractor shall furnish evidence satisfactory to Tupi BV in its sole discretion as to the kind, quality, and quantity of all Equipment. Contractor shall not use any Equipment other than as specified in this Agreement except with the prior written approval by Tupi BV specifically waiving the pertinent requirements of this Agreement. In case of vendors not included in the Vendor List of Exhibit V, Contractor shall submit a Change Order for Tupi BV's approval. If Contractor wishes to modify the requirements contained herein, then it shall make written application to Tupi BV for Tupi BV's approval, which shall be given or withheld in Tupi BV's sole discretion, prior to performing any such Works. Such application shall (i) identify the requirements being modified, (ii) certify that the quality of the proposed substitute is equal to or better than that currently specified, and (iii) certify that the substitute is suited to the same use and capable of

performing the same function as that specified. If the preceding requirements are not followed, then any substitution shall constitute a Default by Contractor. All Equipment and material shall be new and manufactured, built, applied, installed, connected, operated (during start-up and testing), cleaned and conditioned in accordance with the instructions of the applicable vendor, manufacturer, fabricator or processor. Contractor shall obtain (or cause to be obtained) manufacturers' warranties for all Equipment to be held by Tupi BV in Tupi BV's name or to be used by Tupi BV.

(c)     Environmental Compliance. Contractor is fully responsible for ensuring that the Works are performed in an environmentally sound manner, in compliance with all provisions of this Agreement regarding the environment and in compliance with all Environmental Law. Contractor shall report to Tupi BV as soon as reasonably possible after having knowledge thereof, and in any event no later than one (1) day after such occurrence, any violation of the foregoing. Contractor shall, at its sole cost and expense, remediate any Release or other event in violation of this Section 17.1(c) and shall repair any damage caused thereby. Contractor's obligations under this Section 17.1(c) shall not be subject to any limitation of liability contained in this Agreement, except for the provisions of Section 22.6.2, and shall survive termination of this Agreement.

(d)     Local Content Compliance. Contractor is fully responsible for ensuring that Brazilian Local Content requirements are met in accordance with the terms of this Agreement.

17.2    Tupi BV Right to Inspect.

(a)     General Rights. All Works shall be subject to inspection by Tupi BV at all times to determine whether the Works conform to the requirements of this Agreement, for which purpose Tupi BV, its officials or authorized representatives shall at all times have unrestricted right of access to all locations where the Works are in progress, whether on the Site or any other places, including Subcontractors premises where any Works or parts thereof are being performed, manufactured, stored or prepared for delivery to Contractor. Contractor shall furnish Tupi BV with access to all locations where Works are in progress, including locations not on the Site. If, in the judgment of Tupi BV, any Works are Defective, then Contractor shall, at its own expense, promptly repair or replace the Defective Works. Subject to Contractor's right to pursue a dispute under Article 24, the decision of Tupi BV shall be conclusive as to whether the Works are conforming or Defective, and Contractor shall comply with the instructions of Tupi BV in all such matters while pursuing any such dispute. If it is later determined that the Works were not Defective, then Tupi BV shall reimburse Contractor for all costs incurred in connection with such repair or replacement and a Change Order shall be issued for such amount and shall address any impact the repair or replacement may have had on the Project Schedule and/or the Critical Path Schedule. If Contractor fails, after a reasonable period of time not to exceed seven (7) Days, to repair or replace any Defective Works, or to commence to repair or replace any Defective Works, then

Tupi BV may repair, replace or have the Defective Works repaired or replaced and the expenses thereof shall be paid by Contractor, and Contractor shall be responsible for any delay to the Project Schedule or the Critical Path Schedule.

(b)     No Obligation to Inspect. Tupi BV's right to conduct inspections under Section 17.2(a) shall not obligate Tupi BV to do so. Neither the exercise by Tupi BV of any such right nor any failure on the part of Tupi BV to discover or reject Defective Works shall be construed to imply an acceptance of any Defective Works or a waiver of any Defect.

(c)     Cost of Disassembling. The cost of disassembling or dismantling finished Works for the purposes of Tupi BV's control, and of reassembling such portions (together with any delay associated therewith) shall be borne by Tupi BV if such Works are found to conform with the requirements of this Agreement, and by Contractor if such Works are found to be Defective.

17.3    Warranty of Defects

(a)     Warranty Period. Contractor shall promptly correct, repair or replace, and properly install, all at no cost to Tupi BV, any Defective Works, and any part of the FPSO PACKAGES II or FPSO PACKAGES V or other property which is damaged or affected by Defective Works, if the Defect appears or occurs before the twelve (12) month-period (the "Warranty Period") commencing on the Final Completion Date for each FPSO PACKAGE II or FPSO PACKAGE V. Any Equipment and materials furnished by Contractor to correct any Defect shall be guaranteed for an additional twelve (12) month-period starting as of the date that the correction, repair or replacement work is completed.

(b)     Additional Warranties. Without limiting Contractor's obligations hereunder to warrant the Works, Contractor shall assign to Tupi BV all rights under any warranties it may receive or be entitled to receive from Subcontractors, vendors and suppliers. Contractor shall execute such additional documents as Tupi BV may require evidencing such assignment to Tupi By.

(c)     Remedy. Tupi BV shall provide notice to Contractor of the discovery of any Defective Works as soon as reasonably practicable after such discovery. Contractor shall correct, repair or replace such Defective Works, and any other portions of the FPSOs damaged or affected by such Defective Works, immediately and on an expedited basis, at no cost to Tupi BV. Tupi BV shall provide Contractor with access to the FPSO PACKAGE II, the FPSO PACKAGE V and the Site (including the site where the Integration is performed) sufficient to enable Contractor to perform its warranty obligations under this Agreement, so long as such access does not unreasonably interfere with the Works, operation of the FPSO or Tupi BV's ongoing business operations, and subject to any reasonable security or safety requirements of Tupi BV. Any change to parts or Equipment that would alter the requirements of this Agreement may be made only with the prior written approval of Tupi BV in accordance with the terms of Section 17.1(b).

(d) <u>Repair by Tupi BV.</u> If, after notification of a breach of a warranty under <u>Section 17.3(c)</u>, Contractor fails to commence remedial action within a reasonable period of time (not to exceed seven (7) Days), or is delayed in continuing or completing such remedial action, Tupi BV, may, upon written notice to Contractor, correct or have such Defect(s) corrected in accordance with the provisions of this Agreement. In such case Contractor shall promptly reimburse Tupi BV for all respective costs, charges and expenses for such remedial action upon receipt of an invoice from Tupi BV.

# ARTICLE 18

## ASSIGNMENT AND GUARANTEE

18.1 <u>Assignment.</u> This Agreement shall not be assigned or subcontracted by Contractor in whole or in part without Tupi BV's prior written consent, which Tupi BV may grant or withhold at its sole discretion. Notwithstanding the provisions of any assignment or subcontract, Contractor shall be liable to Tupi BV for the due performance of all of Contractor's obligations under this Agreement.

18.2 <u>Guarantee.</u> Contractor may not establish or authorize the establishment of any guarantee over this Agreement (including any credits arising hereunder), nor commit itself contractually to the same effect over any title, fully or partially, without prior written authorization by Tupi BV, which Tupi BV may grant or withhold at its sole discretion.

18.2.1 <u>Progredir Program.</u> The authorization to Contractor to give its credits arising from this Contract through the Progredir Program will be made by electronic means by Petrobras or Tupi BV.

18.3 <u>Contractor not to be Released.</u> The assignment or establishment of guarantees permitted above does not release Contractor from any of its contractual obligations hereunder. Should Tupi BV agree and authorize an assignment or partial subcontracting of Contractor's obligations, Contractor will remain responsible to Tupi BY for any actions or omissions by any such assignee or Subcontractor.

18.4 <u>Assignment by Tupi BV.</u> At its sole discretion and without any previous consent from Contractor, Tupi BV may pledge or assign its rights and obligations in and to this Agreement in whole or in part (including with respect to a single FPSO PACKAGE II or FSPO PACKAGE Y) to: (i) any entity in which Tupi BV or an Affiliate of Tupi BV has an equity interest ("New Owner"); or (ii) to any Lender or creditor upon written and prior notice to Contractor; or (iii) to Guara BV. Contractor also agrees and undertakes, if so requested by Tupi BV or by such New Owner, Lender or creditor, or Guara BV to execute a specific agreement with Tupi BV, New Owner, Lender or creditor, or Guara BV under terms deemed satisfactory to all parties thereto, including an amendment and/or replication of this Agreement to reflect such whole or partial assignment. Such specific agreement may also provide for Contractor's obligation to furnish financial and accounting information, as well as any other information of any nature relating to this Agreement and the performance of the

Works. Such assignment shall not impose on Contractor any additional obligation or adversely affect any right or remedy available to Contractor hereunder.

18.5    Right of Termination. When duly assigned in accordance with the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the assignee; any assignment not in accordance with the provisions of this Article 18 shall be void and without force or effect, and any attempt of Contractor to assign this Agreement in violation of this provision shall grant Tupi BV the right, but not the obligation, to terminate this Agreement at its sole option pursuant to Section 21.1(a).


