UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



DM CONSTRUTORA DE OBRAS LIMITADA,
VENTURA LOCAÇÃO DE EQUIPAMENTOS
LIMITADA AND CONSORCIO MGT,

　　　　　　Petitioners-Cross Respondents

　　-against-

TUPI B.V.,

　　　　　　Respondent-Cross Petitioner

No. 25-cv-7493 (CM)

## DECISION AND ORDER GRANTING CROSS-PETITIONER'S MOTION TO CONFIRM ARBITRATION AWARD AND DENYING PETITIONER'S MOTION TO VACATE ARBITRATION AWARD AND FOR OTHER RELIEF

McMahon, J.:

Before the Court are cross petitions, one to vacate and one to confirm an arbitration award. The arbitration between Petitioners DM Construtora de Obras Limitada, Ventura Locação de Equipamentos Limitada and Consórcio MGT (collectively, "CMGT") and Respondent-Cross Petitioner Tupi B.V., ("Tupi") resulted in the panel of three arbitrators issuing a unanimous award on June 13, 2025 (the "Award") (Dkt. No. 1-1). The arbitrators found in favor of each party one some claims, but after netting the amounts awarded to and against each party, Tupi was the clear winner – ultimately, to the tune of more than $71 million in damages. CMGT then commenced this proceeding by filing a Petition to Vacate the Arbitral Award. (Dkt. No. 1). Tupi both opposes the CMGT Petition and cross-moves for confirmation of the Award. (Dkt. Nos. 30, 31).

I agree wholeheartedly with Tupi that CMGT's petition is nothing more than an effort to relitigate issues that were litigated before and decided by the arbitrators in Tupi's favor. This Court has long cautioned businessmen, who contend that arbitration rather than litigation will lead to the swift and certain resolution of their disputes without subjecting them to what they view as the downsides of American

litigation, that they are making a huge mistake by signing away their right to have their disputes decided by a court of law. This is the case that proves the point. The arbitration consumed seven years – indeed, one of CMGT's arguments in favor of vacatur is that at some point during this lengthy proceeding one of the arbitrators lost access to the record in the case, which had to be recreated for him, causing additional delay and allegedly leading to something akin to arbitrator misconduct. It has cost the parties untold hundreds of thousands of dollars and generated every bit as much pre-trial discovery and motion practice as any lawsuit would have. And while the essence of CMGT's argument – which, no matter how CMGT tries to spin it, is that the arbitrators misinterpreted certain contract provisions and made various errors of fact and law – would provide CMGT with ready fodder for an appeal from a trial court's decision, those findings are unassailable when made by arbitrators. CMGT's efforts to dress up its "they got it wrong" arguments as "excess of authority" or "violation of public policy" should be seen for what they are – a desperate ploy to try to undo the work of three arbitrators (one of them a party arbitrator chosen by CMGT itself) who unanimously agreed on the meaning of the contract and the amounts each party owed to the other arising out of their complicated business relationship. If the arbitrators misinterpreted contract provisions or misunderstood business realities in order to reach their conclusion, that is none of my affair. CMGT is trying, both with its motion to vacate and with its opposition to confirmation, to get me to grapple with merits issues that a court of law simply cannot reach.

Therefore, the petition to vacate the Award is DENIED. The cross-motion to confirm the Award is GRANTED. And because DM Construction's position in this matter is entirely without merit, I am awarding Tupi attorney's fees incurred in opposing the petition and obtaining confirmation of the Award.

## PARTIES, JURISDICTION, AND VENUE

DM Construtora de Obras Limitada ("DM") is a company incorporated under the laws of Brazil and with its registered office at Rua Wiegando Olsen, 2020, Curitiba, State of Paraná, Brazil. Dkt. No. 1, ¶ 4. Ventura Locação de Equipamentos Limitada ("Ventura") is a company incorporated under the laws of

Brazil and with its registered office at Rua José Valdemar Baron, Quatro Barras, State of Paraná, Brazil. *Id.* at ¶ 5. DM and Ventura together formed a consortium called "Consórcio MGT," which is organized and exists under the laws of Brazil with its principal place of business at Rua Wiegando Olsen, 2020, Curitiba, State of Paraná, Brazil. Collectively these entities are the Petitioners and are referred to as CMGT.

Tupi is a company incorporated under the laws of the Netherlands, with its registered office at Weenapoint, toren A, Weena 722, 3e. verdieping, 3014 DA, Rotterdam, the Netherlands. *Id.* at ¶ 7.

The Award arises from a contractual legal relationship that is considered as "commercial"— *i.e.*, a contract for the supply of components, known as modules, used in the construction of offshore oil platforms to extract and process oil found in the Atlantic Ocean Santos Basin off the Brazilian shore. Dkt. No. 1, ¶ 9. The legal relationship is between parties domiciled in Brazil and the Netherlands, and thus the relationship is not "entirely between citizens of the United States." 9 U.S.C. § 202. The Award therefore falls under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958 ("New York Convention" or "Convention").

This Court has subject matter jurisdiction over the petition and cross-petition pursuant to 9 U.S.C. § 203 ("An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding"); *see also Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 404 (2d Cir. 2009).

Venue is proper in this district pursuant to 9 U.S.C. § 204 because the place of arbitration was New York, New York and because the Award was made in New York.

By consenting to arbitration in New York, the parties consented to personal jurisdiction in New York on an action to confirm an award resulting from that arbitration. *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 983 (2d Cir. 1996) ("A party who agrees to arbitrate in a particular jurisdiction consents not

- 3 -

only to personal jurisdiction but also to venue of the courts within that jurisdiction"); *Vidaplan, S.A., Inc. v. Cipriani Int'l, S.A.*, 2006 WL 8461283, at *5 (S.D.N.Y. Aug. 7, 2006) ("An agreement to arbitrate in New York creates an inference of consent to the New York court's enforcement of the award"). Here, Tupi and CMGT signed a Contract which provided for arbitration in New York and stipulated that New York law would govern. *See* Dkt. No. 1-4 ("Contract"). This gives the Court jurisdiction over both parties Additionally, by seeking vacatur of the Award in this courts, CMGT has consented to personal jurisdiction. *Prose Shipping Ltd. v. Integr8 Fuels Inc.*, 2022 WL 280456 at *2 (S.D.N.Y. Jan. 31, 2022) ("[B]y seeking declaratory relief in the Southern District of New York, Plaintiff has not only consented to personal jurisdiction in this District but has also invok[ed] the benefits and protections of [the forum's] laws") (internal quotations omitted).