# ARTICLE 19

# SUBCONTRACTING

19.1    Subcontractors. Tupi BV acknowledges and agrees that Contractor intends to have portions of the Works executed by Subcontractors of Equipment and/or Works pursuant to written Subcontracts between Contractor and Subcontractors previously approved by Tupi BV or in accordance with the Vendor List included in Exhibit V.

19.2    Subcontractors Qualification. All Subcontractors shall be reputable, qualified firms with an established record of successful performance in their respective trades performing identical or substantially similar work. All contracts with Subcontractors shall be consistent with the terms or provisions of this Agreement including, but not limited to, in the case of Major Subcontracts, that they contain provisions in the form and substance of Section 22.1 and Article 14. No Subcontractor is intended to be or shall be deemed a third-party beneficiary of this Agreement. Contractor shall be fully responsible to Tupi BV for the acts and omissions of Subcontractors and of persons directly or indirectly employed by them. The work of any Subcontractor shall be subject to inspection by Tupi BV to the same extent as the Works of Contractor. All Subcontractors and personnel of Subcontractors shall be instructed in the terms and requirements of Tupi BV's approved safety and environmental protection regulations, including Tupi BV Policies, and are expected to comply with such regulations. In the event any Subcontractor or Subcontractor's personnel do not adhere to such regulations, then they shall be removed by Contractor. In no event shall Contractor be entitled to any adjustment of the Contract Price, Project Schedule or the Critical Path Schedule as a result of any increase in cost due to compliance with such regulations or due to the removal of personnel.

19.3    Additional Proposed Subcontractors. In the event that Contractor is considering the selection of a Subcontractor not listed on the Vendor List included in Exhibit V for a Major Subcontract, Contractor shall notify Tupi BV of its proposed Subcontractor as soon as possible during the selection process and furnish Tupi BV all information requested by Tupi BV with respect to Contractor's selection criteria (including copies of bid packages furnished to prospective Subcontractors and the qualifications of the proposed Subcontractors), or in no event less than thirty (30) Days prior to the proposed execution date of a Major Subcontract, whichever is earlier. Tupi BV's consent, in its sole discretion, is required for any proposed Subcontractor not listed on Vendor List for a Major Subcontract, and if it is accepted by Tupi

BV, the name of such proposed Subcontractor shall be added to the list of approved Subcontractors. Contractor shall not enter into any Major Subcontract with a proposed Major Subcontractor that has been rejected by Tupi BV. Tupi BV shall undertake in good faith to review the information provided by Contractor pursuant to this <u>Section 19.3</u> expeditiously and shall notify Contractor of its decision to accept or reject a proposed Major Subcontractor as soon as practicable after such decision is made, but in any case shall have no liability or obligation to Contractor with regard to its acceptance or rejection of any Subcontractor or the time Tupi BV takes to reach such decision.

19.3.1 The Subcontractors shall comply with and perform for the benefit of Tupi BV all requirements and obligations of Contractor to Tupi BV under this Agreement, as such requirements and obligations are applicable to the performance of the Works under the applicable Subcontract, including but not limited to an indemnity in substance the same as that included in <u>Section 22.1</u> and the insurance requirements set forth in <u>Article 14.</u>

19.4    <u>Subcontracts.</u>

19.4.1  <u>Major Subcontracts.</u> Contractor shall furnish Tupi BV with a copy of all Major Subcontracts within ten (10) Days after execution thereof.

19.4.2  <u>Subcontractors.</u> It is the responsibility of Contractor to fully disclose this Agreement and the contents thereof to each Subcontractor. Contractor shall undertake all necessary action to prevent Tupi BV from becoming liable directly to any claims by Subcontractors. Contractor shall defend, indemnify and hold each member of Tupi BV Group harmless against any and all claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or tribunal and related attorneys' fees) suffered or incurred by any member of Tupi BV Group arising out of or resulting from any Subcontract.

19.4.3  <u>Tupi BV and Subcontractors.</u> No subcontract, supply contract, purchase order or other agreement entered into by Contractor for the purposes of performing the Works shall bind or purport to bind Tupi BV. Contractor shall ensure that each such subcontract, supply contract, purchase order or other agreement contains a provision permitting assignment thereof to Tupi BV in the event this Agreement is terminated or upon Contractor's written consent. All subcontracts, supply contracts, purchase orders or other agreements shall provide for the right of unilateral termination by Contractor of all or a portion of such subcontract, supply contract, purchase order or other agreement without any penalties to Contractor or to Tupi BV. If so requested by Tupi BV, following any termination of this Agreement for convenience, or by reason of Default by Contractor, Contractor shall terminate any such subcontract, supply contract, purchase order or other agreement. Each subcontract, supply contract, purchase order and other agreement shall also provide that, in the event of termination of this Agreement, title to Equipment and materials or partially completed Works for which Tupi BV has paid (whether directly or indirectly) shall pass to Tupi BV. Contractor, at the

direction of Tupi BV, will instruct the Subcontractor with respect to the disposition of such Equipment and materials or Works.

19.4.4 <u>No Obligation.</u> Nothing contained herein or in any such subcontract, supply contract, purchase order or other agreement shall (i) create or constitute any contractual relationship between Tupi BV and any Subcontractor, (ii) create any obligation on the part of Tupi BV to any Subcontractor, or (iii) obligate Tupi BV to pay or see to the payment of any Subcontractor.

## ARTICLE 20

## GUARANTEE OF TIMELY COMPLETION

20.1 <u>Guarantee of Timely Completion.</u> Contractor acknowledges that time is of the essence in the performance of this Agreement and of the Guara BV PACKAGE II & V EPC Contract.

20.1.1 <u>General Obligation.</u> Contractor shall diligently pursue the Works, assigning to it a priority that will comply with the Project Schedule as well as the Critical Path Schedule. Contractor shall satisfy and achieve the Milestone Completion Dates specified in <u>Article 11,</u> shall collect all items to be provided by Tupi BV according to the schedule set forth in <u>Section 3.26,</u> and shall timely perform all of its obligations under this Agreement in order to cause the Works to be completed according to the Project Schedule and the Critical Path Schedule.

20.2 <u>Liquidated Damages for Delay.</u>

20.2.1 The events indicated in the Project Schedule shall be achieved by Contractor in sufficient time to permit the completion of each Milestone to occur on or prior to its Milestone Completion Date. If the last Handover or Final Completion of an FPSO PACKAGE II or an FPSO PACKAGE V occurs after the applicable Milestone Completion Date, then Contractor shall pay to Tupi BV (by direct payment and/or deduction from the following payments to Contractor under this Agreement, at Tupi BV's sole option) the amount corresponding to the percentage of the Contract Price indicated below for each full week of delay, until the applicable Milestone occurs:

<u>Handover</u>

| 1st to 4th week | [0.041]% of the Contract Price |
|---|---|
| 5th to 8th week | [0.082]% of the Contract Price |
| 9th to 12th week | [0.19]% of the Contract Price |
| $13$th week onwards | [0.39]% of the Contract Price |

<u>Final Completion</u>

| 1st to 4th week | [0.042]% of the Contract Price |
| 5th to 8th week | [0.083]% of the Contract Price |
| 9th to 12th week | [0.2]% of the Contract Price |
| 13th week onwards | [0.4]% of the Contract Price |

20.2.2      If Contractor fails to collect any of the items set forth in Section 3.26 to be supplied by Tupi BV within the period indicated in Section 3.26, Contractor shall pay to Tupi BV an amount corresponding to five thousandths of a percent (0.005%) of the Contract Price per day of delay, with the exception of the A&C System indicated in Section 3.26.4, for which Contractor shall pay one thousandth of a percent (0.001%) of the Contract Price per day of delay.

20.2.3      If Contractor fails to comply with any of its obligations under this Agreement in a timely manner, Contractor shall pay to Tupi BV an amount corresponding to one thousandth of a percent (0.001%) of the Contract Price per day of delay, after notification by Tupi BV of the delay stating a reasonable cure period and Contractor's failure to cure in such period.

20.2.4      The maximum total amount of liquidated damages payable by Contractor pursuant to Sections 20.2.1, 20.2.2 and 20.2.3 (collectively, "Liquidated Damages for Delay") shall be twenty percent (20%) of the Contract Price excluding amounts related to Initial Performance of the Works, warranty work, indemnities, and taxes. Once this total amount is reached, Tupi BV shall have the right, at its option, to terminate this Agreement in accordance with Article 21.