## FACTUAL BACKGROUND

### 1. Execution and Performance of the Underlying EPC Contract

After a competitive bidding process, on July 26, 2012, CMGT's predecessor entered into two fixed price Engineering, Procurement and Construction ("EPC") contracts (the "2012 Contracts") to supply Tupi and Guará B.V. ("Guará") with three components (the "Modules") on each of six Floating Production, Storage and Offloading Platforms (the "FPSOs" or "Platforms"). *See* Final Award ("Award"), dated June 13, 2025 (Dkt. No. 1-1), ¶ 87. In the 2012 Contracts, CMGT was responsible for the detailed engineering, procurement, construction and commissioning of the Modules, for a one-time payment of $23 million, plus an agreed price of $363 million, which the parties allocated across detailed construction milestones. In order to be paid, CMGT submitted regular "Measurement Reports" to Tupi indicating milestones completed and the associated amounts due. Award, ¶ 404.

Section 9.1 of the Contract defined the total amount to be paid to CMGT, denominated the "Contract Price" to include this fixed price "as may be further adjusted" under various the specific terms of the Contract.

Beginning in March 2013, the parties had repeated disagreements over the amount CMGT was to be paid for the creation of the Modules (needless to say, costs increased as the price of goods ballooned). The parties differed over whether changes in market prices allowed for adjustment of the Contract Price, and whether certain changes to which Tupi appeared to agree were actual final changes to the parties' agreement or were merely "provisional" changes designed to facilitate negotiations. In 2013, 2014, 2016 and 2018, there were repeated back and forths involving demands for increased payment and threatened work stoppages. The disputes covered many different items, but the principal dispute was over something called SMP-285. Temporary solutions and negotiations failed to bridge the gap between the parties. CMGT commenced arbitration on November 7, 2018.

## 2. The Arbitration

CMGT nominated as arbitrator Ricardo Feris, former Deputy Secretary General of the ICC International Court of Arbitration and partner at the law firm Squire Patton Boggs (US) LLP. In its Response, Tupi nominated Elliot Polebaum, former partner at Fried, Frank Harris, Shriver & Jacobson LLP in Washington D.C. Both of these arbitrators were confirmed by the ICC without challenge by the parties. After the parties failed to agree on the nomination of a chairperson, the ICC appointed Professor Horacio Grigera Naon, former Secretary-General of the ICC Court and Distinguished Practitioner-in-Residence, as well as the Director of the Center on International Commercial Arbitration at the Washington College of Law.[1]

The parties exchanged statements of claims and counterclaims on August 19, 2019. CMGT's claims principally sought additional compensation for numerous alleged "changes" to the Contract under Article 12, totaling around $163 million in damages. In its final quantification of damages, CMGT sought $111 million

---

[1] In its Petition and Memorandum of Law, as part of the smoke-and-mirrors "suggestivity" that characterizes many of its arguments, CMGT suggests – but does not exactly argue – that Professor Naon was somehow affiliated with Tupi, for two reasons: First, he was a party arbitrator in a disclosed arbitration involving Shell Oil, and second, that he was involved in another arbitration ivolving Guara, which was not disclosed. However, CMGT does not raise arbitrator bias as a basis to reject the Award – possibly because the Award was also signed by two other arbitrators (one of whom was CMGT's party arbitrator). I note that CMGT suggests that certain procedural irregularities (consisting, as far as I can tell, of the ridiculously long amount of time it took the Tribunal to issue an Award) should be viewed by this court with particular alarm in view of Professor Naon's "undisclosed relationship" with Tupi and Guara. But if those "undisclosed relationships" (one of which was in fact disclosed) did not rise to a level that would allow CMGT to assign them as arbitrator bias, then I am not persuaded by the suggestion.

in principal damages and $108 million in interest. Zaslowsky Decl. ¶ 9.

Tupi both disputed CMGT's claims and filed a number of counterclaims.

Hearings were held virtually between December 6 and 23, 2021.

Before the parties could submit their final post-hearing briefs, Brazil issued revisions to its regulations relating to Local Content. Those revisions were effective as of July 1, 2022. Zaslowsky Decl. Exhibit O, ¶¶ 20-26. The parties argued that these changes, and certain new certifications issued pursuant thereto, had an impact on Tupi's counterclaims. On November 18, 2022 and February 3, 2023, the parties exchanged submissions, including expert reports and witness statements, addressing this new issue. Award, ¶¶ 75–76. The Tribunal granted an extra hearing to address these new submissions; it was held on April 4, 2023. *Id.* ¶ 77.

The parties exchanged Post-Hearing Briefs on June 25, 2023, and Reply Post-Hearing Briefs on August 17, 2023. The record was formally deemed closed on January 22, 2024. Zaslowsky Decl. Ex. X.[2]

Tupi represents, and CMGT does not contest, that over the five plus years between the filing of the petition and the closing or the record, CMGT submitted eleven substantive briefs addressing its legal arguments – over 800 pages in total. It introduced thirteen witness statements from six fact witnesses and over 800 fact exhibits. During an eleven-day merits hearing, CMGT was permitted to contravene the evidence submitted by Tupi. And when the matter was reopened in October 2022 following the changes in the relevant Brazilian regulations, there was a yet another round of written submissions, followed by a second merits hearing, held in April 2023, after which final briefs were exchanged. It cannot be said that CMGT had no opportunity to present its case to the Tribunal.

The ICC granted a number of extensions of the time for issuing an Award, including at least one attributable to the fact that the President of the Tribunal could not access the "Box" containing the record and had to be sent a duplicate copy of the record on a USB port. The last and final extension ordered that the Award

---

[2] The text of the communication lists January 22, 2023 as the date, but the cover email indicates that the date the record was closed was actually in 2024. It appears that the President of the Tribunal made the common mistake that many of us make in January, of using the previous year, instead of the correct year, when dating a document that is created early in the new year.

be issued no later than June 30, 2025.