20.3      Liquidated Damages Are Not a Penalty. The Parties acknowledge and agree that because of the unique nature of the FPSO PACKAGES II & V; the unavailability of a substitute facility; the need to store, preserve and protect all of the items set forth in Section 3.26 to be supplied by Tupi BV; the importance of the timing for construction and delivery of each FPSO; and the effects of delay in performance of this Agreement, it would be impracticable or extremely difficult to fix the actual damages resulting from Contractor's failure to achieve the last Handover or Final Completion by the required Milestone Completion Dates, to collect the items set forth in Section 3.26 to be supplied by Tupi BV, or to perform any of its other obligations under this Agreement in a timely manner. It is understood and agreed by the Parties that (i) Tupi BV shall be damaged by failure of Contractor to meet such Milestone obligations, to collect the items set forth in Section 3.26 to be supplied by Tupi BV, or to perform any of its other obligations under this Agreement in a timely manner, including losses incurred by Tupi BV as the end user of the FPSOs s a result of lost oil production; (ii) it would be impracticable or extremely difficult to fix the actual damages resulting therefrom; (iii) Liquidated Damages for Delay are in the nature of liquidated damages, and not a penalty, and are fair and reasonable; and (iv) such amount represents a reasonable estimate of fair compensation for the losses that the Parties reasonably anticipate Tupi BV may suffer as a result of such failure or delay.

20.4 <u>Sole Remedy for Delay.</u> Payment of the Liquidated Damages for Delay shall be Tupi BV's sole and exclusive remedy for Contractor's delay failures in achieving Handover or Final Completion by the required Milestone Completion Dates, in collecting the items set forth in <u>Section 3.26</u> to be supplied by Tupi BV, or in performing any of its other obligations under this Agreement in a timely manner and by the required dates. Contractor agrees that Liquidated Damages for Delay are intended only to cover damages suffered by Tupi BV or any other member of Tupi BV Group as a result of delay in achieving Handover or Final Completion, collecting the items set forth in <u>Section 3.26</u> to be supplied by Tupi BV, or performing any of Contractor's other obligations under this Agreement in a timely manner. Liquidated Damages for Delay are not deemed to cover the cost of completion of the Works, the cost to store, maintain and transport the items set forth in <u>Section 3.26</u> to be supplied by Tupi BV, or any other losses or damages that may be suffered by Tupi BV or any other member of Tupi BV Group, and Tupi BV shall also be entitled to rely on its other remedies under this Agreement for all Defaults other than Contractor's failure to achieve Handover or Final Completion, to collect the items set forth in <u>Section 3.26</u> to be supplied by Tupi BV, or to perform any of its other obligations under this Agreement in a timely manner and by the required dates.

20.5 <u>No Challenge.</u> Each of the Parties agrees not to challenge the enforceability of the liquidated damages provisions contained herein. If the enforceability of the amount of liquidated damages under this Agreement is successfully challenged by Contractor, or by a third-party acting in its place, as being a penalty or unreasonable in amount, Contractor shall instead be liable to Tupi BV and other members of Tupi BV Group for all direct and consequential damages, costs and losses incurred by Tupi BV and such other members of Tupi BV Group in connection with Contractor's failure to achieve any Milestone, to collect the items set forth in <u>Section 3.26</u> to be supplied by Tupi BV, or to perform any of its other obligations under this Agreement in a timely manner and by the required dates, together with all costs incurred by Tupi BV and such other members of Tupi BV Group in proving or enforcing the same, without regard to any limitations whatsoever set forth in this Agreement, including, but not limited to, any waiver of consequential damages.

20.6 <u>Performance Security.</u> In addition to any other performance securities provided herein, Contractor shall furnish a Performance Security for the full and faithful performance of its obligations under this Agreement and under the Guara BV PACKAGE II & V EPC Contract in accordance with <u>Section 3.7</u> of the Instructions to Bidders released by Guara BV and Tupi BV in connection with the Request for Proposal, in the form set forth in <u>Exhibit XXIV.</u> This Performance Security shall remain in full force and effect until the issuance of the last Final Completion Acceptance Notice under this Agreement or its equivalent under the Guara BV PACKAGE II & V EPC Contract.


## ARTICLE 21

## DEFAULT, TERMINATION AND SUSPENSION

21.1 <u>Default by Contractor.</u>

(a)   <u>Termination by Tupi BV for Default.</u> Contractor shall be deemed to have committed a default hereunder if at any time in connection with the Works or Contractor's obligations under this Agreement: (i) Contractor shall refuse or fail to provide sufficient skilled workers, adequate supervision or payment for materials of the proper quality; (ii) Contractor shall fail in any material respect to follow the Project Schedule or the Critical Path Schedule; (iii) Contractor shall fail to pay its Subcontractors or to pay its debts as they become due in accordance with this Agreement, a Subcontract or a Subcontractor's invoice; (iv) Contractor shall cause, by any action or omission, the stoppage or delay of or interference with the Works; (v) Contractor shall fail to comply with any material provision of this Agreement; (vi) any Performance Security delivered to Tupi BV expires or is terminated or repudiated, except in accordance with the express terms of this Agreement; (vii) Contractor abandons the Works (except due to a termination of the Works permitted by this Agreement); (viii) Contractor, after a delay in or suspension of the Works permitted by this Agreement, fails or refuses to resume performance of the Works after cessation of such delay or suspension; (viii) Contractor exceeds the limitation on Liquidated Damages for Delay set forth in <u>Section 20.2.4;</u> (ix) Contractor becomes insolvent or has a receiver appointed; (x) Contractor violates the provisions of <u>Section 18.1</u> or makes a general assignment for the benefit of its creditors (and if the events described in clause (ix) or (x) occur, the cure provisions found below shall not apply); (xi) Contractor is in default under the Guara BV PACKAGE II & V EPC Contract; (xii) Contractor's refusal or failure to enter into the amendment to this Agreement or to supply the Additional FPSO PACKAGE II & V in accordance with <u>Section 12.6(a)</u> following the delivery by Tupi BV of the Option Notice; (xiii) Contractor fails to obtain the Consents listed in Exhibit XIII and any other permits, approvals or licenses required for performance of the Works for which Tupi BV has not assumed responsibility under Exhibit XIV (each of the foregoing clauses (i) through (xiii) being a <u>"Default");</u> then, upon notice by Tupi BV in accordance with <u>Section 25.5</u> specifying the nature and origin of the alleged Default (and provided that: (1) Contractor shall not have taken adequate steps to cure such condition within seven (7) Days from the date of notice by Tupi BV; or (2) if the Default cannot reasonably be corrected within seven (7) Days, and Contractor has commenced such corrective action within seven (7) Days but has not cured such condition within fourteen (14) Days), Tupi BV, at its option and in its sole discretion, without prejudice to any other rights it may have under this Agreement and without further notice to Contractor, may:

(i)   Take such steps as are necessary to mitigate or cure the Default, in which case Contractor shall be fully liable to Tupi BV and shall pay for the cost thereof;

(ii)   Suspend Contractor's performance of all or any part of the Works and seek any legal remedies it may be entitled to under this Agreement. If Tupi BV elects this remedy, Tupi BV will be immediately and exclusively entitled to have all or any part of the remaining Works completed by others, at its sole discretion, without any interference from Contractor, and Contractor (A) will be responsible for the

payment of any costs incurred by Tupi BV in respect of the completion of the uncompleted Works, (B) will reimburse the amount incurred by Tupi BV to complete the Works up to the amount of the unpaid balance of the Contract Price and for which Tupi BV does not then have a payment obligation, and (C) will indemnify and hold Tupi BV harmless for any expenses, costs, losses or damages resulting from the termination, subject only to the limitations on Contractor's liability set forth in <u>Section 22.6;</u> and/or

(iii) Seek interlocutory injunctive relief requiring performance of Contractor's obligations, it being agreed by Contractor that such relief may be necessary to avoid irreparable harm to Tupi BV.

Tupi BV shall not be obligated to make any payments hereunder at any time in which a Default shall have occurred and is continuing, except for any payments due for those services that have been completed as of such date of Default and/or are not related to the Default. Notwithstanding any of the foregoing, Tupi BV shall not have any affirmative obligation to terminate this Agreement in the event of a Default.

<u>(b)</u>    <u>Additional Rights of Tupi BV Upon Termination.</u> In the event that Tupi BV terminates this Agreement in whole or in part in connection with a Default, or for convenience under <u>Section 21.2,</u> Tupi BV may, at its sole option, (i) enter the Site and take full possession and control of the Site and all Equipment, materials, tools, supplies, documents, and information of Contractor, (ii) assume any or all of the Subcontracts and (iii) complete (or cause others to complete) the Works in the most cost-efficient means reasonably practicable. To the extent Tupi BV exercises any of these additional rights upon termination, Contractor shall cooperate fully with, and provide all reasonable assistance to, Tupi BV and any of Tupi BV's Affiliates, employees, agents, representatives and subcontractors. Contractor shall not be entitled to receive any further payment from Tupi BV until the Works have been fully completed and accepted by Tupi BV and any Disputes in connection with such completion are resolved. Tupi BV's rights under this  <u>Section 21.1(b)</u> are in addition to any other rights provided for under this Agreement. Tupi BV agrees to act reasonably and to use its best efforts to mitigate any costs it might incur in connection with any termination in connection with a Default.