The 278-page Award was issued on June 13, 2025 and notified to the parties on June 16, 2025. CMGT prevailed on certain claims and defenses, while Tupi prevailed on some of its counterclaims and defenses. When the Tribunal's various findings in favor of each party were netted against each other, Tupi was awarded over $59.6 million in damages. The entire record of the arbitration appears to have been submitted to this Court and the parties have included in their Petitions and moving papers extensive information about what the arbitrators' findings were. But it is not necessary to discuss the details of the arbitrators' decision in order to decide the instant motion. I refer any interested party to the briefs for further details.

On July 15, 2025, CMGT submitted a Request for Correction of the Award and Addendum of Costs under Article 36 of the ICC Rules ("Request"), seeking a number of changes to the Tribunal's decisions and dispositions as set forth in the Award. Zaslowsky Decl. ¶ 21. Tupi submitted its Response to the Request on August 20, 2025. On September 24, 2025, the Arbitral Tribunal denied Claimants' Request for Correction of the Award and Addendum on Costs. Zaslowsky Decl. Ex. V. The Tribunal held "each of the assignments of error that Claimants have asserted in respect of the Award takes issue with the Arbitral Tribunal's reasoning, evaluation of the evidence, and/or its substantive decisions. Such challenges do not afford a basis for relief pursuant to Article 36." *Id.* at ¶ 57. The Tribunal (including, again CMGT's chosen arbitrator) further concluded that CMGT's application was "frivolous" and assessed attorneys' fees against Petitioner in the amount of USD $62,784. *Id.* at ¶ 63. This sum was added to the Award pursuant to Article 36 of the ICC Rules.

The instant petition was filed on September 10, 2025. The cross-motion to confirm the Award was made on November 14, 2025.

## DISCUSSION

### 1. The Award Falls Within the Scope of the New York Convention

The United States is a signatory to the New York Convention, which has been implemented through Chapter 2 of the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. § 201. Under 9 U.S.C. § 207, this Court has the authority to confirm "an arbitral award falling under the Convention." Tupi has moved for

confirmation of the Award in a timely manner, which is to say, within three years of the making of the Award. *See* 9 U.S.C. § 207. None of this is disputed by the parties.

Nor is there any dispute over the fact that the award sought to be confirmed (by Tupi) or vacated (by CMGT) falls under the category of "nondomestic arbitral awards" – a category that includes awards, like the Award here, that were "decided under the laws of the United States but involve[] . . . entities that are not U.S. citizens." *CBF Industria de Gusa S/A*, 850 F.3d at 73.

The Court thus has the power to confirm the Award – unless, of course, there is some reason to vacate it. So I turn first to that question.

### 2. There is No Basis on Which to Vacate the Award

The Federal Arbitration Act sets out four possible bases for obtaining vacatur of an arbitration award, *see* 9 U.S.C. § 10:

> (1)  where the award was procured by fraud or corruption;

> (2)  where there was "evident" partiality or corruption in the arbitrators;

> (3)  where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced; or

> (4)  where the arbitrators exceeded their power, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made.

A party seeking vacatur of an arbitration award on any of these grounds "bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law." *Barzelatto v. Spire Sec., LLC*, 2019 WL 8889865, at *8 (S.D.N.Y. Nov. 5, 2019) (quoting *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004)).

In its petition, CMGT does not seek vacatur of the Award under either Section 10(1) or Section 10(2) – which is to say, it does not allege either fraud or evident impartiality. Rather, it seeks vacatur of the Award for three separate reasons under Sections 10(3) and 10(4). It also seeks vacatur on the ground

that the Award violates public policy.

None of CMGT's arguments persuades.

**Public Policy**: CMGT argues that the Award should be vacated because it violates public policy. But violation of public policy is not a ground for vacatur of an arbitral award. *See* 9 U.S.C. § 10; *Hall Street Associates, LLC v. Mattel, Inc.*, 522 U.S. 576, 584 (2008). A court can refuse to confirm an award on the ground that it would violate public policy, but it cannot vacate an award on that ground, because the FAA does not assign "violation of public policy" as a basis for vacatur. Neither does the Convention. The Second Circuit recognized as much in *Telenor Mobile Communications AS v. Storm LLC*, 584 F.3d 396, 405 (2d Cir. 2009) when it said:

> The Convention sets forth seven grounds *for denial of confirmation*, including, of relevance to this appeal, if "recognition or enforcement of the award would be contrary to the public policy of [the] country [in which that relief is sought]," New York Convention, art. V(2)(b).

In so holding, the Second Circuit was simply applying the plain language of the Convention, which sets forth in Article V the grounds on which "*recognition and enforcement the award may be refused*, at the request of the party against whom it is invoked." (Emphasis added). The word "vacatur" does not appear in the Convention, and there is no basis for seeking vacatur of the Award on public policy grounds under the Convention. *See Kondot S.A. v. Duron LLC*, 586 F. Supp. 3d 246, 255 (S.D.N.Y. 2022) ("While the New York Convention provides bases upon which a court may refuse confirmation of an award, it does not provide a basis for vacatur of an award.").

Since the Convention does not provide for vacatur of an arbitration award on public policy grounds, I will defer any discussion of CMGT's public policy arguments until I reach Tupi's motion to confirm the Award.

**Arbitrator Misconduct**: CMGT also asks this Court to vacate the Award pursuant to 9 U.S.C. § 10(a)(3), on the ostensible ground that the arbitrators "misbehaved"[3] in some manner that prejudiced its

---

[3] I note again that CMGT does not assign bias on the part of the President of the Tribunal as a basis for vacating the award.

rights.

Usually, arbitrator misconduct is limited to situations in which the arbitrators refused to hear evidence pertinent to the controversy. 9 U.S.C. § 10(a)(3). But CMGT does not argue – and for the reason set out above, cannot credibly argue – that the Tribunal refused to hear its evidence. CMGT has not pointed to anything the Tribunal did that prevented it from presenting its arguments. That makes any suggestion of misconduct pursuant to Section 10(a)(3) a stretch. As this Court has previously said, § 10(a)(3) protects a party's "adequate opportunity to present its evidence and argument." *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (internal citation omitted). As Respondents have not identified any misconduct or misbehavior that prejudiced them in their ability to present their case, there is no basis to *vacate* the Award under § 10(a)(3).