<u>(c)</u>    <u>Obligations Upon Termination.</u> All terms, covenants, conditions and obligations under this Agreement shall survive the termination of this Agreement under this  <u>Section 21.1,</u> including but not limited to any claims, demands, obligations, losses, Liens, or causes of action arising out of the Works or the performance of the Works by Contractor or its Subcontractors, warranties, indemnities, insurance coverage and protection, workmanship, repair obligations and obligations with respect to proprietary and Confidential Information.

21.2    <u>Termination for Convenience by Tupi BV.</u> Tupi BV shall have the right to terminate for convenience all or any part of this Agreement by providing Contractor with a written

notice of termination, to be effective thirty (30) Days from delivery of such notice. In the event of a termination for convenience, Contractor shall (i) immediately discontinue the Works on the date and to the extent specified in such notice; (ii) place no further orders for Subcontracts, Equipment, or services in respect of such FPSO PACKAGE **II or** FPSO PACKAGE V except as may be necessary for completion of any portion of the Works currently being undertaken so as to avoid the impact of any remobilization; (iii) promptly make every reasonable effort to procure cancellation, transfer or assignment of the Subcontracts and rental agreements to Tupi BV or its designees on terms satisfactory to Tupi BV to the extent they relate to the performance of the Works then discontinued; (iv) cooperate with Tupi BV for the efficient transition of the Works; and (v) thereafter execute only that portion of the Works as may be necessary to preserve and protect Works already in progress and to protect Equipment at the Site or in transit thereto, and to comply with any Applicable Law. Contractor shall be paid the reasonable value of the Works performed for any affected FPSO PACKAGE II or FPSO PACKAGE V prior to such termination plus any reasonable mobilization costs plus reasonable direct close-out costs, but in no event shall Contractor be entitled to receive any amount for overhead, anticipatory profit, or loss of opportunity.

21.3    <u>Suspension of Works by Tupi BV.</u> Tupi BV may, for any reason, at any time and from time to time, by written notice to Contractor, suspend the performance of the Works or any part thereof in respect of one or more FPSO PACKAGES II or FPSO PACKAGES V, whereupon Contractor shall suspend the performance of the Works or any part thereof for such time or times and in such manner as Tupi BV may request. During any such suspension, Contractor shall protect and secure the Works in such manner as Tupi BV may reasonably request (or, in the absence of a request, in such manner as Contractor reasonably believes is appropriate to protect and secure the Works). Unless otherwise instructed by Tupi BV, Contractor shall, during any such suspension, maintain its staff and labor on or near the Site ready to proceed with the Works upon receipt of Tupi BV's further instructions. Tupi BV and Contractor shall negotiate a Change Order to address the impact of such suspension on the Contract Price, the Project Schedule and the Critical Path Schedule. If applicable, the Contract Price may be adjusted for the reasonable costs (including actual overhead and reasonable profit) of such suspension, including demobilization and remobilization costs, if relevant, along with appropriate supporting documentation to evidence such costs, and the Project Schedule and Critical Path Schedule in respect to such FPSO PACKAGE(S) II or FPSO PACKAGE(S) V shall be adjusted to reflect such suspension.

21.4    <u>Suspension or Termination by Contractor.</u> Contractor may terminate this Agreement with respect to an FPSO PACKAGES **II** or an FPSO PACKAGE V or suspend the execution of the Works with respect to an FPSO PACKAGES **II** or an FPSO PACKAGE V only if any payment due to Contractor by Tupi BV in respect of the affected FPSO PACKAGES II or FPSO PACKAGE V is delayed for more than sixty (60) Business Days from the date of Contractor's notice of the payment delay to Tupi BV, provided that Contractor has achieved the corresponding portion of the Works, as set forth in the Project Schedule and the Critical Path Schedule, with respect to such FPSO PACKAGES **II** or such FPSO PACKAGE V and payment is not being otherwise withheld pursuant to <u>Section 10.8.</u>

        21.4.1 If this Agreement is terminated by Contractor in respect of any or all

FPSO PACKAGES II or FPSO PACKAGES V pursuant to this <u>Section 21.4</u>, Tupi BV shall pay to Contractor, within sixty (60) Business Days from the date of the termination notice, all undisputed and outstanding amounts due to Contractor under this Agreement with respect to such affected FPSO PACKAGE II or FPSO PACKAGE V. If there is a Dispute with respect to any amount owed in respect of an FPSO PACKAGE II or FPSO PACKAGE V, Contractor shall not have the right of termination, Tupi BV shall pay all undisputed amounts on or before the due date hereof and the Parties may submit the Dispute for resolution pursuant to <u>Article 24.</u>

21.4.2 If Contractor suspends the execution of the Works pursuant to this <u>Section 21.4</u> and such suspension is proper because Contractor has the right under this Agreement to suspend the Works, the Parties shall negotiate a Change Order to address the impact of such suspension on the Contract Price, the Project Schedule and the Critical Path Schedule.

21.5    <u>Exception.</u> Notwithstanding the foregoing,  <u>Section 21.4</u> shall not apply if Tupi BV withholds, suspends or delays any payment due to Contractor hereunder in connection with any Default under this Agreement or the Guara BV PACKAGE II & V EPC Contract.


# ARTICLE 22

## INDEMNITIES; LIMITATIONS OF LIABILITY


22.1    <u>Contractor's Indemnification Obligation.</u> Subject to the other provisions of this Agreement, Contractor shall defend, indemnify and hold each member of Tupi BV Group harmless from and against any and all claims, losses and/or liabilities, (including the cost and expenses related to any administrative, judicial, or arbitration procedures before any court or tribunal and related attorneys' fees) suffered or incurred by such member of the Tupi BY Group arising out of or resulting from the negligence or willful misconduct of, or the violation of any Applicable Law or the material breach of this Agreement by any member of Contractor Group.

22.2    <u>Tupi BV's Indemnification Obligation.</u> Subject to the other provisions of this Agreement, Tupi BV shall defend, indemnify and hold each member of the Contractor Group harmless from and against any and all claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, or arbitration procedures before any court or tribunal and related attorneys' fees) suffered or incurred by such member of Contractor Group arising out of or resulting from the gross negligence or willful misconduct of, or the violation of any Applicable Law or the material breach of this Agreement by Tupi BV.

22.3    <u>Intellectual Property Indemnification.</u> Without prejudice to <u>Section 22.1</u>, Contractor shall defend, indemnify and hold each member of the Tupi BV Group harmless from and against any and all claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, or arbitration procedures before any court or tribunal and related

attorneys' fees) suffered or incurred by such member of the Tupi BV Group arising out of any actual or alleged infringement of any intellectual property rights, or the improper use of any proprietary rights, that may occur in connection with the performance of the Works or the ownership or use of the Equipment by any member of Contractor Group or any member of any member of the Tupi BV Group. Subject to Section 22.4, Contractor shall have sole authority for the control of the defense of any and all such claims. Should any such claim materially impair Contractor's performance of the Works or continued operations, then Contractor shall, at its own expense, timely procure the right to continue its performance of the Works so as not to materially impair the Project Schedule, the Critical Path Schedule or the ongoing performance of the Works. Any amounts incurred by Contractor to perform its obligations under this Section 22.3 shall not be included in determining any limitations of liability contained in this Agreement.

22.4 Notice. The Parties shall give reasonably prompt written notice to each other of any and all injuries to persons or damage to property (including any claim with respect thereto) of which such Party has notice or knowledge and which in any way arises from the performance of the Works or this Agreement. The indemnifying Party shall not settle any suit for which it is providing indemnity under this Article 22 without the prior written consent of the indemnified Party, which consent shall not be unreasonably withheld, conditioned or delayed.

22.5 Survival and Duration. The indemnification provisions contained in this Agreement shall survive Contractor's completion of the Works hereunder and any termination or expiration of this Agreement. Claims for indemnified losses may be made so long as any claim may be made in respect of such matters under any Applicable Law, including any statute of limitations; provided, that the foregoing shall not affect any claim made in good faith prior to the date of such expiration.

22.6 Tupi BV and Contractor Limitation of Liability. Each of Tupi BV's and Contractor's liability for damages pursuant to this Agreement is limited to direct damages, excluding loss of profits, other consequential damages and Liquidated Damages, as defined in Sections 4.4 and 20.2, and except as otherwise provided below and subject to Section 22.8, the aggregate amount of Contractor's liability for direct and liquidated damages hereunder shall, except as otherwise provided in this Section 22.6, be limited to an amount equal to twenty percent (20%) of the Contract Price, excluding amounts related to Initial Performance of the Works, warranty work, indemnities, and taxes. This Section 22.6 expressly survives the termination of this Agreement.

    22.6.1 The Parties agree that the physical loss or damage to existing facilities, Equipment or materials of Tupi BV, shall be limited to the amount of one million five hundred thousand United States Dollars (US$1,500,000.00) per event.