And indeed, in both of the cases on which CMGT relies for the proposition that the arbitrators committed misconduct, the court examined the "fundamental fairness" of the proceeding, not on the basis of the result (which is what Petitioners challenge here) but in light of whether the complaining party had been given the opportunity to present its claims and defenses. *See Tempo Shain*, 120 F.3d at 20; *Dolan v. ARC Mech. Corp.*, 2012 WL 4928908 at *3 (S.D.N.Y. Oct. 17, 2012). Unlike in those cases, CMGT has submitted no evidence that it was prevented from presenting its case. And as I have noted in my discussion of the arbitration itself – which sets out in detail the opportunities for briefing CMGT had, the massive amounts of evidence it introduced, and the number of hearing days it had (*see supra.*, p. 6) – any such suggestion would have to be summarily dismissed as absurd.

Instead, the purported "misconduct" argument is really based on nothing more than the fact that the Tribunal ruled against CMGT. Were there any doubt on this score, I point to the fact that CMGT's brief urges vacatur for misbehavior because, "Rather than carefully considering the claims and defenses raised by each party, the Tribunal apparently found an easier way to proceed—it effectively adopted Tupi's arguments wholesale." Dkt. No. 1, ¶ 100. There could be no clearer

indication that the "misbehavior" assigned by CMGT to the arbitrators was their decision to rule in Tupi's favor.

But arbitrators do not "misbehave" by adopting one party's arguments over the other's – even if they do so "wholesale" (and obviously these arbitrators did not, since the Tribunal awarded certain sums to each side). Arbitrators do not "misbehave" unless they commit gross procedural aberrations. This ground for vacatur is reserved for the "very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct." *Supreme Oil Co. v. Abondolo*, 568 F. Supp. 2d 401, 406 (S.D.N.Y. 2008). As this Court has explained elsewhere, if a party is given an adequate opportunity to present its arguments, the fact that "it lost does not mean that it was prejudiced in the procedural sense contemplated by § 10(a)(3)." *Barzelatto*, 2019 WL 8889865, at * 12.

It appears that CMGT would have the Court infer that, because the Tribunal was rushed for time,[4] it simply incorporated many of Tupi's arguments into its Award verbatim from Tupi's briefs – which somehow rendered Tupi's victory "unconsidered" and so constituted misconduct (I think that this is what CMGT means when it says that the Tribunal adopted Tupi's arguments "wholesale."). But incorporating arguments of one party or the other verbatim into an Award does not constitute misconduct. Busy courts, including this one, have been known to incorporate portions of a party's brief into their decisions when they find the arguments made therein to be meritorious and they cannot think of a better way to phrase them. As far as I know, no appellate court has ever condemned such a practice as "judicial misconduct." So even assuming the arbitrators chose to "cut and paste" portions of Tupi's briefs and incorporate that language into their Award (and I make no finding whether they did or not), that does not mean they refused to consider CMGT's arguments before making their

---

[4] The first draft of the Award – submitted in January 2025, well over a year after briefing closed but just twelve months after the record was closed by the ICC – was rejected by the ICC, and the Panel had to rework it and resubmit it for ICC approval. That approval was ultimately given in April 2025. The Award issued within the time frame ultimately allowed by the ICC. The fact that the ICC expressed concern over the length of time it took to render a decision – and apparently even penalized the members of the Tribunal for taking so long – does not detract from the validity of the Award.

decision. The far more logical inference is that they found CMGT's arguments wanting in comparison with Tupi's, and considered Tupi's arguments to have been well put by its lawyers. Incorporation of Tupi's phraseology affords no basis for this Court to infer that the Tribunal ignored CMGT's extensive submissions or denied it "fundamental fairness."[5] Section §10(a)(3) does not assign "incorporating parts of one party's brief into an opinion" as a reason supporting vacatur of an Award. If the arbitrators thought that Tupi's arguments were more persuasive than CMGT's – and apparently they did – they committed no "misbehavior" by adopting those arguments "wholesale."

**Procedural Irregularity/Delay**: Nor does CMGT's application for vacatur on the ground of misconduct fare any better because the Award was issued "more than four years after the maximum time limit allowed by the ICC." Dkt. No. 1, ¶ 98.[6] Delay in the transmission of an award, without more, affords no basis for vacatur of the award. In *West Rock Lodge No. 2120, International Association of Machinists & Aerospace Workers, AFL-CIO v. Geometric Tool Company, Division of United-Greenfield Corporation*, 406 F.2d 284, 286 (2d Cir. 1968), the Second Circuit squarely rejected that argument:

> We believe it to be a better rule that any limitation upon the time in which an arbitrator can render his award be a directory limitation, not a mandatory one, and that it should always be within a court's discretion to uphold a late award if no objection to the delay has been made prior to the rendition of the award or there is no showing that actual harrn to the losing party was caused by the delay.

Nothing in the record indicates that CMGT ever objected, prior to issuance of the Award, that any delay in rendering the Award would affect its enforceability. Indeed, CMGT admits that the ICC extended

---

[5] Apparently the President of the Tribunal advised the parties sometime during 2024 that he was unable to access the "Box" in which the parties' submissions were deposited with the ICC, which necessitated the provision of a USB drive with a consolidated set of documents. CMGT sees something nefarious in this, but since the requested USB drive contained a "consolidated set" of documents – including all of CMGT's documents – I fail to see what the problem is. This fact certainly does not suggest that the Tribunal, or one of its members, either was unable to consider CMGT's evidence and arguments or that he or they refused to do so.

[6] The hearings were formally closed on January 22, 2024. Zaslowdky Decl. ¶ 26, Ex. X. The 120-day period ran from that date. *See* Tribunal Procedural Order 1 (Zaslowsky Decl. ¶ 26, Ex. W. 120 days from January 22, 2024 was May 21, 2024. The Award was not transmitted until June 2025, more than a year later.

the time for issuance of the Award on multiple occasions, ultimately allowing the Tribunal until June 30, 2025 to issue the Award – which means that it was timely, if belatedly, issued. CMGT offers no evidence that it objected contemporaneously to any of those extensions; it appears that they only became problematic when CMGT was ordered to pay a substantial sum to Tupi.