  22.6.1.1    The limitation of liability provided in Section 22.6.1 shall apply only to physical loss or damage as follows:

  (a)    With regard to existing properties during the performance of the Works: from incidents that would be included in the coverage of WELCAR 2001-Offshore Project Construction Policy, without consideration of item 21 of the "Exclusions for

Section II" Clause (Liability) with respect to the Principal Assureds' Existing Properties; or

(b) With regard to the Works performed after the beginning of the operational phase of each FPSO: from incidents that are included in Tupi BV's Policy of Operational Risk Insurance for Offshore Facilities.

22.6.1.2    The limitations of liability set forth in this Section 22.6 are not applicable to Section 20.2.

22.6.2 In case of any Release, oil spill or other waste discharge at sea, Contractor shall be liable to Tupi BV and any other member of Tupi BV Group up to the limit of one million United States Dollars (US$1,000,000.00) per event and the costs of its direct consequences.

22.6.3 Tupi BV shall be entitled to recourse against Contractor if Tupi BV is obliged to pay for any losses or damages caused by Contractor to third parties.

22.6.4 Notwithstanding the provisions of Section 22.6.2, the amount Tupi BV may be reimbursed pursuant to  Section 22.6.3 shall include whatever third parties obtain whether in court or otherwise, plus all expenses (court and administrative fees and attorneys' fees, among others).

22.6.5 The limitation of liability provided in Section 22.6.1 in respect of a Party shall not apply with respect to such Party if the event giving rise to a claim for such indemnified amount is found to result from any of the following:

(a)    losses and damages resulting from such Party's gross negligence, willful misconduct, fraud, willful refusal to perform the Works or any obligations hereunder, intentional breach of this Agreement or any Subcontract, or any act of bad faith committed by Tupi BV, on the one hand, Contractor or any Subcontractor, on the other hand, in relation to the Works;

(b)    abandonment or obstruction of the Works by Contractor, or a reduction of its level of activities to protect and preserve the Works, except when directed by Tupi BV pursuant to an existing provision of this Agreement;

(c)    violation of any applicable Environmental Law, or the occurrence of any Release or environmental damage caused by any member of the Contractor Group or Subcontractors (except as set forth in Section 22.6.2);

(d)    failure to comply with any aspect of applicable fiscal, labor and social security laws, or of any provisions in this Agreement related to such matters;

(e)    costs incurred to repair any Defective Works or to complete all or any portion of the Works in the event of a suspension or termination of this Agreement pursuant to Article 21; or

(f) violation by the Party of any intellectual property right of third parties, including copyrights, patents, trademarks or any other intellectual property right in connection with the Works, including any Works performed by Subcontractors.

22.7    <u>Risk of Loss.</u> Contractor hereby agrees that Contractor shall bear all risks of any losses or damages caused by Contractor or any member of Contractor Group relating to the performance of the Works until such date as Contractor has completed all of the Works according to the provisions of <u>Exhibit I</u> and Tupi BV has issued a written Final Completion Certificate for each FPSO PACKAGE II and for each FPSO PACKAGE V.

22.8    <u>Consequential Damages.</u> Notwithstanding any other provision of this Agreement to the contrary, but except for the provisions of <u>Section 20.5,</u> in no event shall Tupi BV or Contractor be liable to each other for any indirect, special, incidental or consequential loss or damage (other than such damages as may be included as a component of liquidated damages hereunder), including, but not limited to, loss of profits or revenue, loss of opportunity or use incurred by either party to the other, or like items of loss or damage, and each Party hereby releases the other Party therefrom.

## ARTICLE 23

### FORCE MAJEURE

23.1    <u>No Liability.</u> Notwithstanding anything to the contrary in this Agreement, neither Contractor nor Tupi BV shall be liable to the other for any damages, claims or suits of any nature arising out of delay or noncompliance with its obligations under this Agreement if such delay or noncompliance is due to Force Majeure.

23.1.1 The Party invoking Force Majeure shall give written notice to the other Party pursuant to <u>Section 25.5</u> immediately following the occurrence of the event of Force Majeure specifying the details and the anticipated duration of the Force Majeure. Once the Party is no longer prevented from performing its obligations under this Agreement as a result of an event of Force Majeure, it shall promptly notify the other Party of this fact. In the event that a Party fails to acknowledge the occurrence of an event of Force Majeure, the Party claiming Force Majeure shall bear the burden of proof with respect to the existence thereof

23.1.2 A Force Majeure event shall be deemed to have commenced not earlier than seventy-two (72) hours prior to the giving of such notice. The affected Party shall, in such notice, indicate what actions it is taking to mitigate the effects of such Force Majeure event. The affected Party shall further provide the other Party with (i) periodic supplemental written notices during the period of the Force Majeure event regarding any change, development, progress, or other relevant information concerning the Force Majeure event as per <u>Section</u>

3.17(e); and (ii) written notice promptly after the termination of the Force Majeure event.

23.2     <u>Prevention and Mitigation.</u> The affected Party shall: (i) make all reasonable efforts to prevent, reduce to a minimum or mitigate the effect of any delay or cost increase resulting from a Force Majeure; and (ii) use its reasonable efforts to ensure resumption of normal performance of the Works promptly after the termination of any event of Force Majeure.

23.3     <u>Mutual Consultation.</u> If an event of Force Majeure has occurred, the Parties shall consult with one another as to the effect, if any, of such event of Force Majeure and whether the Force Majeure shall affect the Project Schedule or the Critical Path Schedule. If necessary, the Project Schedule and/or the Critical Path Schedule shall be equitably adjusted to take into account the effect that the Party claiming an event of Force Majeure demonstrates is actually and necessarily attributable to such event of Force Majeure. Any such adjustment shall take into account rescheduling or other actions, as Contractor or Tupi BV may reasonably be expected to undertake, in order to minimize the material adverse effect of such event of Force Majeure on the Project Schedule and/or the Critical Path Schedule. Each Party shall bear its own increased costs arising from each event of Force Majeure.

23.4     <u>Definition.</u> For the purposes of this Agreement, "Force Majeure" shall mean any act, event or condition that (i) renders it impossible for the affected Party to perform its obligations under this Agreement, (ii) are beyond the reasonable control of the affected Party and not due to its fault or negligence and (iii) could not have been prevented or avoided by the affected Party through the exercise of due diligence, including but not limited to, the expenditure of any reasonable sum taking into account the Contract Price. Force Majeure may include catastrophic storms or floods, lightning, earthquakes and other typical acts of God, wars, civil disturbances, revolts, insurrections, sabotage, commercial embargoes, fires, explosions, or actions of a Governmental Authority that were not requested, promoted or caused by the affected Party, that prevent Contractor from timely discharging its duties and obligations. Notwithstanding the foregoing, Force Majeure shall not include any of the following: (a) economic hardship; **(b)** changes in market conditions; (c) late delivery or failure of Equipment, unless otherwise caused by Force Majeure hereunder; (d) strikes and other industrial disturbances caused by or associated with Contractor's employees or Subcontractor's employees, or that are considered as illegal or abusive; (e) nonperformance or delay by Subcontractors, unless otherwise caused by Force Majeure hereunder; (f) weather conditions which could reasonably be anticipated by experienced contractors (and any Site conditions arising therefrom); and (g) robbery or theft of any warehoused, stored or in transit Equipment, materials or any other goods under Contractor's responsibility or control, whether or not owned by Contractor.


# ARTICLE 24

## DISPUTE RESOLUTION

24.1     <u>Amicable Resolution.</u>

(a)     In the event of any dispute, claim, or controversy arising out of, relating to, or in connection with this Agreement ("Dispute") the Parties agree in the first instance to submit the Dispute to a joint negotiation between senior management officers of each Party. Each Party shall nominate its respective senior management officer within fifteen (15) Days from the earliest date on which a Party shall be deemed to have given notice, pursuant to Section 25.5, of a dispute, claim, or controversy (the "Dispute Notice"). The two senior management officers shall meet at a mutually agreeable time and location within thirty (30) Days after the Dispute Notice is given to try to resolve the Dispute in an equitable and good-faith manner. If the Parties cannot agree on a time and location for the senior officers' meeting, then they may proceed directly to proceedings under Sections 24.2 or 24.3, as applicable. The Parties expressly acknowledge and agree that Tupi BV's right to terminate this Agreement is not limited in any way by the dispute resolution provisions of this Article 24.

(b)     Notwithstanding anything in this Article 24, the Parties may at any time, without prejudice to any other proceedings, seek to settle any Dispute through mediation before one neutral mediator who shall be fluent in the English language and who shall be qualified by experience and education to mediate disputes concerning international commercial agreements. If the Parties cannot agree on a neutral mediator and a method to conduct the mediation, the Parties agree to submit the matter to mediation to be conducted in English under the International Chamber of Commerce ("ICC") ADR Rules in force on the date of the dispute. The Parties agree that the neutral mediator cannot serve as the Expert, as that term is defined in Section 24.2, or as an arbitrator under Section 24.3.

24.2   Disputes of Technical Nature.

(a)     Any Dispute that concerns a technical matter which can be reasonably settled by empirical studies and which relates primarily to technical issues, rather than commercial, economic, financial, or accounting issues, shall be deemed a "Technical Dispute."