Furthermore, CMGT has not shown that any "actual harm" was caused by the delay, other than its insistence that the delay was the reason the Tribunal ruled in Tupi's favor – a proposition for which there is not the slightest evidence in the record before the Court. *See Pacelli v. Vane Line Bunkering, Inc.*, 549 F. Supp. 3d 306, 317 (S.D.N.Y. 2021) ("Pacelli thus points to no authority to support his position that the arbitrator's extension requests amounted to 'misbehavior' by the arbitrator such that Pacelli's rights were prejudiced, especially when Pacelli consented to the extensions. And the Court is aware of none. This argument lacks all merit."). For the reasons stated above, any suggestion that adopting *in haec verba* arguments made by Tupi was improper or demonstrated a last minute rush to judgment attributable to the lengthy delay in reaching and preparing an Award is entirely without merit.

**Arbitrators Exceeded Their Powers**: Finally, CMGT argues that the arbitrators exceeded their powers and issued an imperfect award by interpreting the contract as they did – in a manner that, according to Petitioners, rewrote the parties' deal in a manner that makes it commercially unreasonable. Petitioner urges that the Second Circuit permits challenges to an arbitral award where the Award contradicts "an express and unambiguous term of a contract." *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F. 3d 200, 219–220 (2d Cir. 2022).

But *Westerbeke* holds no such thing. It holds that an "exceeding powers" argument "focuses on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *Id.* at 220. In this Circuit it is clear that "exceeding powers" justifies vacatur of an award only when a tribunal decides an issue that the parties did not agree to submit to arbitration – not when a tribunal got the issue wrong, as it allegedly

did in this case by misinterpreting the contract. Ruling for one's opponent does not render an award "imperfect;" neither does it mean that the tribunal exceeded its powers. As Tupi points out in its brief opposing vacatur, the cases cited by CMGT hold as much. *See, e.g., IBAR Ltd. V. American Bureau of Shipping,* 92 Fed. Appx. 820, 822 (2d Cir. 2004) ("In evaluating whether the panel exceeds its authority, the only question is whether the panel had the contractual authority to reach a certain issue, not whether the [panel] correctly decided that issue.").

Here, there can be no argument that the Award is somehow "imperfect" in that it was not mutual, final or indefinite. The arbitrators made awards in favor of both parties on different claims, are not alleged to have failed to resolve all the issues before them, and were clear and definite in their conclusions. Significantly, CMGT does not argue that the arbitrators lacked the power to reach any of the issues that were decided. Instead, it argues that the Tribunal exceeded its power by misinterpreting "an express and unambiguous term of a contract" that, if properly interpreted, would have caused Tupi to lose, rather than recover, on certain of its counterclaims. That is not an "exceeding powers" argument; it is a "they got it wrong" argument.

It is obvious that CMGT wants this Court to vacate the Award because the arbitrators came out the wrong way. Petitioner's own words (adopted by the Court for purposes of this decision) prove as much: "The arbitrary and irrational nature of the Award is exemplified by the Tribunal's award of sums to Tupi that are not awardable under the Contract or applicable law and that offend basic principles of equity and justice. This inexplicable outcome reflects a Tribunal that, after years of delay, fundamentally misunderstood the Contract and the essence of the dispute before it. Such a manifestly arbitrary result demonstrates that CMGT was denied fundamental fairness in the arbitration process. The Award cannot be allowed to stand." Dkt. No. 26 at 30.

But as this Court and many of my colleagues have made clear, again and again, that a court cannot and, indeed, must not vacate an arbitration award because it disagrees on the merits. "One thing is crystal

clear: a federal district court does not sit as a court of appeals over an arbitration panel to correct errors of law." *Barzelatto*, 2019 WL 8889865, at *8. An award cannot be vacated because the arbitrators "got it wrong" from the perspective of the challenging party. "We will not overturn the arbitrator's award merely because we do not concur with the arbitrator's reading of the agreement." *Yusuf Ahmed Alghanim & Sons W.I.I. v. Toys "R" Us*, 126 F. 3d 15, 25 (2d Cir. 1997).

The only exception to this rule is if the arbitrators have shown a "manifest disregard" of the law. *See Singh v. Raymond James Fin. Servs., Inc.*, 633 F. App'x 548, 550 (2d Cir. 2015). But this is a very narrow exception. And significantly, "manifest disregard" does not mean the arbitrators interpreted the law erroneously. As this Court held long ago, getting the law wrong is not "disregarding" it for purposes of arbitration:

> The parties contracted to allow non-judges to determine their dispute. But that means they chose to eschew having a court of law decide the questions of law applicable to their case, or rule on facts in accordance with settled legal principles. Arbitrators are free to make an award that they think is fair, even if a court of law would reach a different result. There is no requirement that arbitrators get the law right. Indeed an award of should confirmed even if it is contrary to what the court understands the law to be

*AmTrust N. Am., Inc. v. Pac. Re, Inc.*, 2016 U.S. Dist. LEXIS 44889, at *7–8; *see also Barzelatto*, 2019 WL 8889865 at *8 ("Arbitrators who get the law wrong, or who issue a decision that is not in accordance with law that would be controlling in a courtroom, do not "manifestly disregard" it.") If a business person wants his case heard by a tribunal that is charged with getting the law "right" – and whose decision can be reviewed on the ground that it got the law "wrong" – he should not sign an agreement containing an arbitration clause. Period. End of story.

Significantly, CMGT does not argue *in haec verba* that the Tribunal manifestly disregarded the law. But when push comes to shove, that is the reason why it demands vacatur of the Award. It will not obtain that relief from this Court.

For all these reasons, the petition to vacate the Award is DENIED.

### 3. No Grounds Exist to Refuse or Defer Recognition or Enforcement

As this Court has explained, a court's review of an arbitrator's decision is "one of the narrowest standards of judicial review in all of American jurisprudence." *Associated Indus. Ins. Co., Inc. v. Excalibur Reinsurance Corp.*, 2014 WL 6792021, at *1 (S.D.N.Y. Nov. 26, 2014) (*quoting Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F. 3d 640, 643 (6th Cir. 2005)).