(b)     If a Technical Dispute exists and is not resolved pursuant to Section 24.1, the Parties agree to submit the Technical Dispute to an independent petroleum industry engineering expert (the "Expert"), who shall be fluent in the English language. If the Parties cannot mutually agree on the Expert within fifteen (15) Days after the conclusion of the senior officers' meeting under Section 24.1 (or, if no such meeting occurs, within forty-five (45) Days after the Dispute Notice), the Parties agree that the ICC's Centre for Expertise (the "Centre") shall appoint the Expert in accordance with the Rules of Expertise of the ICC that are in effect on the date of the Dispute Notice. The Parties request that the Centre shall endeavor to appoint the Expert within fifteen (15) Days following receipt of a request to appoint the Expert.

(c)     Within fifteen (15) Days after the Expert is agreed to or appointed under Section 24.2(b), each Party shall provide the Expert and the other Party with a written notice in English detailing the issues in the Technical Dispute, along with

copies of all supporting documentation on which the Party is relying to support its position. The Expert shall complete all proceedings regarding the Technical Dispute and issue a written decision (the "Decision") in English as soon as reasonably possible, but in no event later than thirty (30) Days after the Expert is agreed to or appointed under Section 24.2(b). If the Expert needs additional time to issue the Decision, the Expert shall notify the Parties in writing and shall be entitled to an additional period not to exceed fifteen (15) Days, unless the Parties agree otherwise.

(d)     The Decision shall be final and binding on the Parties, unless a Party provides the other Party and the Expert with written notice of dissatisfaction (the "Dissatisfaction Notice") with the Decision within fifteen (15) Days after the issuance of the Decision. If a Party provides Dissatisfaction Notice, the Technical Dispute shall be finally resolved through arbitration under Section 24.3.

24.3     Binding Arbitration.

(a)     Subject to the requirements of Sections 24.1 and 24.2, the Parties agree that any Dispute, including any Dispute as to the breach, validity, or existence of this Agreement or this Article 24, shall be finally resolved by binding arbitration before three (3) arbitrators in New York City, New York, U.S.A., pursuant to the Rules of Arbitration of the ICC (the "ICC Rules") in force on the date of the Dispute Notice, except as those rules may be modified by this Article 24.

(b)     Except as set forth in this Article 24 or Section 21.1(a)(iii), the Parties agree that arbitration shall be the exclusive means of resolving the Dispute; and no Party shall refer or attempt to refer the Dispute to any court or other tribunal for resolution.

(c)     The arbitration shall be conducted in the English language. Unless agreed otherwise, all documents submitted in connection with the arbitration shall be in the English language or, if submitted in any other language, shall be accompanied by a certified English translation.

(d)     The Party filing the Request for Arbitration (the "Request") under the ICC Rules shall deliver a copy of the Request to the other Party at the same time and in the same manner as it delivers the Request to the Secretariat of the International Court of Arbitration (the "Court") of the ICC. The Request shall be made within a reasonable time after the Dispute arises.

(e)     The arbitral tribunal (the "Tribunal") shall consist of three (3) arbitrators who shall be qualified by experience and education to arbitrate disputes concerning international commercial agreements and who shall be chosen as follows:

(i)     Each Party shall nominate one arbitrator within twenty (20) Days after the filing of the Request with the Secretariat of the Court. If a Party does not timely nominate an arbitrator, that Party's arbitrator shall be appointed by the Court pursuant to the ICC Rules;

(ii) Within twenty (20) Days after the date on which the second arbitrator has been confirmed or appointed by the Court, the two arbitrators selected under Section 24.3(e)(i) shall jointly nominate the third arbitrator, who shall act as chairman of the Tribunal after being confirmed by the Court. If the two arbitrators cannot agree on the third arbitrator, the Court shall appoint the third arbitrator pursuant to the ICC Rules.

(f)     The Tribunal's award shall be made and payable in US Dollars after any tax or other deduction. The award shall include interest from the date of breach, if breach of this Agreement is found. The Tribunal shall also fix an appropriate rate of interest from the date of the award until the award is paid in full.

(g)     The Parties agree that judgment upon the Tribunal's award may be entered in any court having jurisdiction thereof, and may not be challenged in any court, either at the place of arbitration or elsewhere. Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any such enforcement proceeding and to the proceeding being brought in an allegedly inconvenient forum. Each Party also hereby agrees to accept service of process in any such enforcement proceeding.

(h)     The Parties agree that each Party shall bear the fees and expenses of the arbitrator nominated by it (or on its behalf) and share of the ICC administrative expenses assessed by the Court. The fees and expenses of the third arbitrator shall be borne by the Parties in equal parts. Any other arbitration fees and expenses, including attorneys' and expert fees, shall be allocated by the Tribunal in its award. The Parties agree to instruct the Tribunal to allocate such fees and expenses to the Parties in a proportion to reflect their relative success on the merits (including the successful assertion of any defense).

(i)     The Tribunal shall have the authority to enter interim, conservatory, injunctive, and declaratory relief, if appropriate under applicable substantive law. The Tribunal shall also have the power to determine whether a Dispute is arbitrable. The Tribunal shall not have the power to award punitive or exemplary damages. Notwithstanding anything in this Section 24.3(i), each Party retains the right to apply for injunctive relief in any court having jurisdiction thereof prior to or during the arbitration, and any such application shall not be deemed to be an infringement or waiver of the ability to arbitrate under this Section 24.3 and shall not affect the relevant powers reserved to the Tribunal.

(j)     In accordance with Section 25.8, the substantive law of the State of New York, without regard to its conflict of laws principles, shall apply to the arbitration. The Tribunal shall not have the power of an *amiable compositeur*.

(k)     Unless the Parties agree otherwise, the arbitration shall be completed within the shorter of (i) the time limit under the ICC Rules, or (ii) two hundred seventy

(270) Days after the confirmation or appointment of the third arbitrator under Section 24.3(e)(ii).

(l) Unless this Agreement is terminated in accordance with its terms, each Party shall continue to perform its obligations under this Agreement during the course of any of the dispute resolution procedures set forth in this Article 24.

(m) This Article 24 shall survive termination of all or any part of this Agreement, as indicated in Section 25.15.


## ARTICLE 25

## MISCELLANEOUS PROVISIONS

25.1    Entire Agreement. This Agreement, together with all Exhibits, schedules, and attachments, contains the entire understanding of the Parties with respect to the subject matter hereto and incorporates any and all prior agreements and commitments with respect thereto. There are no other oral understandings, terms or conditions, and neither Party has relied upon any representation, express or implied, which is not contained in this Agreement.

25.2    Opportunity to Review. Contractor agrees and acknowledges that it has had a full and complete opportunity to examine this Agreement and understands the obligations contained herein. Contractor represents that it has carefully examined the documents listed or referenced in the Scope of Work and all Exhibits attached hereto and has fully acquainted itself with the data and information contained therein (including any and all designs, specifications and estimates). Any failure of Contractor to review such information and data shall not release Contractor of its responsibilities under this Agreement nor shall it give rise to an increase in the Contract Price or an adjustment to the Project Schedule or the Critical Path Schedule. Notwithstanding the foregoing, it shall be Contractor's responsibility to determine the accuracy, adequacy and completeness of such information and data as Tupi BV makes no guaranty or warranty, express or implied, as to the accuracy, adequacy or completeness of such information or data._

25.3    Amendments. No change, amendment or modification of this Agreement shall be valid or binding upon the Parties hereto unless such change, amendment or modification is in writing and duly executed by both Parties hereto.

25.4    Captions. The captions and section headings contained in this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope of intent of this Agreement or the intent of any provision contained herein.

25.5    Notice. Any notice, demand, offer, or other written instrument required or permitted to be given pursuant to this Agreement shall be in writing signed by the Party giving such notice and shall be hand delivered or sent by overnight courier, messenger, facsimile (with confirmation of receipt), e-mail (with confirmation of receipt) or certified mail, return receipt requested, to the other Parties at the address set forth below.

    (a)    If delivered to Tupi BV:
               TUPI BV
               Av. Republica do Chile, n. 500 — 23 floor — Centro - Rio de Janeiro
               CEP 20031-170
               Facsimile: (55 21) 3487 6644
               Attn: Mr. Mani° Ferreira Alencar

    (b)    If delivered to Contractor:
               CONTRACTOR: Consortium MGT
               Rua Wiegando Olsen, 2020 - Cidade Industrial Curitiba — PR
               CEP 81460-070
               Facsimile: (55 41) 3313 8000
               Attn: Mr. Gustavo Adolfo Persson

Each Party shall have the right to change the place to which notice shall be sent or delivered by sending a notice to the other Party informing of such change. Notices shall be deemed to have been duly given on the date they are: (i) delivered personally; (ii) sent by facsimile or e-mail, if receipt is acknowledged or a confirming copy is sent the same day by mail; or (iii) sent by a recognized overnight delivery service to the Party to whom the notice is to be given. All other notices shall be deemed given when received. Notwithstanding the foregoing, if a notice is delivered or sent after the close of regular business hours, it shall be deemed to have been given on the first Business Day following receipt, unless receipt is acknowledged on the same day.