Indeed, this Court has cited the Second Circuit in stating, "the power of a court to overturn an arbitration award is almost nonexistent." *Barzelatto*, 2019 WL 8889865, at *3 (citing *Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71–72 (2d Cir. 2012)). According to the Supreme Court: "it is the arbitrator's construction [of the contract] which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his. . . .The arbitrator's construction holds, however good, bad, or ugly." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 573 (2013).

"[T]he confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)). And as this Court has often said, the review of arbitration awards is "very limited . . . in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993); *see Yonir Techs., Inc. v. Duration Sys. Ltd.*, 244 F. Supp. 2d 195, 203 (S.D.N.Y. 2002). Accordingly, "the showing required to avoid summary confirmation is high." *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987); *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997).

The New York Convention, which controls the enforcement of foreign arbitration awards, imposes its own very strong pro-enforcement bias on courts tasked with confirming such awards. It limits judicial discretion to deny confirmation to narrowly defined circumstances. *See Compagnie Noga D'Importation*

*et D'Exportation, S.A. v. Russian Federation*, 361 F.3d 676, 683 (2d Cir. 2004). Indeed, both the New York Convention and the FAA make recognition and enforcement mandatory unless one of the enumerated exceptions permitting non-recognition is established. *See* New York Convention, Arts. III, V; 9 U.S.C. § 207. A district court must (I emphasize the word MUST) enforce an arbitral award unless a litigant satisfies one of the seven enumerated defenses under Article V of the Convention. *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 809 (2d Cir. 2022).

Specifically, the Convention provides that recognition and enforcement of an award "may be refused" only if the party against whom the award is invoked "furnishes ... proof" that:

(1) The parties to the arbitration agreement were "under some incapacity" or the agreement "is not valid" under the law designated by the parties, or, in the event they have not designated any, the law of the country where the award was made;

(2) The party against whom the award is invoked "was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case;"

(3) "The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration," although any "part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced;"

(4) "The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place;" or

(5) "The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." Convention, art. V.

Recognition and enforcement may also be refused if "the competent authority in the country where

recognition and enforcement is sought finds that:"

(6) "The subject matter of the difference is not capable of settlement by arbitration under the law of that country;" or

(7) "The recognition or enforcement of the award would be contrary to the public policy of that country." *Id.*

These are the only reasons why an American court may not confirm an arbitration award issued pursuant to the Convention. Furthermore, the "party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses" applies. *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005). "The burden is a heavy one, as the showing required to avoid summary confirmance is high." *Id.* (internal quotations omitted).

CMGT fails to meet this heavy burden, because none of the seven grounds in the Convention applies.

The parties did not lack the capacity to agree to arbitrate and the arbitration agreement itself is valid and enforceable; indeed, it was CMGT that invoked the arbitration agreement by commencing arbitration.

As discussed extensively above, CMGT was able to present its case fully.

The issues decided by the Tribunal were all within its mandate; CMGT makes no argument to the contrary.

The composition of the Tribunal was strictly in accordance with the parties' agreement.

The Award has not been annulled or suspended – indeed, the arbitrators themselves have branded as "frivolous" CMGT's post-Award effort to get them to change their minds.

And, the subject matter of the parties' disputes, which arises out of a commercial contract, is capable of settlement by arbitration under the relevant law.

So CMGT is left to argue that the Award should not be confirmed because it somehow violates the public policy of the United States, the country in which enforcement is sought. As noted above, while

violation of public policy is not a ground for vacating an award, it can justify refusing to confirm an award. New York Convention, art. V(2)(b). This is true even though it is manifestly against the public policy of the United States for a federal district court to sit as a "court of appeals" and retry a fully and fairly tried arbitration – which is essentially what CMGT is trying to get this Court to do.[7]

CMGT argues that the Award violates public policy because it permits the owner of the project (Tupi) to receive materials paid for by the contractor (CMGT) without reimbursing the contractor for those costs, thereby "unjustly enriching" the owner. But this is simply a "they got it wrong" merits argument dressed up in public policy clothing. It does not violate public policy of the United States for a businessman to make a bad deal. There does not seem to be any dispute that this was a fixed price contract rather than a cost plus contract. Businesses lose money on fixed price contracts all the time. CMGT's argument that the Award violates public policy because, if it confirmed, Petitioner "will not recover its costs for SMP-285 and will be required to itself bear a substantial portion of the costs of the GDUs purchased and installed for the benefit of Tupi," Dkt. No. 26 at 17, is telling. What CMGT is actually saying is, "The arbitrators concluded that we made a bad deal, and somehow that conclusion violates public policy." It does not.[8]

Furthermore, as Tupi points out in its brief in support of confirmation, *see* Dkt. No. 32, if CMGT wanted to argue that the contract violated United States public policy in some way, it needed to make that argument to the arbitrators. It did not do so. CMGT does not cite to anything in the record indicating that it argued to the Tribunal that awarding Tupi the damages it sought would be "punitive" in derogation of

---

[7] Any doubt on that score is erased by the fact that the entire record on the underlying arbitration – a huge box full of documents – was submitted to this Court for review. The only conceivable purpose of such review is to get me to conclude that the arbitrators decided the case wrongly.

[8] Tupi argues that the Tribunal found that CMGT was in fact reimbursed to the tune of $136 million for changes relating to SMP-285, but proved just $50 million in actual costs to make those changes. Award, Dkt. No. 1-1, ¶¶ 345-47. Tupi also points out that the arbitrators concluded that it (Tupi) could not recover the difference between that $50 million in actual costs and the $136 million it paid to CMGT – what would appear to be an overpayment of $86 million in CMGT's favor – although Tupi argued that the entire $136 million should be refunded to it. This, of course, is precisely the sort of merits argument that this Court is duty bound not to entertain when deciding whether an award should be confirmed. But it certainly suggests that the arbitrators did not hand down a one-sided award, ignoring CMGT's interests and arguments.