        25.5.1 All communications between the Parties in connection with this Agreement will be in the English language. Portuguese may be used, as an alternative, only when expressly allowed by Tupi BV.

25.6   <u>Severability.</u>   If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, such term, provision, covenant or restriction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Upon such a determination, the Parties shall promptly modify this Agreement so as to achieve the original intent of the Parties as closely as possible in order that the transactions contemplated hereby shall be consummated as originally contemplated to the fullest extent possible.

25.7   <u>No Waiver.</u> Any failure of either Party to enforce any of the provisions of this Agreement or to require compliance with any of its terms at any time during the term of this Agreement shall **in** no way affect the validity of this Agreement, or any part hereof, and shall not be deemed a waiver of the right of such Party thereafter to enforce any and each such provisions.

25.8    Governing Law. This Agreement shall be governed, construed and enforced in accordance with the Laws of the State of New York, without giving effect to its conflicts of law rules (except Sections 5-1401 and 5-1402 of the General Obligations Law).

> 25.8.1 Contractor has investigated to its satisfaction the Applicable Law as of the date hereof and warrants that it can fully perform under the Agreement in accordance therewith. Except for any changes in Applicable Law which may occur during the performance of the Works and which directly affect the performance or cost of the Works and which risk is not specifically allocated in the Agreement, Contractor hereby waives any right to make any claim for adjustment of the Contract Price, the Project Schedule, or the Critical Path Schedule, or to make any claim of Force Majeure or impossibility of performance due to the requirements of Applicable Law. Without prejudice to the foregoing, Contractor acknowledges that, while operating in Brazil, it will be subject to and shall abide by the Applicable Law of Brazil and that, while operating in any country different from its country of origin, it will be bound to abide by the Applicable Law of that country.

25.9    Successors and Assigns. This Agreement shall be binding upon the Parties hereto, their successors and permitted assigns.

25.10   Exhibits. All Exhibits, Schedules or other attachments referenced in this Agreement are incorporated into this Agreement by such reference and shall be deemed an integral part of this Agreement.

25.11   Limitations on Third Party Beneficiaries; Independent Contractor. This Agreement is for the sole and exclusive benefit of the Parties hereto and is not intended to create any benefit in favor of any third party, except as provided with regard to the members of Tupi BV Group, Guara BV and the members of Guara BV Group, as applicable. This Agreement does not establish a joint venture, partnership or principal-agent relationship between the Parties. Contractor is an independent contractor, and all persons employed by Contractor in connection herewith shall be employees of Contractor and not employees of Tupi BV in any respect. Contractor is not an agent of Tupi BV and shall maintain complete control over its employees. Neither Party shall have any right, power or authority to enter into any agreement or undertaking for, act on behalf of, or to act as or be an agent or representative of, or to otherwise bind or obligate the other Party.

25.12   Further Assurances. Contractor and Tupi BV agree to provide such information, to execute and deliver any instruments and documents, and to take such other actions as may be necessary or reasonably requested by the other Party that are not inconsistent with the provisions of this Agreement and that do not involve the assumptions of obligations other than those provided for in this Agreement, in order to give full effect to this Agreement and to carry out the intent of this Agreement.

25.13   Restrictions on Public Announcements. Contractor shall not publicize, issue press releases, participate in interviews, print advertisements, publicity materials, prospectuses, financial documents or in any similar way mention or refer to the FPSO PACKAGES II, the

FPSO PACKAGES V, the FPSOs or the Works without the prior written consent of Tupi BV, which consent shall not be unreasonably withheld.

25.14   <u>Confidential Information.</u> Contractor acknowledges that all information or data obtained by Contractor and any member of Contractor Group in the performance of this Agreement and all Confidential Information are the property of Tupi BV and/or any other member of Tupi BV Group or was obtained by Tupi BV and/or any other member of Tupi BV Group pursuant to an undertaking to hold such information and data confidential. To that end, Contractor shall take such further actions as Tupi BV may request in order to comply with Tupi BV's undertakings of confidentiality and non-disclosure. Contractor acknowledges that the business operations of Tupi BY and/or any other member of Tupi BY Group in the jurisdictions where this Agreement is to be performed are highly competitive, and that Tupi BV's and any other member of Tupi BV Group's strategies, methods, business relationships, and commercial contractual and financial information concerning such jurisdiction comprise Confidential Information and trade secrets of Tupi BV and/or any other member of Tupi BV Group, which will enable Tupi BV and/or any other member of Tupi BV Group to obtain a competitive advantage over competitors which do not know or use such Confidential Information. Contractor further acknowledges that protection of the Confidential Information and trade secrets against unauthorized disclosure and use is of critical importance to Tupi BV and/or any other member of Tupi BV Group in maintaining its competitive position. Contractor warrants that Contractor, its Affiliates, and their directors, officers, equity holders, employees, agents and Subcontractors shall hold such data and Confidential Information strictly confidential and shall not disclose or allow the disclosure of any such Confidential Information or data to any Person without the prior written consent of Tupi BV. Moreover, Contractor warrants that neither Contractor, its Affiliates, or their directors, officers, equity holders, employees, agents or subcontractors, shall in any manner use such Confidential Information or data in a manner injurious to Tupi BV or any other member of Tupi BV Group or to the detriment of Tupi BV's or any other member of Tupi BV Group's objectives. In particular, Contractor shall not directly or indirectly represent, advise, counsel, or otherwise assist any Person or Governmental Authority in the jurisdictions where this Agreement will be performed in any manner that would have, or be likely to have, an adverse effect on Tupi BV, its Affiliates or any other member of Tupi BV Group or the achievement of their business objectives. If Tupi BV, any of its Affiliates or any other member of Tupi BV Group enters into any granting instrument or other contract as a direct or indirect result of Contractor's services or efforts, that granting instrument or other contract shall be for the sole benefit of Tupi BV and/or any other member of Tupi BV Group or the applicable Affiliates and Contractor shall not have any interest in such granting instrument or other contract. Contractor acknowledges that the restrictions set out above may limit its ability to engage in businesses, or to advise or assist others engaging in businesses similar to Tupi BY's, its Affiliates or any other member of Tupi BV Group during the term of this Agreement and thereafter. Each member of the Tupi BV Group shall be entitled to enforce the provisions of this Section by appropriate judicial action, including orders compelling Contractor's compliance with these restrictions.

25.15   <u>Survival.</u> The provisions of <u>Sections 3.2(1),</u> 3.15, 17.1, 17.3, 18.1, 18.3, 18*A,* 21.1, <u>22.1, 22.2, 22.3, 22.5, 22.6, 25.5, 25.8,</u> 25.14, and <u>Articles 1,</u> 4, 6, 10, 12, 14, 15 and 24 shall survive the termination or expiration of this Agreement, except that <u>Sections 22.6</u> and <u>25.14</u> shall survive the termination or expiration of this Agreement for a period of five (5) years.

25.16   <u>Overall Project.</u> When applicable, the provisions of this Agreement shall be interpreted, considered and performed jointly with the provisions set forth under the Guara BV PACKAGE II & V EPC Contract.

25.17   <u>Digital Signature.</u> Using the digital signature, the Parties recognize the integrity, the authenticity and the authorship of paper documents scanned, attached to this electronic contract.


# ARTICLE 26

## ADDITIONAL CONSIDERATIONS

26.1   <u>Duty to Perform.</u> Each Party agrees that it is bound to perform its contractual duties hereunder even if events have rendered performance more onerous than could reasonably have been anticipated at the time of the conclusion of this Agreement.

26.2   <u>Right to Negotiate.</u> Notwithstanding <u>Section 26.1,</u> if a Party to this Agreement asserts on the basis of documented evidence provided to the other Party that:

> (a)   the continued performance of its contractual duties has become excessively onerous due to an event beyond its reasonable control which it could not reasonably have been expected to have taken into account or to have foreseen at the time of the execution of this Agreement; and that

> (b)   it could not reasonably have avoided, mitigated or prevented the event or its consequences (even if such avoidance, mitigation or prevention would require the Party to occur additional costs or expenses or to achieve less profit than originally anticipated hereunder), then, within a reasonable time of the assertion of this <u>Section 26.2</u> as provided above, the Parties agree to negotiate alternative contractual terms which reasonably allow for the consequences of the event; provided, that in no circumstance shall Tupi BV have any obligation to accept or agree to any Change, amendment or alternative contractual terms, and Tupi BV may elect to pursue or discontinue any such negotiations at any time in its sole discretion.

26.3   <u>Right to Disclosure.</u> Tupi BV shall have the right to disclose any information obtained from or by virtue of the performance of this Contract to (i) the members of Tupi BV Group, and (ii) Guara BV and the members of Guara BV Group (as defined in the Guara BV PACKAGE II & V EPC Contract).