- 19 -

the public policy of the United States (not New York law or public policy, since New York is not a "country in which enforcement is sought") or Section 24.3(i) of the Contract, or that issuing such an award would constitute "unjust enrichment."

Neither does the Award violate public policy because it awards punitive damages against CMGT. Now, the arbitrators certainly did not state that they were awarding punitive damages. So it must be the case that CMGT is arguing that damages the Tribunal found to be authorized by the Contract were somehow "punitive." But any such argument is doomed to fail. The parties' Contract contained a liquidated damages provision, by which they agreed to reduce the contract price under certain circumstances relating to Local Content. The Tribunal concluded that the circumstances triggering the liquidated damages clause were met and applied the provision to reduce the contract price. *Id.* at ¶¶ 475-77. That is not an award of punitive damages.

### 4. Tupi Is Entitled to Receive Pre- and Post-Judgment Interest on the Award

Tupi argues that this Court should award it pre and post judgment interest on the net amount of the Award in its favor.

The Total amount awarded by the Tribunal to Tupi on its counterclaims was $59,644,798.75, before interest, as follows (Award ¶ 663):

| Counterclaim 1.1 | $ 6,895,257.00 |
| Counterclaim 1.2 | $ 48,277,274.00 |
| Counterclaim 1.3 | $ (5,548,685.86) |
| Counterclaim 2 | $ 8,579,324.38 |
| Counterclaim 3 | $ 974,211.29 |
| Counterclaim 4 | $ 429,697.93 |
| Counterclaim 5 | $ 37,720.01 |

As the Tribunal explained, both sides requested an award of interest on any amounts to be awarded to them, but took different positions as to the interest rate. Award ¶ 641. Tupi argued that the Tribunal should apply Section 10.9 of the Contract, which provided for interest at the six-month LIBOR rate, plus 2% per annum. The Tribunal agreed that it should use the rate in the Contract. *Id.* at ¶ 643.

The Tribunal further held that, because the six-month LIBOR ceased to become available as of September 30, 2024, for the subsequent period, the rate to be used was the Prime Rate as published from time to time in the Wall Street Journal. *Id*. This being a breach of contract claim. pre-award interest on Tupi's successful counterclaims began to run on January 19, 2019, through the date of notification of the Final Award, which was June 16, 2025. *Id*. at ¶ 644. The amount of such interest is $ 19,873,567.77, leading to a total award in Tupi's favor of $79,518,366.53.

The total amount awarded to CMGT on its claims before interest was $6,027,495.54, as follows (Award ¶ 663):

| Claim 16 | $      5,178,172.98 |
| Claim 14 | $ 682,770.99 |
| Claim 1 | $ 166,551.57 |

In addition, the Tribunal awarded interest on this amount, from November 9, 2018 to the date the Award was transmitted to the parties, at the contractually-mandated amount of LIBOR plus 2% until September 30, 2024 (and thereafter at the Wall Street Journal Prime Rate due to the discontinuance of LIBOR). Award ¶ 644. The amount of such interest is $2,008,619.14, leading to an award in CMGT's favor of $8,091,807.08.

Netting these totals against each other, as of the date of the Award, Tupi was entitled to a payment from CMGT of $71,426,559.44. The pre-judgment interest was incorporated into the Award, which the court is confirming.

The Tribunal gave CMGT an opportunity to avoid any post-Award interest if it paid the amounts awarded to Tupi within 60 days of the date the Award was notified to the parties (June 16, 2025). *Id*. at ¶ 645. However, if not paid by then, it ruled that post-award interest would accrue as of the June 16, 2025 notification date. *Id*. Since CMGT has not paid any portion of the Award, post-Award interest began to accrue on June 16, 2025, at the Prime Rate as published from time to time in the Wall Street Journal "until such amount is paid in full." *Id*. Applying the Wall Street Journal Prime Rate, this represents an additional

$1,464,808.52, as of September 24, 2025.

On September 24, 2025, the arbitrators awarded Tupi an additional $62,784.00, representing Tupi's legal fees incurred in opposing CGMT's "frivolous" motion for reconsideration. Zaslowsky Decl., Exhibit V, ¶ 63. This increased the principal amount of the award to $71,489,343.44. Interest on that amount at the Wall Street Prime Rate from September 25, 2025 until the date of the filing of the motion for confirmation on November 14, 2025 is an additional $716,852.05. The amount of post-Award interest increases at the rate of $13,710.29 per day, based on the Wall Street Journal Prime Rate of 7%, until the date on which this Court confirms the Award. Tupi should immediately provide the Court with a form of final judgment that calculates the correct amount of the Award plus post-Award interest through the date of this decision and provide the Court with a per-day increase in the post-Award interest until such time as judgment can be entered.

Tupi is also entitled to post-judgment interest. Post-judgment interest ordinarily accrues at the rate set forth in  28 U.S.C. § 1961, but can be higher if parties agree to use a different rate, provided the parties set that different rate through "clear, unambiguous and unequivocal language." *AX Versicherung AG v. New Hampshire Ins. Co.*, 962 F.Supp.2d 509, 512 (S.D.N.Y. 2013). Likewise, in *Newmont U.S.A. Limited. v. Insurance Company of North America*, 615 F.3d 1268, 1276–77 (10th Cir. 2010), the Tenth Circuit held that parties could set their own post-judgment interest rate via contract, and the arbitration panel could honor such agreements if the language was sufficiently explicit.

Tupi argues that the parties to this agreement used such unequivocal language. This is not a situation in which a contract includes a generic clause with a higher rate of interest to be applied until payment is made. Rather, the Contract included a specific interest rate. In addition, *in the arbitration clause itself*, the parties agreed that "the Tribunal shall also fix an appropriate rate of interest from the date of the award *until the award is paid in full*." Dkt. No. 1-4, Section 24.3(f) (emphasis added). In accordance therewith, the Tribunal specifically held that all unpaid amounts would continue to accrue

interest "at the Prime Rate as published from time to time in the Wall Street Journal . . . *until such amount is paid in full.*" Award ¶ 645 (emphasis added). Accordingly, the Wall Street Journal Prime Rate from time to time in effect applies to the calculation of post-judgment as well.