# ARTICLE 27

## FOREIGN TRADE

27.1   <u>Compliance with Brazilian Law.</u> In accordance with Brazilian law as of the date hereof, Contractor shall accept, as detailed below, the materials, Equipment and any other

goods provided under this Agreement, or other goods previously authorized or requested in writing by Tupi BV in connection with the performance of the Works.

> 27.1.1 Contractor shall at all times during the term of this Agreement be properly licensed as a beneficiary in the Secretariat of the Federal Revenue of Brazil *(Secretaria da Receita Federal do Brasil,* "RFB") to proceed with the admission into a Special Custom Regime *(Regime Aduaneiro Especial)* for the materials, Equipment and goods contemplated by this Contract, according to the requirements of Brazilian law.

27.2    <u>Contractor Responsibility for Export/Import Costs.</u> Contractor shall be solely responsible for any and all costs and charges arising or resulting from the export, import and transport of all materials, Equipment and any other goods, supplied by it or purchased in Brazil or abroad by Tupi BV or by any Person authorized by it in connection with the performance of the Works.

27.3    <u>Contractor Responsibility for Custom Duties.</u> Contractor shall be solely responsible for the payment of any and all customs duties or any other amounts imposed in respect of the management, processing or approval of any grant claims, discharges, write-offs or amendments before the responsible or consenting Governmental Authority, and any other action that may be necessary in respect of the materials, Equipment and any other goods that are needed by Contractor for the performance of the Works under this Agreement. Contractor further agrees that it shall be responsible for any fines, sanctions or penalties, of any nature, imposed or levied by any Governmental Authority in connection herewith.

27.4    <u>Contractor Customs Compliance Obligations.</u> Contractor shall comply with and respect all customs requirements, particularly those set out in Brazilian law with regard to the presence in Brazil of materials, Equipment and any other goods under its responsibility in connection with the performance of the Works under this Agreement and admitted into the Special Custom Regime. Contractor is also directly and exclusively responsible for the breach of any rules related to the Special Custom Regime, including its termination or expiration.

27.5    <u>Contractor Responsibility for Transportation Costs.</u> Contractor will be solely responsible for all costs of transport and insurance of materials, Equipment and any other goods in connection with the performance of the Works by Contractor and that are purchased or supplied by it, as well as those materials, Equipment or goods purchased and supplied by Tupi BV or any company authorized by it that are returned or sent for repair or replacement from the Site to the supplier, in Brazil or abroad, and from the supplier, in Brazil or abroad, to the Site.

> 27.5.1 The costs of storage, stowage, rental of containers, demurrage, and any other costs resulting from this Agreement shall be exclusively under Contractor's responsibility.

> 27.5.2 Contractor shall transport the materials, Equipment and other goods to be imported by air, land or sea in accordance with the Applicable Law and shall be responsible for any loss or damage resulting from noncompliance with

Applicable Law.

27.6    <u>Proper Packaging of Materials.</u> Contractor shall arrange the proper packaging of materials, Equipment and any other goods, in order to avoid damages or deterioration during the transport to the final destination, as well as its compliance with the national and international requirements related to the appropriate packages, markings and labor, in particular with regard to dangerous products or pollutants that can cause environmental damage. The packages shall be resistant to support, with no limits, the violent handling and the exposure to extreme temperatures, sun and rain during the transit. The package size and weight shall take into consideration the distance to the final destination of the goods, the kind of transportation used and the difficulty in handling the material during the transit.

27.6.1 Contractor shall be responsible for the integrity of materials, Equipment and any other goods referred to in this <u>Article 27,</u> as well as any loss or damage from the transportation or handling during import or export stages, or during the construction and assembly of the FPSO PACKAGES II or FPSO PACKAGES V using such materials, Equipment and other goods.

27.7    <u>Contractor to Maintain Control.</u> Contractor shall maintain control of all materials, Equipment and any other goods supplied by it or acquired in Brazil or abroad by Tupi BV or any Person authorized by it, in the performance of its obligations under this Agreement. All charges or costs resulting from this control are Contractor's exclusive responsibility.

27.7.1 Within thirty (30) days before each Handover and each Final Completion, Contractor shall provide a complete inventory of materials, Equipment and other goods referred to in this <u>Article 27</u> for such FPSO PACKAGE II and for such FPSO PACKAGE V, in accordance with the model presented by Tupi BV that shall contain, at minimum, the following information: full description of each good specifying an identification number (part number or serial number), quantity, and the classification indicating the correspondent NCM according to *Tarifa Externa Comum* ("TEC").

27.7.2 Contractor shall comply with Brazilian law with regard to the Term of Responsibility *(Termo de Responsabilidade)* and the Regime Termination Form *(Extinceio de Regime)* for materials, Equipment and any other goods admitted into the Special Custom Regime.

27.8    <u>Contractor Responsibility for Notifications.</u> Contractor will be responsible for any notification or charge resulting from errors or omissions in the import/export/transfer process of materials, Equipment and any other goods admitted into the Special Custom Regime, as well as the FPSO PACKAGES II or FPSO PACKAGES V supplied and the Customs Clearance Re-exam by the Secretariat of the Federal Revenue of Brazil *(Reviseio Aduaneira da Receita Federal).*

27.9    <u>Contractor Submission of Proof of Compliance.</u> Contractor shall submit to Tupi BV, upon request, proof of its compliance with regard to the operations, requirements and the recommendations related to the import, export and transfer process set forth in this <u>Article 27.</u>

27.10   Contractor Issuance of Sales Invoices. Contractor shall issues a sale invoice to Tupi BV with regard to the goods and Equipment to be provided under this Agreement, except in cases of partial assignment of rights, in which case the assignee will be responsible to submit the sales invoice.

27.11   Non-Exclusive Nature of Obligations. The list of obligations and responsibilities of this Article 27 is not exclusive and Contractor remains obligated to comply with all of its other obligations in this Agreement and under all Applicable Law.

# ARTICLE 28

## NO VIOLATION OF LAW

28.1   No Violation of Applicable Law. Contractor agrees that in connection with this Agreement and the activities contemplated herein, that neither it nor any of its directors, officers, employees, agents, Affiliates or any other member of Contractor Group did or shall: (i) take action, or omit to take any action that would violate any Applicable Law related to the business practices of Contractor; (ii) offer, promise, authorize, make or give any payments, gifts or gratuities directly or indirectly to any Person (including any legal entity, government official, political party or private individual) for the purpose of illegally or improperly inducing or influencing such person or individual or an organization to make a business, purchase or contracting decision, or to take any other action favorable to the Parties or the performance of this Agreement; or (iii) otherwise take any action, or omit to take any action that would cause a violation of any Applicable Law, including **but** not limited to the US Foreign Corrupt Practices Act, the UK Bribery Act, Brazilian anti-bribery laws and the principles described in the Organization for Economic Co-operation and Development (OECD) Convention on Combating Bribery of Foreign Public Officials in International Business Transactions. Contractor shall include this requirement in all Subcontracts and purchase orders in connection with the performance of this Agreement.

28.2   Commercial Acts. Contractor agrees and undertakes, on behalf of itself, its directors, officers, employees, agents, affiliates and any other member of Contractor Group, not to pay any fees, commissions or rebates to any employee, officer or agent of Tupi BV, its Affiliates or shareholders, nor provide or cause to be provided to any of them any gifts or entertainment of significant cost or value in connection with this Agreement or in order to influence or induce any actions or inactions in connection with the commercial activities of Contractor hereunder. Contractor shall include this requirement in all Subcontracts and Purchase Orders.

28.3   Records and Indemnification. Contractor shall keep all records, files and books necessary to confirm compliance with  Sections 28.1 and 28.2, and shall make such documents available to Tupi BV upon request. Contractor shall defend, indemnify and hold each member of Tupi BV Group harmless from and against any and all claims, losses or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or tribunal and related attorneys' fees) suffered or incurred by a member of Tupi BV Group arising out of or resulting from any breach of Sections 28.1 and 28.2.

28.4    <u>Representation and Warranty.</u> Contractor represents and warrants, on the date hereof, that it has not taken any actions that would, if such actions were undertaken after the date hereof, conflict with its obligations under <u>Sections 28.1</u> and 28.2.

28.5    <u>Notice of Violation.</u> Each Party shall immediately notify the other Party upon receipt of notification or otherwise becoming aware of any event or occurrence that might constitute a breach or violation of Applicable Law or <u>Sections 28.1</u> and 28.2.

*[signature page follows]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives.

Digitally Signed                                    Digitally Signed
By Tupi BV:                                        By Contractor:


_____          _____
Name: Samir Passos Awad                   Name: Rondson de Si. Freire Ferreira
                                                         Director


                                                 _____
                                                 Name: Samuel Fernando Scalise Miranda
                                                         Director



Witnesses:


_____          _____
Digitally Signed by:                            Digitally Signed by:
Name: Marcio Ferreira Alencar             Name: Jose Tolentino Leite Neto
Identity: 140.409.646-91 (CPF)           Identity: 645.276.208-78 (CPF)