### 5. Tupi is Entitled to Legal Fees Incurred in Connection with this Proceeding

In the Second Circuit, district courts have inherent and statutory authority (under 28 U.S.C. § 1927) to sanction parties and lawyers for conduct that impedes the efficient administration of justice. *Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267, 280 (2d Cir. 2021). As this Court has previously explained, as a vehicle for discouraging losing parties in arbitration from bringing meritless challenges to arbitral awards, a court can invoke its inherent powers to award attorneys' fees:

> When the court's "inherent equitable power" is "applied to suits for the confirmation and enforcement of arbitration awards, the guiding principle has been [that] 'when a challenger refuses to abide by an arbitrator's decision without justification, attorney's fees and costs may properly be awarded.'" *Id.* at 819-20 (quoting *Int'l Chern. Workers Union (AFL-CIO), Local No. 227 v. BASF Wyandotte Corp.*, 774 F.2d 43, 47 (2d Cir. 1985)

*Drywall Tapers & Pointers of Greater New York Loc. Union 1974 v. Drywall & Acoustics of Ne., Inc.*, 2023 WL 8602924, at *3 (S.D.N.Y. Dec. 12, 2023) (citations omitted); Zaslowsky Decl., Ex. S. Moreover, the arbitration was governed by the ICC Rules, Article 35 of which states that "by submitting the dispute to arbitration under the Rules, the parties undertake to carry out any award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made."[9]

The Second Circuit fully supports an award of attorneys' fees in situations like the one facing the Court. *See First Nat'l Supermarkets, Inc. v. Retail, Wholesale & Chain Store Food Enrol. Union, Local 228*, 118 F.3d 893, 898 (2d Cir. 2007) (in actions for the confirmation and enforcement of arbitral awards, a court may award attorneys' fees if the party challenging the award has "refused to abide by an arbitrator's decision without justification."). More recently, the Second Circuit explained that when a court's "inherent

---

[9] The 2017 version of the ICC Rules, which governed the arbitration in this case, can be found at https://www.international-arbitration-attorney.com/wp-content/uploads/2017/07/2017-ICC-Arbitration-Rules.pdf.

equitable power" is "applied to suits for the confirmation and enforcement of arbitration awards, the guiding principle has been [that] 'when a challenger refuses to abide by an arbitrator's decision without justification, attorney's fees and costs may properly be awarded.'" *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 819–820 (2d Cir. 2022) (citations omitted).

"When a party who loses an arbitration award . . . drags the dispute through the court system without an objectively reasonable belief it will prevail, the promise of arbitration is broken" and "that party should pay sanctions." *Trs. of the N.Y. State Nurses Ass'n Pension Plan v. White Oak Glob. Advisors, LLC*, 102 F.4th 572, 615 (2d Cir. 2023) (quoting *B.L. Harbert Int'l, LLC v. Hercules Steel Co.*, 441 F.3d 905, 914 (11th Cir. 2006)). The Second Circuit stated, "we easily agree with the district court that some sanctions were warranted, as the record supports its conclusion that White Oak advanced a number of arguments that were so completely lacking in merit as to require the conclusion that they must have been undertaken in bad faith." *Id.* The Second Circuit went on to explain that sanctions may be assessed even if some of a challenger's arguments have merit:

> Nonetheless, a party who frustrates an arbitration award in bad faith is not immune from sanctions merely because its arguments are not uniformly meritless. District courts are permitted to "assess and allocate specific litigation expenses" based on their findings, and a party's appropriate behavior in one area does not excuse its sanctionable conduct in another. We have made clear that "even a single bad-faith filing" may demonstrate the bad faith and lack of color prerequisites to an imposition of monetary sanctions, and the offending party may, where appropriate, be sanctioned even where the party advanced meritorious arguments alongside its sanctionable ones.

*Id.* at 616 (citations omitted); *see also Trs. of the New York City Dist. Council of Carpenters Pension Fund v. Jessica Rose Enters. Corp.*, 2016 WL 6952345, at *5 (S.D.N.Y. Nov. 28, 2016) (awarding attorneys' fees to the award creditor where the award debtor failed to provide "any justification" for its failure to comply with the award).

To like effect, Judge Easterbrook recently said that many decisions "hold that woebegone contests to arbitrators' awards are sanctionable. Anything less makes a mockery of arbitration's promise to

- 24 -

expedite and cut the costs of resolving disputes." *Am. Zurich Ins. Co. v. Sun Holdings, Inc.*, 103 F.4th 475 (7th Cir. 2024).

I agree that CMGT's petition to vacate the Award is nothing more than a "woebegone" and meritless attempt to appeal the Tribunal's decision to this Court – using arguments that the Tribunal itself has already ruled to be "frivolous" and meriting an award of attorneys' fees to Tupi. CMGT has no basis for refusing to pay the Award. In its petition to vacate the Award, CMGT fails to submit even colorable arguments for vacatur and ignores binding precedent fatal to its public policy, exceeding authority, and "misbehavior" arguments. CMGT and its counsel should therefore be sanctioned in the amount of the attorneys' fees Tupi is being forced to expend in this judicial proceeding. Without awarding attorneys' fees as sanctions, parties will continue to find lawyers who refuse to recognize that, having chosen the arbitration bed, "they must lie in it." *AmTrust N. Am., Inc.*, 2016 U.S. Dist. LEXIS 44889, at *9.

Tupi has 14 business days to submit to the Court a formal request for attorneys' fees incurred in connection with this proceeding (not the underlying arbitration, but the proceeding to vacate/confirm).

## **PRAYER FOR RELIEF**

For all the reasons set forth above, the petition to vacate the Award is DENIED and Tupi's cross motion for confirmation of the Award is GRANTED. Tupi should immediately submit a form of judgment to the Court for entry. The judgment should include pre- and post-Award interest as authorized by the Tribunal and post-judgment interest in accordance with this opinion. It should also include an award of attorneys' fees incurred in this proceeding.

The Clerk of Court is directed to remove the motion at Dkt. No. 31 from the Court's list of open motions. We will close the case when the final judgment is entered.

This constitutes the decision and order of the Court. It is a written decision.

Dated: New York, New York
June 25, 2026

_____
U.S.D.J

BY ECF TO ALL COUNSEL